Katherine B. Harrison
Jason Snyder
PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York  10020
Telephone: 212-785-9100
Attorneys for Plaintiffs

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                :

In re:                              :       Chapter 11

CABRINI MEDICAL CENTER,      :       Case No. 09-14398 (AJG)

                 Debtor.    :

------------------------------------------------------------x
MANNUCCIO MANNUCCI, GUIDO PADULA, :
DILVA SALVIONI and ANGELO TARANTA  :      Adv. Pro. No. _____

               Plaintiffs,   :

     vs.                   :       **COMPLAINT**

CABRINI MEDICAL CENTER,        :

              Defendant.  :

------------------------------------------------------------x

     Plaintiffs MANNUCCIO MANNUCCI, GUIDO PADULA, DILVA SALVIONI and ANGELO TARANTA (collectively, "Plaintiffs") hereby assert the following claims against defendant Debtor, CABRINI MEDICAL CENTER ("Cabrini" or the "Debtor"), and allege as follows:

## Nature of the Action

1.     This is an adversary proceeding under the Bankruptcy Code and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq. ("ERISA"), to recover millions of dollars of Plaintiffs' ERISA deferred compensation benefits wrongfully looted by the Debtor.  Because Plaintiffs' ERISA benefit funds were not owned by the Debtor – and were being held in separate accounts for the benefit of each doctor (designated as such by Cabrini) – those funds are not part of the Debtor's estate and should be returned in full to the Plaintiffs under Section 541(b)(7) of the Bankruptcy Code.

2.     Plaintiffs are three physicians now in their 80s, and the widow of a physician, all of whom dedicated their lives and careers to medicine at Cabrini.  Dr. Padula, Dr. Taranta, Dr. Salvioni, Mrs. Salvioni, and Dr. Mannucci are also referred to herein as the "Doctors."  Each is a beneficiary of at least one ERISA deferred compensation plan into which Cabrini deposited thousands of dollars of the Doctors' compensation which was to be "deferred" until the Doctors retired and then paid out to them either by lump sum or according to a life-expectancy formula under the plans. Starting with deposits in the 1960s, the Doctors' funds grew in four segregated, funded, investment brokerage accounts, ultimately to millions of dollars.  Each segregated account was either in the name of the doctor, or designated as "for the account of" each doctor.

3.     In total disregard of its fiduciary duties to the Doctors under ERISA, Cabrini collected the Doctors' money, placed it in brokerage accounts in the Doctors' names for many years and then failed to distribute the money when the Doctors retired

according to the terms of the deferred compensation plans that Cabrini itself had drafted. Cabrini admitted this breach in a 1997 letter to each of the Doctors.

4. On information and belief, when Cabrini finally did begin making the yearly distributions, Cabrini made inadequate payments and stretched out the payments far beyond what the plan terms allowed, again in breach of its ERISA fiduciary duties.

5. As a result, Dr. Salvioni, who retired in 1980 and should have received all of his deferred compensation no later than 2000 (pursuant to the terms of his deferred compensation plan), died in November 2007 with Cabrini improperly having failed to pay him (and holding in his account) $619,455 of his deferred compensation. Instead of paying Dr. Salvioni the money in Dr. Salvioni's account, in 2006 and 2007 Cabrini looted Dr. Salvioni's account, effectively stealing his ERISA pension funds. His widow and beneficiary, Plaintiff Dilva Salvioni, has been battling in state court and bankruptcy proceedings since that time to recover the retirement money that he earned, which is governed and protected by ERISA.

6. Dr. Padula also retired in 1980 and should have received all of his deferred compensation no later than 2000 pursuant to the terms of his deferred compensation plan. Instead of paying Dr. Padula the money in Dr. Padula's account, in 2006 and 2007 Cabrini looted Dr. Padula's account, effectively stealing his ERISA pension funds totaling $265,833. Dr. Padula has been battling in state court and bankruptcy proceedings since that time to recover the retirement money that he earned, which is governed and protected by ERISA.

7. Dr. Taranta retired in 1995 and should have received all of his deferred compensation no later than 2007 and 92.3077% of his deferred compensation

by the time Cabrini began looting his account in 2006, pursuant to the terms of his deferred compensation plan. Instead of paying Dr. Taranta the money in Dr. Taranta's account, in 2006 and 2007 Cabrini looted Dr. Taranta's account, effectively stealing his ERISA pension funds totaling $1,298,724. Dr. Taranta has been battling in state court and bankruptcy proceedings since that time to recover the retirement money that he earned, which is governed and protected by ERISA.

8.     Dr. Mannucci retired in 2000 and should have received all of his deferred compensation no later than 2010 and 60% of his deferred compensation by the time Cabrini began looting his account in 2006, pursuant to the terms of his deferred compensation plan. Instead of paying Dr. Mannucci the money in Dr. Mannucci's account, in 2006 and 2007 Cabrini looted Dr. Mannucci's account, effectively stealing his ERISA pension funds totaling $771,843. Dr. Mannucci has been battling in state court and bankruptcy proceedings since that time to recover the retirement money that he earned, which is governed and protected by ERISA.

9.     By 2006, Cabrini failed to pay in excess of $2 million dollars of the Doctors' deferred compensation funds that were required to have been paid out years earlier under the respective deferred compensation plan terms. Having knowingly failed to distribute Plaintiffs' funds when Cabrini was required to, in November 2006, without Plaintiffs' authorization, and in flagrant breach of the respective deferred compensation plan terms and ERISA, Cabrini looted almost $2 million from Plaintiffs' deferred compensation accounts, which at that time were at Merrill Lynch.

10.     In early to mid-2007, Cabrini cleaned out all of the remaining funds in Plaintiffs' accounts at Merrill Lynch. Thus, without Plaintiffs' authorization, from late

2006 to mid-2007, Cabrini improperly took a total of approximately $2,956,176 from Plaintiffs' deferred compensation accounts.

11.    In October 2007, Cabrini admitted that it withdrew a total of $2,956,176 from the four Plaintiffs' deferred compensation accounts.

12.    Plaintiffs here seek to recover their funds in full, which were not Cabrini's funds.  Cabrini failed to distribute to Plaintiffs as required by their respective deferred compensation plans, and then in 2006 and 2007 stole such funds. Accordingly, such funds could never have lawfully passed into Cabrini's bankruptcy estate.

## Jurisdiction and Venue

13.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §157, 28 U.S.C. §1331, and 28 U.S.C. §1334, because the claims asserted arise under the laws of the United States.

14.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

15.    This adversary proceeding is commenced under 11 U.S.C. §541 and Rule 7001(1), (2), (7) and (9) of the Federal Rules of Bankruptcy Procedure.

16.    Venue is proper in this district under 28 U.S.C. §1409(a).

## The Parties

17.     Plaintiff Guido Padula is a radiologist who was affiliated with Cabrini Hospital for many years until his retirement in 1980.  Dr. Padula is a resident of New York, New York.   He is currently 85.  Dr. Padula is a participant and beneficiary of the Padula Deferred Compensation Plans (as defined below).  During his employment with Cabrini, Dr. Padula served as Assistant Director of Radiology but was not part of the hospital's executive management nor was he a highly compensated employee.  Dr. Padula did not have sufficient influence within Cabrini to negotiate compensation agreements that would have protected his interests without the protection of ERISA.

18.     Plaintiff Dilva Salvioni is the widow of Daniele Salvioni, who died in November 2007.  Mrs. Salvioni is a resident of Florence, Italy.  Dr. Salvioni was the Director of Radiology at Cabrini from 1964 to 1993.  He designated Mrs. Salvioni as his beneficiary under the terms of the Salvioni Deferred Compensation Plans (as defined below).   During his employment with Cabrini, Dr. Salvioni served as Director of Radiology but was not part of the hospital's executive management.  Dr. Salvioni did not have sufficient influence within Cabrini to negotiate compensation agreements that would have protected his interests without the protection of ERISA.

19.     Plaintiff Angelo Taranta is a physician who was affiliated with Cabrini Hospital for more than two decades until his retirement in 1995.  He served as the Director of Medicine for many of those years.  Dr. Taranta is a resident of Oakland, California.   He is currently 84.   Dr. Taranta is a participant and beneficiary of the Taranta Deferred Compensation Plan (as defined below).  During his employment with Cabrini, Dr. Taranta served as Director of Medicine but was not part of the hospital's

executive management. Dr. Taranta did not have sufficient influence within Cabrini to negotiate compensation agreements that would have protected his interests without the protection of ERISA.

20. Plaintiff Mannuccio Mannucci is a psychiatrist who was affiliated with Cabrini from 1974 until his retirement in 2000. He served as Director of the Inpatient Service from 1974 to 1981 and then Chairman of the Department of Psychiatry from 1981 to 1996. Dr. Mannucci is a resident of New York, New York. He is currently 85. Dr. Mannucci is a participant and beneficiary of the Mannucci Deferred Compensation Plan (as defined below). During his employment with Cabrini, Dr. Mannucci was not part of the hospital's executive management. Dr. Mannucci did not have sufficient influence within Cabrini to negotiate compensation agreements that would have protected his interests without the protection of ERISA.

21. Until it filed for bankruptcy, Cabrini Medical Center was a New York not-for-profit corporation with its principal place of business at 227 East 19th Street, New York, New York 10003.

<b>The Deferred Compensation Plans</b>

**Dr. Padula's Deferred Compensation Plans**

22. In or about January 1967, Cabrini (then known as Columbus Hospital) set up the first deferred compensation plan for Dr. Padula (the "First Padula Plan"). A copy of the First Padula plan is attached hereto as <u>Exhibit A</u>.

23. Under the terms of the First Padula Plan, Cabrini would deposit $3,000 per year of "additional compensation" for Dr. Padula into an account at Irving

Trust Company where the funds would be invested in mutual fund shares and all dividends and other earnings would be reinvested.

24.     The First Padula Plan directed that distributions to Dr. Padula or his designated beneficiary would begin upon termination of Dr. Padula's employment with Cabrini for any reason.  The First Padula Plan also directed that Cabrini, after consulting with Dr. Padula, adopt a method of distribution of the funds either in a lump sum, ten equal installments, or "life expectancy installments."

25.     In or about April 1975, Cabrini set up a second deferred compensation plan for Dr. Padula (the "Second Padula Plan"), the terms of which were similar to the First Padula Plan.  A copy of the Second Padula plan is attached hereto as Exhibit B.

26.     The purpose of the Second Padula Plan was to

provide for the uninterrupted services of Employee in such capacities as shall be assigned by the Board of Directors of the Corporation until he reaches the age of sixty-five (65) and thereafter to have the advantage of his services in a consulting and advisory capacity.

Second Padula Plan at p. 1.

27.     The Second Padula Plan expressly provided:  "During the lifetime of Employee this Agreement may be amended or terminated, in whole or in part, by the mutual written agreement of Employee and the Board of Directors of [Cabrini]; provided, however, that no amendment or termination shall cause the payment of benefits provided herein to become forfeitable to the Employee."  Second Padula Plan ¶ 11.

28.     At the time he entered into the First Padula Plan and the Second Padula Plan (collectively referred to as the "Padula Deferred Compensation Plans"), Dr. Padula believed that such Deferred Compensation Plans were clear that the money

invested pursuant to the Padula Deferred Compensation Plans was Dr. Padula's property and not subject to forfeiture to Cabrini. Dr. Padula never believed that Cabrini could take the money set aside in his pension account – which was entitled "for the benefit of Dr. Guido Padula."

29. According to Cabrini's records, Dr. Padula retired from Cabrini in October 1980. Upon Dr. Padula's retirement, Dr. Padula became fully vested in the Padula Deferred Compensation Plans and Cabrini was obligated to begin making distributions pursuant to the express terms set forth in the Padula Deferred Compensation Plans.

**Dr. Salvioni's Deferred Compensation Plans**

30. In or about December 1973, Cabrini (then known as Columbus Hospital) set up the first deferred compensation plan for Dr. Salvioni (the "First Salvioni Plan"). A copy of the First Salvioni Plan is attached hereto as Exhibit C.

31. The purpose of the First Salvioni Plan was to

provide for the uninterrupted services of Employee in such capacities as shall be assigned by the Board of Directors of the Corporation until he reaches the age of sixty-five (65) and thereafter to have the advantage of his services in a consulting and advisory capacity.

See First Salvioni Plan at p. 1.

32. Under the terms of the First Salvioni Plan, Cabrini would invest $14,000 per year of "additional compensation" for Dr. Salvioni in mutual fund shares, and all dividends and other earnings would be reinvested.

33. The First Salvioni Plan directed that distributions to Dr. Salvioni or his designated beneficiary would begin upon termination of Dr. Salvioni's employment with Cabrini for any reason. The First Salvioni Plan also directed that Cabrini, after

consulting with Dr. Salvioni, adopt a method of distribution of the funds either in a lump sum, ten equal installments, or "life expectancy installments."

34.    In or about August 1978, Cabrini set up a second deferred compensation plan for Dr. Salvioni (the "Second Salvioni Plan"), the terms of which were similar to the First Salvioni Plan.  The Second Salvioni Plan was signed by Sister Josephine Tsue for Cabrini.  A copy of the Second Salvioni Plan is attached hereto as Exhibit D.

35.    The Second Salvioni Plan directed that distributions to Dr. Salvioni or his designated beneficiary would begin upon termination of Dr. Salvioni's employment with Cabrini.  "Employee, or his beneficiary, shall receive distributions, as hereinafter provided, as soon as practicable following Employee's termination of employment with the Corporation."  Second Salvioni Plan ¶ 5.

36.    The Second Salvioni Plan also directed that Cabrini adopt a method of distribution of the funds either in a lump sum or "life expectancy" installments calculated by Dr. Salvioni's life expectancy at the time of his first distribution with larger payments at the end of his expected years.

37.    The Second Salvioni Plan expressly provided:  "During the lifetime of Employee this Agreement may be amended or terminated, in whole or in part, by the mutual written agreement of Employee and the Board of Directors of [Cabrini]; provided, however, that no amendment or termination shall cause the payment of benefits provided herein to become forfeitable by the Employee."  Second Salvioni Plan ¶ 10.

38.    At the time he entered into the First Salvioni Plan and the Second Salvioni Plan (collectively referred to herein as the "Salvioni Deferred Compensation

Plans"), Dr. Salvioni believed that the Salvioni Deferred Compensation Plans were clear that the money invested pursuant to such plans was Dr. Padula's property and not subject to forfeiture to Cabrini. Dr. Salvioni never believed that Cabrini could take the money set aside in his pension account – which was entitled "for the benefit of Dr. Daniele Salvioni."

39.    On September 17, 1997, Dr. Salvioni designated in writing that his wife, Dilva Salvioni be his principal beneficiary in his deferred compensation plan. He designated his children as secondary beneficiaries.

40.    According to Cabrini's records, Dr. Salvioni retired from Cabrini in October 1980. Upon Dr. Salvioni's retirement, Dr. Salvioni became fully vested in the Salvioni Deferred Compensation Plans and Cabrini was obligated to begin making distributions pursuant to the express terms set forth in the Salvioni Deferred Compensation Plans.

**Dr. Taranta's Deferred Compensation Plan**

41.    In or about December 1975, Cabrini set up a deferred compensation plan for Dr. Taranta (the "Taranta Deferred Compensation Plan"). A copy of the Taranta Deferred Compensation Plan is attached hereto as Exhibit E. The purpose of the Taranta Deferred Compensation Plan was to

> provide for the uninterrupted services of Employee in such capacities as shall be assigned by the Board of Directors of the Corporation until he reaches the age of sixty-five (65) and thereafter to have the advantage of his services in a consulting and advisory capacity.

See Taranta Plan at p. 1.

42.     Pursuant to the Taranta Deferred Compensation Plan, Cabrini would deposit $13,880 in compensation for Dr. Taranta into an account that would invest in mutual fund shares, and all distributions and dividends would be reinvested.

43.     The Taranta Deferred Compensation Plan directed that distributions to Dr. Taranta or his designated beneficiary would begin upon termination of Dr. Taranta's employment with Cabrini for any reason.   The Taranta Deferred Compensation Plan also directed that Cabrini adopt a method of distribution of the funds either in a lump sum or life expectancy installments calculated by Dr. Taranta's life expectancy at the time of his first distribution with larger payments at the end of his expected years.

44.     The Taranta Deferred Compensation Plan expressly provided: "During the lifetime of Employee this Agreement may be amended or terminated, in whole or in part, by the mutual written agreement of Employee and the Board of Directors of [Cabrini]; provided, however, that no amendment or termination shall cause the payment of benefits provided herein to become forfeitable to the Employee."

45.     At the time he entered into the Taranta Deferred Compensation Plan, Dr. Taranta believed that such plan was clear that the money invested pursuant to the Taranta Deferred Compensation Plan was Dr. Taranta's property and not subject to forfeiture to Cabrini.   Dr. Taranta never believed that Cabrini could take the money set aside in his pension account – which was entitled "for the benefit of Dr. Angelo Taranta."

46.     According to Cabrini's records, Dr. Taranta retired from Cabrini in 1995.  Upon Dr. Taranta's retirement, Dr. Taranta became fully vested in the Taranta

Deferred Compensation Plan and Cabrini was obligated to begin making distributions pursuant to the express terms set forth in the Taranta Deferred Compensation Plan.

**Dr. Mannucci's Deferred Compensation Plan**

47.     On information and belief, in the mid-1970s, Cabrini set up a deferred compensation plan for Dr. Mannucci (the "Mannucci Deferred Compensation Plan"). On information and belief, pursuant to the Mannucci Deferred Compensation Plan, each year, Cabrini deposited part of Dr. Mannucci's annual compensation into an account which would be invested in mutual fund shares and the Mannucci Deferred Compensation Plan directed that distributions to Dr. Mannucci or his designated beneficiary would begin upon termination of Dr. Mannucci's employment with Cabrini.

48.     According to Cabrini's records, Dr. Mannucci retired from Cabrini in 2000. Upon Dr. Mannucci's retirement, Dr. Mannucci became fully vested in the Mannucci Deferred Compensation Plan and Cabrini was obligated to begin making distributions pursuant to the express terms set forth in the Mannucci Deferred Compensation Plan.

49.     The Mannucci Deferred Compensation Plan, the Taranta Deferred Compensation Plan, the Padula Deferred Compensation Plans, and the Salvioni Deferred Compensation Plans (collectively, the "Deferred Compensation Plans") are all ERISA benefit plans within the meaning of the statute.

50.     Cabrini is the administrator and sponsor of the Deferred Compensation Plans within the meaning of ERISA.

51.     Cabrini is an ERISA fiduciary with respect to the Deferred Compensation Plans within the meaning of ERISA.

52.     Plaintiffs were not part of a select group of Cabrini's management.

53.     None of the Doctors had sufficient influence within Cabrini to negotiate compensation agreements that would have protected his interests without the protection of ERISA.

54.     None of the Doctors negotiated the terms of his Deferred Compensation Plan.

## The Segregation and Funding of the Plans

55.     From the inception of each Deferred Compensation Plan, Cabrini segregated and funded each Deferred Compensation Plan, setting up separate investment accounts for each doctor.

56.     On information and belief, in or about 1998, Cabrini moved the Deferred Compensation Plans and their investments to four individual accounts at Merrill Lynch – one for each of the Doctors, in the name of each of the Doctors.

57.     Plaintiffs' funds were placed in the following separate Merrill Lynch accounts:

| | |
|---|---|
| Dr. Padula: | Account # 855-07N58 |
| Dr. Salvioni: | Account # 855-07N57 |
| Dr. Taranta: | Account # 855-07N61 |
| Dr. Mannucci: | Account # 855-07N59 |

58.     From the creation of the Merrill Lynch accounts in or about 1998 forward, Drs. Padula, Salvioni, Taranta and Mannucci each received monthly statements from Merrill Lynch titled in their individual names: "FAO Dr. Guido Padula," "FAO Dr. Daniele Salvioni," "FAO Dr. Angelo Taranta" and "FAO Dr. Mannuccio Mannucci." On information and belief, "FAO" stands for "for the account of."

59.     Thus, for close to ten years, Merrill Lynch sent monthly account statements to each Doctor, setting forth the current amounts in the Doctors' accounts. Nowhere in the statements does it say that these assets are assets of Cabrini, or that these assets have not vested, or that the Doctors have no right to such assets. <u>See</u> representative examples of the Merrill Lynch account statements attached hereto as Exhibits <u>F</u>, <u>G</u>, <u>H</u>, and <u>I</u>.

60.     By late 2006, after the Plaintiffs had worked for Cabrini for decades and had allowed Cabrini to withhold their compensation and place it into their Deferred Compensation Plans, their investments had grown to a total value of millions of dollars, according to their Merrill Lynch account statements:

Padula Deferred Compensation Plan (as of 10/06):        $256,930.00
Salvioni Deferred Compensation Plan (as of 10/31/06):   $598,683.80
Taranta Deferred Compensation Plan (as of 10/06):       $1,238,567.84
Mannucci Deferred Compensation Plan (as of 10/31/06):   $735,440.77.

### 1980-1997: Cabrini's Failure to Make the Deferred Compensation Plan Distributions to the Doctors According to the Terms of the Plans

#### Dr. Padula

61.     According to Cabrini's records, Dr. Padula retired in October 1980.

62.     Under the terms of the First Padula Plan (at Section Sixth), distributions were to begin on the "first day of the second full month occurring after" termination of employment for any reason whatsoever.

63.     Under the Second Padula Plan (¶ 5), distributions were to begin "as soon as practicable following Employee's termination of employment with the Corporation."

64.     However, in breach of its fiduciary duties and obligations under the First Padula Plan, Cabrini did not consult with Dr. Padula as to which distribution method to use and, on information and belief, the "Directors of the Corporation" did not adopt a mode of distribution at all, as required by the Second Padula Plan.   On information and belief, in breach of its fiduciary duties and in breach of the Padula Deferred Compensation Plans' terms, Cabrini failed to make any distribution immediately following Dr. Padula's retirement from Cabrini in 1980.

65.     On information and belief, in breach of its fiduciary duties, Cabrini did not make a lump sum distribution to Dr. Padula and did not even begin making distributions to him until approximately 1997 – close to seventeen years after he retired.

66.     Under the "life expectancy" formula mode of distribution set forth in the Padula Deferred Compensation Plans, given that Dr. Padula retired in 1980 at age 55, according to the 1980 Vital Statistics of the United States Life Tables for white males (attached as Exhibit J), his life expectancy at that point was an additional 21 years.   Thus, pursuant to the terms of the Padula Deferred Compensation Plans, the longest Cabrini was permitted to make annual payments to Dr. Padula – assuming Cabrini had properly elected at the time of Dr. Padula's retirement to make annual payments based on Dr. Padula's life expectancy – was within 21 years of his retirement.

67.     Thus, had Cabrini followed the terms of the Padula Deferred Compensation Plans, Dr. Padula would have received his final distribution no later than 2000, long before Cabrini removed the money from his Merrill Lynch account in 2006-2007.  (See the chart attached as Exhibit K hereto indicating the payments that should have been made to Dr. Padula under the terms of the Padula Deferred Compensation

Plans, assuming that Cabrini properly elected to make annual payments based on Dr. Padula's life expectancy (the "Required Payments Chart").)

**Dr. Salvioni**

68.     According to Cabrini's records, Dr. Salvioni retired in October 1980.

69.     Under the Salvioni Deferred Compensation Plans (¶ 5), distributions were to begin "as soon as practicable following Employee's termination of employment with the Corporation."

70.     However, in breach of its fiduciary duties and obligations under the Salvioni Deferred Compensation Plans, on information and belief, the "Directors of the Corporation" did not adopt a mode of distribution.  On information and belief, in breach of its fiduciary duties and in breach of the Salvioni Deferred Compensation Plans' terms, Cabrini failed to make any distribution immediately following Dr. Salvioni's retirement from Cabrini in 1980.

71.     Under the "life expectancy" formula mode of distribution set forth in the Salvioni Deferred Compensation Plans, given that Dr. Salvioni retired in 1980 at age 55, according to the 1980 Vital Statistics of the United States Life Tables for white males (attached as Exhibit J), his life expectancy at that point was an additional 21 years.   Thus, pursuant to the terms of the Salvioni Deferred Compensation Plans, the furthest Cabrini was permitted to stretch out annual payments to Dr. Salvioni – assuming Cabrini had properly elected at the time of Dr. Salvioni's retirement to make annual payments based on Dr. Salvioni's life expectancy – was within 21 years of his retirement.

72.    Thus, had Cabrini followed the terms of the Salvioni Deferred Compensation Plans, Dr. Salvioni would have received his final distribution no later than 2000, long before Cabrini removed the money from his Merrill Lynch account in 2006-2007.  (See the Required Payments Chart attached as Exhibit K hereto indicating the payments that should have been made to Dr. Salvioni under the terms of the Salvioni Deferred Compensation Plans, assuming that Cabrini properly elected to make annual payments based on Dr. Salvioni's life expectancy.)

**Dr. Taranta**

73.    According to Cabrini's records, Dr. Taranta retired in 1995.

74.    Under the Taranta Deferred Compensation Plan (¶ 5), distributions were to begin "as soon as practicable following Employee's termination of employment with the Corporation."

75.    However, in breach of its fiduciary duties and obligations under the Taranta Deferred Compensation Plan, on information and belief, the "Directors of the Corporation" did not adopt a mode of distribution.  On information and belief, in breach of its fiduciary duties and in breach of the Taranta Deferred Compensation Plan's terms, Cabrini failed to make any distributions immediately following Dr. Taranta's retirement from Cabrini in 1995.

76.    Under the "life expectancy" formula mode of distribution set forth in the Taranta Deferred Compensation Plan, given that Dr. Taranta retired in 1995 at age 68, according to the 1995 Vital Statistics of the United States Life Tables for white males (attached as Exhibit L), his life expectancy at that point was an additional 13 years.    Thus, pursuant to the terms of the Taranta Plan, the longest Cabrini was

permitted to make annual payments to Dr. Taranta – assuming Cabrini had properly elected at the time of Dr. Taranta's retirement to make annual payments based on Dr. Taranta's life expectancy – was within 13 years of his retirement.

77.     Thus, had Cabrini followed the terms of the Taranta Deferred Compensation Plan, it already would have paid out 92.3077% of Dr. Taranta's funds to him by the time it began looting his account in 2006.  (See the Required Payments Chart attached as <u>Exhibit K</u> hereto, indicating the payments that should have been made to Dr. Taranta under the terms of the Taranta Deferred Compensation Plan.) Moreover, Cabrini was required pursuant to the terms of the Taranta Deferred Compensation Plan to pay 100% of Dr. Taranta's funds to him prior to the time the Debtor filed for bankruptcy in 2009.

**Dr. Mannucci**

78.     According to Cabrini's records, Dr. Mannucci retired in 2000 at the age of 74.  According to the 2000 Vital Statistics of the United States Life Tables for white males (attached as <u>Exhibit M</u>), Dr. Mannucci's life expectancy at that point was another 10 years.

79.     Thus, had Cabrini paid Dr. Mannucci under a "life expectancy" formula, he already would have received approximately 60% of his funds by 2006 when Cabrini looted his Merrill Lynch account. (See the Required Payments Chart at <u>Exhibit K</u>.)  Moreover, Cabrini was required pursuant to the terms of the Mannucci Deferred Compensation Plan to pay 90% of Dr. Mannucci's funds to him prior to the time the Debtor filed for bankruptcy in 2009.

**The 1997 "Tax Problem" Letter: Cabrini's Admission That it Had Not
Made the Required Distributions and that the Funds Belong to the Doctors**

80.     On April 8, 1997, almost 20 years after Drs. Padula and Salvioni
had retired and at a point in time at which they should either have been paid in full by
lump sum or paid approximately 85.7% of their funds under the "life expectancy
formula" (see the Required Payments Chart, Exhibit K), Cabrini wrote a letter to each of
the Doctors concerning a "tax problem" it had discovered, based on the fact that Cabrini
had not made a lump sum or any annual payments to them pursuant to the express
terms of the Deferred Compensation Plans.

81.     The letter admitted that: "The agreements all require payment to
commence to you as soon as practicable following your termination of employment. . . .
For reasons which are not clear, the required payments were not begun immediately
following your termination of employment."

82.     The letter went on to discuss possible remedial measures Cabrini
could take to cure its purported "tax reporting" problem, and in the course of doing so
made it very clear that Cabrini had made no payments under the Deferred
Compensation Plans:

> The options we have been given include (1) reporting the income back in
> the year of termination, (2) paying out your deferred compensation
> account in a lump sum this year and reporting it as income this year, and
> (3) paying out installment payments commencing this year but with a
> current lump sum payment equal to the total installments that would have
> been paid from the time of termination through the present. (emphasis
> added).

83.     Thus, although Cabrini had not distributed the funds to the
Doctors, Cabrini was advising them that, as of their retirement dates, they were entitled

to those funds and there were potential tax ramifications to the Doctors (whether or not the required payments were in fact made):

> Our attorneys advise us that under the tax rules governing deferred compensation arrangements, the IRS can argue that you were taxable on the full amount of your deferred compensation account in the year you terminated employment.
>
> *     *     *     *
>
> (Tax rules require you to be taxed when you first could have received the funds.)

Copies of Cabrini's April 8, 1997 letters to each of the Doctors are attached as Exhibit N.

84.     Cabrini's April 8, 1997 letter is an admission that, at least as of each of their retirement dates, Plaintiffs owned the funds in their deferred compensation accounts, not Cabrini.

85.     Of the three options Cabrini laid out in its April 8, 1997 letter (quoted above) to remedy the fact that it had not made the distributions required by the Deferred Compensation Plans, Cabrini carried out none of them.

86.     Despite its admission and full knowledge of its breach of fiduciary duties and breach of the Deferred Compensation Plan terms, Cabrini did not make full lump sum payments to any of the Doctors who had retired by 1997 – Drs. Padula, Salvioni and Taranta.  Neither did Cabrini begin installment payments with a "catch-up" lump sum payment "equal to the total installments that would have been paid from the time of the termination through the present."

87.     Instead, on information and belief, in 1997, Cabrini began making yearly distributions to Drs. Padula and Salvioni based on what appeared to be an arbitrary ten-year distribution schedule, such that in 1999, each doctor received 1/10 of

the balance of his Merrill Lynch account. The following year, in 2000, Dr. Padula and Dr. Salvioni each received 1/9 of the balance of his Merrill Lynch account. (See the Chart of actual distributions to each of the doctors attached as Exhibit O.)

88.     Although both Dr. Padula and Dr. Salvioni had retired 17 years earlier and were both then 72 years old, Cabrini willfully and maliciously chose to ignore the express terms of the Deferred Compensation Plans in violation of its fiduciary duty and ERISA obligations.

89.     On information and belief, in 1999 Cabrini began making yearly distributions to Dr. Taranta based on what appeared to be an arbitrary fourteen-year distribution schedule, such that in 1999, Dr. Taranta received 1/14 of the balance of his Merrill Lynch account. (See Exhibit O)

### Cabrini's Looting of Plaintiffs' Funds in 2006-2007

90.     In November 2006, without Plaintiffs' prior authorization, Cabrini's then-President and CEO Robert Chaloner sent a letter to each of the Plaintiffs stating that Cabrini was in desperate need of working capital in order to maintain its operations. "As a result, we must temporarily move [hundreds of thousands of dollars] from the deferred compensation investment account designated for your benefit into the Medical Center's general operating account." (the "Chaloner Letter" attached as Exhibit P). The letter also stated:

> It is expected that these funds, along with any interest that would have accrued, will be returned to the deferred compensation investment account during 2007. . . . Please be assured that Cabrini Medical Center is committed to fulfilling its obligation under the Deferred Compensation Agreement with you, including making the 2007 distribution, and will keep you informed of the progress of our efforts to replenish the deferred investment account.

91.     Plaintiffs did not consent to or authorize this conversion of the funds in their Deferred Compensation Plans, which was a breach of their Deferred Compensation Plans and in violation of ERISA.

92.     By Cabrini's own terms, Plaintiffs' Deferred Compensation Plan funds were not part of the Cabrini's "general operating account" or there would have been no need to move the funds from the Plaintiff's accounts into the hospital's general operating account.

93.     In breach of ERISA and the Deferred Compensation Plans, Cabrini admittedly took the following approximate amounts from Plaintiffs' Deferred Compensation Plans in late 2006:

| | |
|---|---|
| Dr. Padula Deferred Compensation Plans | $180,000 |
| Dr. Salvioni Deferred Compensation Plans | $619,424 |
| Dr. Taranta Deferred Compensation Plan | $818,000 |
| Dr. Mannucci Deferred Compensation Plan | $486,000 |

94.     The approximate total funds taken by Cabrini from Plaintiffs' accounts in late 2006 was $2,103,424.

95.     Not only did Cabrini not restore the money it took in late 2006 to the Deferred Compensation Plans as promised, in or about early-mid 2007, without the knowledge or authorization of Plaintiffs, in breach of ERISA and the Deferred Compensation Plans, Cabrini withdrew the remaining funds from each of the Deferred Compensation Plans, leaving Plaintiffs with nothing.

96.     In breach of ERISA and the Deferred Compensation Plans, Cabrini admittedly took the following approximate total amounts from Plaintiffs' Deferred Compensation Plans during the period from late 2006 to mid-2007:

| | |
|---|---|
| Dr. Padula Deferred Compensation Plans | $265,962 |

Dr. Salvioni Deferred Compensation Plans     $619,645
Dr. Taranta Deferred Compensation Plan     $1,298,724
Dr. Mannucci Deferred Compensation Plan     $771,843

97.    The approximate total of all of Plaintiffs' funds taken by Cabrini was $2,956,176.

98.    By letter dated October 23, 2007, in response to a request for information and documents, Cabrini admitted the following facts:

    a.    That Cabrini had Deferred Compensation Plans with each of Dr. Mannucci, Dr. Padula, Dr. Salvioni and Dr. Taranta;

    b.    That Cabrini had a Deferred Compensation Plan with Dr. Mannucci notwithstanding the fact that it could not locate the written agreement signed by him;

    c.    That Cabrini is the Administrator with respect to those Deferred Compensation Plans; and

    d.    That from 2006 to 2007, Cabrini withdrew the following amounts from the accounts set up for the Doctors' Deferred Compensation Plans:

        Dr. Padula     $265,962.29
        Dr. Salvioni     $619,645.51
        Dr. Taranta     $1,298,724.74
        Dr. Mannucci     $771,843.47

A copy of the October 23, 2007 letter is attached as <u>Exhibit Q</u>.

99.    In further breach of ERISA and their representations to Plaintiffs, Cabrini did not keep Plaintiffs informed as to any aspect of the Deferred Compensation Plans, ignoring Plaintiffs' many phone calls and letters of inquiry.

100.    In further breach of ERISA and the Deferred Compensation Plans, Cabrini failed to make any further distributions to Plaintiffs.

## FIRST CAUSE OF ACTION
### (Claim for $2,956,176 of ERISA Benefit Plan Funds
### Held by Cabrini But Not Property of the Debtor's Estate)

101.    Plaintiffs incorporate herein by reference paragraphs 1 through 100 of this Complaint as if set forth herein.

102.    The Deferred Compensation Plans were "employee benefit plans" within the meaning of ERISA.

103.    The deferred compensation funded into Plaintiffs' Merrill Lynch accounts was not the property of Cabrini at any time.  In the alternative, the deferred compensation became the property of Plaintiffs, at the latest, upon the retirement of each Plaintiff, when the benefits vested (1980 for Drs. Padula and Salvioni, 1995 for Dr. Taranta, and 2000 for Dr. Mannucci), well before Cabrini took the funds out of the accounts in 2006-2007.  In the second alternative, the deferred compensation was the property of Plaintiffs, at the latest, in 2000 for Drs. Padula and Salvioni, and in 2007 for Dr. Taranta, which is the latest Cabrini could have legally held on to such funds pursuant to the terms of the respective Plans; for Dr. Mannucci, 90% of the funds in Dr. Mannucci's deferred compensation account became Dr. Mannucci's property prior to the Debtor's filing of its bankruptcy petition.

104.    Pursuant to 11 U.S.C. §541(b)(7)(A) and (B), as ERISA employee benefits plan funds, because the funds in the Merrill Lynch accounts and any proceeds of such funds were not property of Cabrini, they are not property of the Cabrini estate in bankruptcy, but rather are property of Plaintiffs.

105.    Such funds must be returned to Plaintiffs in full.

## SECOND CAUSE OF ACTION
### (Claim for $2,956,176 Held in Trust for Plaintiffs by Cabrini)

106.    Plaintiffs incorporate herein by reference paragraphs 1 through 105 of this Complaint as if set forth herein.

107.    The Deferred Compensation Plans were "employee benefit plans" within the meaning of ERISA.

108.    In violation of ERISA and the terms of the Deferred Compensation Plans, Cabrini improperly held the funds in Plaintiffs' deferred compensation accounts that should have been paid out to Plaintiffs upon their respective retirements from Cabrini or soon thereafter, but in any event Cabrini was required to distribute such funds prior to the life expectancy of each doctor at the time of his respective retirement.

109.    At no time did Cabrini or the Estate have equitable title to such funds.

110.    At all times, Plaintiffs retained equitable title to their respective deferred compensation accounts.

111.    Pursuant to Section 541(d) of the Bankruptcy Code, property held in trust for another is not property of the bankruptcy estate and not available to satisfy the debtor's creditors.

112.    Such funds must be returned to Plaintiffs in full.

## THIRD CAUSE OF ACTION
### (Claim for $2,956,176 Held in Trust for Plaintiffs by Cabrini)

113.    Plaintiffs incorporate herein by reference paragraphs 1 through 112 of this Complaint as if set forth herein.

114.    The Deferred Compensation Plans were "employee benefit plans" within the meaning of ERISA.

115.    The funds placed into Plaintiffs' Merrill Lynch accounts became fully vested upon the Plaintiffs' respective retirement dates, all of which were well before Cabrini took the funds out of the accounts in 2006-2007.

116.    But for Cabrini's looting of such accounts, Plaintiffs' funds would still be located in their accounts at Merrill Lynch.

117.    Cabrini did not have equitable title to any of the Deferred Compensation Plan funds but held those funds in trust for the Plaintiffs.  As such, those funds did not become part of Cabrini's estate in bankruptcy pursuant to 11 U.S.C. §541(d).

118.    Such funds must be returned to Plaintiffs in full.

**FOURTH CAUSE OF ACTION**
**(Claim for $2,956,176 Held in Plaintiffs' Names**
**and Not Property of the Debtor's Estate)**

119.    Plaintiffs incorporate herein by reference paragraphs 1 through 118 of this Complaint as if set forth herein.

120.    Each of the Deferred Compensation Plans contains language to the effect that Plaintiffs do not have any right to the securities in the deferred compensation accounts, purchased by Cabrini in respect of the Deferred Compensation Plans, and that such securities remain the property of Cabrini.

121.    Despite such language, Cabrini subsequently waived legal title or any other claim to Plaintiffs' funds and created accounts at financial institutions, including Merrill Lynch, in Plaintiffs' names and for their benefit.

122.    Plaintiffs had, and continue to have, legal title to the deferred compensation accounts Cabrini improperly looted.

123.   As such, the funds did not become part of Cabrini's estate in bankruptcy and must be returned to Plaintiffs in full.

WHEREFORE, Plaintiffs respectfully request that the Court grant them the following relief:

a) An award of actual damages arising from Cabrini's wrongful taking of Plaintiffs' Deferred Compensation Plan funds in the amount of $2,956,176;

b) Pre- and Post-judgment interest at the applicable statutory rates;

c) An award of attorneys' fees and costs of this action pursuant to ERISA, 29 U.S.C § 1132(g);

d) Such other and further relief as the Court deems just and proper.

Dated: July 18, 2011

PADUANO & WEINTRAUB LLP

By: _____
       Katherine B. Harrison
       Jason Snyder

1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100

Attorneys for Plaintiffs
Mannuccio Mannucci, Guido Padula,
Dilva Salvioni and Angelo Taranta

# EXHIBIT A

SAMPLE DEFERRED COMPENSATION AGREEMENT

THIS AGREEMENT made at _____Columbus Hospital_____

this _Jan_ day of _1/67_ by and between _Columbus Hospital_
(hereinafter called "Employer") and _GUIDO PADULA_ (hereinafter
called "Employee".)

W I T N E S S E T H   T H A T :

WHEREAS, Employee is now in the employ of Employer, and

WHEREAS, Employer desires to secure the benefit of Employee's services,
knowledge and experience.

NOW, THEREFORE, this Agreement Witnesseth That:

FIRST: Employer agrees to employ Employee, and Employee agrees to work for
Employer, in active employment for _3000_ year(s) beginning _1/1/67_.

SECOND: Employee's regular compensation for such active employment shall be
payable at such rates and times as shall be mutually agreeable to Employee and Employer.

THIRD: Employer agrees to pay additional compensation of $ _3,000.00_ per
year of active employment. The additional compensation will be set aside by Employer
in an account set up with the Irving Trust Company in the Employer's name and inves-
ted in the shares of any open-end Investment Company under the management of Calvin
Bullock, Ltd. Employer agrees to reinvest all dividends, capital gain distributions
and other earnings from this account in additional Investment Company shares. The
value of all accumulations set aside as deferred compensation as well as earnings on
these accumulations shall be paid to Employee or his beneficiary under the conditions
set forth below. It is expressly understood that all securities in the account shall
at all times remain the property of Employer.

FOURTH: Employee shall have the right to designate a beneficiary and, from
time to time, to change such designation by written notice delivered to Employer. If
there is no designated beneficiary surviving when a payment is due, payment of any
benefits which may be payable shall be made to the person in, or divided equally
among all the persons in the first of the following classes in which there shall be
any survivors of Employee:

        (i)     his spouse;
        (ii)    his children;
        (iii)   his parents;
        (iv)    his brothers and sisters;
        (v)     his executors or administrators.

FIFTH: The period of active employment of Employee by Employer may be
extended for such further period or periods as the parties hereto shall mutually
agree.

SIXTH: Employee, or a beneficiary designated in writing by him, shall receive distributions beginning on the first day of the second full month occuring after whichever of the following events first occurs to Employee:

a. attaining age _____; or
b. termination of employment for any reason whatever; or
c. death.

SEVENTH: Starting with the first year of distribution, Employer or its agent, shall after consultation with Employee, adopt one of the following modes of distribution:

a. A lump sum distribution.
b. Ten equal installments.
   THE AMOUNT OF SUCH INSTALLMENTS SHALL BE: 1/10th of the
   then market value of the account during the first year,
   1/9th of the said value during the second year, and proceed-
   ing in larger fractions until at the end of ten years the
   entire fund has been distributed.
c. Life expectancy installments.
   THE NUMBER OF SUCH INSTALLMENTS SHALL BE the number of
   years in the Employee's life expectancy as may be actuaria-
   lly determined. The fraction paid each year shall progress
   in the same manner as under b. For example, if the life
   expectancy is 15 years, the first year there shall be paid
   1/15th, the second year 1/14th, and proceeding until distri-
   bution has been completed.

If distribution commences because of the death of Employee, the above modes of payment shall be available for distributions to the beneficiary of Employee.

EIGHTH: Employee shall elect whether to receive any of the above distributions in the form of cash, the form of mutual fund shares, or through the purchase of an annuity.

NINTH: The interests of Employee under this Agreement shall not be subject to alienation, assignment, garnishment, attachment, execution or levy of any kind.

TENTH: All matters pertaining to the construction, validity and effect of this Agreement shall be determined in accordance with the laws of the State of
_____.

This Agreement shall be binding upon the successors in interest of both Employer and Employee. Signed by the parties hereto at the day and year above written.

_____          _____
(EMPLOYER)                                        (EMPLOYEE)

# EXHIBIT B

SAMPLE

DEFERRED COMPENSATION AGREEMENT

THIS AGREEMENT, entered into this 1st day of April , 1975
by and between Cabrini Health Care Center - Columbus Hospital a
corporation organized and existing under the laws of New York State
(hereinafter referred to as "Corporation") and Dr. Guido Fadula
(hereinafter referred to as "Employee").

## W I T N E S S E T H :

WHEREAS, the Employee has acquired valuable knowledge and experience necessary
to the Corporation; and

WHEREAS, it is deemed to be in the best interest of the Corporation to pro-
vide for the uninterrupted services of Employee in such capacities as shall be assigned
by the Board of Directors of the Corporation until he reaches the age of sixty-five
(65) and thereafter to have the advantage of his services in a consulting and advisory
capacity; and

WHEREAS, the Corporation and Employee desire to enter into this Agreement
as an integral part of Employee's employment contract;

NOW THEREFORE, in consideration of the premises and in order to effectuate
their mutual desires, purposes and intentions, the parties do agree as follows:

1. The Corporation has employed Employee as Assistant Director of Radiology and
Employee agrees to faithfully perform such services and duties as shall be assigned
to him by the Board of Directors and the Corporation until he retires or dies, or until
his employment is otherwise terminated as provided herein. Employee shall be paid
by the Corporation a salary at such annual rate as shall be determined by the Board
of Directors of the Corporation from time to time.

2. Employee shall retire from the Corporation on the last day of the month
in which he attains his sixty-fifth (65th) birthday unless the Corporation requests,
and Employee agrees to continue his employment beyond that date. "Retirement" as
used in this Agreement shall refer to Employee's actual retirement from the Cor-
poration.

3. On or about the last day of each month beginning with the first month
of the calendar year following the day and year first above written, while Employee
remains in the employ of the Corporation, the Corporation will purchase in the name
of the Corporation, mutual fund shares of (Bullock Fund, Ltd., Dividend Shares, Inc.,

-1-

or New York Venture Fund, Inc.) in amounts totaling    Three Thousand

($   3,000.00    ) Dollars per annum in accordance with the terms of an Accumulation

Plan of such mutual fund which provides for the automatic reinvestment in additional

shares of said Fund of all dividends and distributions (both from income and capital

appreciation) which may accrue therefrom.  Employee shall have no right in such mutual

fund shares, which shall be the absolute property of the Corporation.

4.  Employee shall have the right to designate a beneficiary and, from time

to time, to change such designation by written notice delivered to the Corporation.

If there is no designated beneficiary surviving when a payment is due, payment of any

benefits which may be payable shall be made to the person in, or divided equally among

all the persons in the first of the following classes in which there shall be any

survivors of Employee:

> (a) his spouse;
> (b) his children;
> (c) his parents;
> (d) his brothers and sisters;
> (e) his executors or administrators.

5.  Employee, or his beneficiary, shall receive distributions, as hereinafter

provided, as soon as practicable following Employee's termination of employment with

the Corporation.

6.  Starting with the first year of distribution, the Directors of the Cor-

poration shall adopt one of the following modes of distribution;

(a)  A lump sum distribution equivalent to the value of the total

number of mutual fund shares accumulated by the Corporation

pursuant to this Agreement.

(b)  Periodic installments over any period not exceeding the Employee's

or beneficiary's life expectancy.

The number of such installments shall be measured by no more than

the number of years in the Employee's or beneficiary's life

expectancy at the time of initial distribution.  The fraction

determining the total yearly payment, shall become progressingly

greater.  For example, if life expectancy is fifteen years, for

the first year there shall be paid 1/15th of the value of the total

number of mutual fund shares accumulated by the Corporation pursuant

to this Agreement, for the second year 1/14th of the remaining value

at such time and preceeding until distribution has been fully com-

pleted at the fifteenth year.

-2-

7. Employee shall elect whether to receive any of the above distributions in the form of cash or mutual fund shares.

8. Employee and the Corporation may at any time agree in writing to the substitution of any other mutual fund or investment medium as the measured base for determination of the amounts of Employee's benefits under Paragraph 6. above.

9. Neither Employee nor his beneficiary shall have any right to commute, sell, assign, transfer or otherwise convey the right to receive any payments hereunder, which payments and the right thereto are expressly declared to be non-assignable, non-transferable and non-forfeitable, nor shall any interest of Employee herein be liable to any claim of any creditor or subject to any judicial process involving Employee.

10. This Agreement shall be binding upon the parties hereto, their successors, assigns, executors, beneficiaries or administrators.

11. During the lifetime of Employee this Agreement may be amended or terminated, in whole or in part, by the mutual written agreement of Employee and the Board of Directors of the Corporation; provided, however, that no amendment or termination shall cause the payment of benefits provided herein to become forfeitable to the Employee.

12. During the period which Employee is receiving payments hereunder he will render to the Corporation such services of any advisory or consultative nature as the Corporation may reasonably require, so that the Corporation may continue to have the benefit of his experience and knowledge of the affairs of the Corporation and he will be available for advice and consultation to the officers and Directors of the Corporation at all reasonable times by telephone, letter or in person, provided, however, that his failure to render such services or to give such advice and consultation by reason of his illness or unavailability shall not affect his right to receive such payments during such period. Employee shall not be required to render any reports to the Corporation, nor shall he be required to observe any regular office hours in connection with the provisions of this Paragraph 12.

IN WITNESS WHEREOF, the Corporation has caused this Agreement to be executed by its duly authorized officer, and Employee has hereunto set his hand and seal on the day and year first above written.

CORPORATION:   Cabrini Health Care Center
               Columbus Hospital

EMPLOYEE:      X _____

        (sgn)  _Vincent Mossien_

-3-

# EXHIBIT C

SAMPLE

DEFERRED COMPENSATION AGREEMENT

THIS AGREEMENT, entered into this 15 day of _____ December _____, 1973

by and between ___Columbus Hospital_____ a

corporation organized and existing under the laws of ___New York State___

(hereinafter referred to as "Corporation") and ·Dr. Daniele Salvioni___

(hereinafter referred to as "Employee").

W I T N E S S E T H :

WHEREAS, the Employee has acquired valuable knowledge and experience necessary
to the Corporation; and

WHEREAS, it is deemed to be in the best interest of the Corporation to pro-
vide for the uninterrupted services of Employee in such capacities as shall be assigned
by the Board of Directors of the Corporation until he reaches the age of sixty-five
(65) and thereafter to have the advantage of his services in a consulting and advisory
capacity, and

WHEREAS, the Corporation and Employee desire to enter into this Agreement
as an integral part of Employee's employment contract:

NOW THEREFORE, in consideration of the premises and in order to effectuate
their mutual desires, purposes and intentions, the parties do agree as follows:

1. The Corporation has employed Employee as ___Director of Radiology___ and
Employee agrees to faithfully perform such services and duties as shall be assigned
to him by the Board of Directors and the Corporation until he retires or dies, or until
his employment is otherwise terminated as provided herein. Employee shall be paid
by the Corporation a salary at such annual rate as shall be determined by the Board
of Directors of the Corporation from time to time.

2. Employee shall retire from the Corporation on the last day of the month
in which he attains his sixty-fifth (65th) birthday unless the Corporation requests,
and Employee agrees to continue his employment beyond that date. "Retirement" as
used in this Agreement shall refer to Employee's actual retirement from the Cor-
poration.

3. On or about the last day of each month beginning with the first month
of the calendar year following the day and year first above written, while Employee
remains in the employ of the Corporation, the Corporation will purchase in the name
of the Corporation, mutual fund shares of (Bullock Fund, Ltd., Dividend Shares, Inc.,

-1-

or New York Venture Fund, Inc.) in amounts totaling ___Fourteen Thousand

($ 14,000.00 ) Dollars per annum in accordance with the terms of an Accumulation
Plan of such mutual fund which provides for the automatic reinvestment in additional
shares of said Fund of all dividends and distributions (both from income and capital
appreciation) which may accrue therefrom. Employee shall have no right in such mutual
fund shares, which shall be the absolute property of the Corporation.

4. Employee shall have the right to designate a beneficiary and, from time
to time, to change such designation by written notice delivered to the Corporation.
If there is no designated beneficiary surviving when a payment is due, payment of any
benefits which may be payable shall be made to the person in, or divided equally among
all the persons in the first of the following classes in which there shall be any
survivors of Employee:

> (a) his spouse;
> (b) his children;
> (c) his parents;
> (d) his brothers and sisters;
> (e) his executors or administrators.

5. Employee, or his beneficiary, shall receive distributions, as hereinafter
provided, as soon as practicable following Employee's termination of employment with
the Corporation.

6. Starting with the first year of distribution, the Directors of the Cor-
poration shall adopt one of the following modes of distribution:

(a) A lump sum distribution equivalent to the value of the total
    number of mutual fund shares accumulated by the Corporation
    pursuant to this Agreement.

(b) Periodic installments over any period not exceeding the Employee's
    or beneficiary's life expectancy.
    The number of such installments shall be measured by no more than
    the number of years in the Employee's or beneficiary's life
    expectancy at the time of initial distribution. The fraction
    determining the total yearly payment, shall become progressively
    greater. For example, if life expectancy is fifteen years, for
    the first year there shall be paid 1/15th of the value of the total
    number of mutual fund shares accumulated by the Corporation pursuant
    to this Agreement, for the second year 1/14th of the remaining value
    at such time and proceeding until distribution has been fully com-
    pleted at the fifteenth year.

-2-

7. Employee shall elect whether to receive any of the above distributions in the form of cash or mutual fund shares.

8. Employee and the Corporation may at any time agree in writing to the substitution of any other mutual fund or investment medium as the measured base for determination of the amounts of Employee's benefits under Paragraph 6. above.

9. Neither Employee nor his beneficiary shall have any right to commute, sell, assign, transfer or otherwise convey the right to receive any payments hereunder, which payments and the right thereto are expressly declared to be non-assignable, non-transferable and non-forfeitable, nor shall any interest of Employee herein be liable to any claim of any creditor or subject to any judicial process involving Employee.

10. This Agreement shall be binding upon the parties hereto, their successors, assigns, executors, beneficiaries or administrators.

11. During the lifetime of Employee this Agreement may be amended or terminated, in whole or in part, by the mutual written agreement of Employee and the Board of Directors of the Corporation; provided, however, that no amendment or termination shall cause the payment of benefits provided herein to become forfeitable to the Employee.

12. During the period which Employee is receiving payments hereunder he will render to the Corporation such services of any advisory or consultative nature as the Corporation may reasonably require, so that the Corporation may continue to have the benefit of his experience and knowledge of the affairs of the Corporation and he will be available for advice and consultation to the officers and Directors of the Corporation at all reasonable times by telephone, letter or in person, provided, however, that his failure to render such services or to give such advice and consultation by reason of his illness or unavailability shall not affect his right to receive such payments during such period. Employee shall not be required to render any reports to the Corporation, nor shall he be required to observe any regular office hours in connection with the provisions of this Paragraph 12.

IN WITNESS WHEREOF, the Corporation has caused this Agreement to be executed by its duly authorized officer, and Employee has hereunto set his hand and seal on the day and year first above written.

CORPORATION: Columbus Hospital

EMPLOYEE: _____
Daniele Salvioni

(sgn) _____
Vincent Massaro
Assistant Administrator - Finance

-3-

# EXHIBIT D



THIS AGREEMENT, entered into this ____ day of _____
19__, by and between Cabrini Medical Center, a corporation organized
and existing under the laws of New York State (hereinafter referred to
as "Corporation") and ___Daniel Salvioni_____ (hereinafter
referred to as "Employee").

W I T N E S S E T H

WHEREAS, the Employee has acquired valuable knowledge and
experience necessary to the Corporation; and

WHEREAS, it is deemed to be in the best interest of the
Corporation to provide for the uninterrupted services of Employee
in such capacities as shall be assigned by the Board of Directors of
the Corporation until he reaches the age of 65, retires or otherwise
terminates employment; and

WHEREAS, the Corporation and Employee desire to enter into this
Agreement as an integral part of Employee's employment contract:

NOW, THEREFORE, in consideration of the premises and in order
to effectuate their mutual desires, purposes, and intentions, the
parties do agree as follows:

1.  The Corporation hereby employs Employee as __physician_____
and Employee agrees to faithfully perform such services and duties as
shall be assigned to him by the Board of Directors of the Corporation
until he retires or dies, or until his employment is otherwise
terminated.  Employee shall be paid by the Corporation a salary at



such annual rate as shall be determined by the Board of Directors of the Corporation from time to time.

2. Employee shall retire from the Corporation on the last day of the month in which he attains his 65th birthday unless the Corporation requests, and Employee agrees, to continue his employment beyond that date.

3. On or about the last day of each month, beginning with the first month of the calendar year following the day and year first above written, while Employee remains in the employ of the Corporation, the Corporation will set aside on its books and records ----------------- ($14,000.00 ) Dollars for the purpose of providing the benefits set forth in paragraph 6 below.

4. Employee shall have the right to designate a beneficiary to receive his benefits in the event of Employee's death and, from time to time, change such designation by written notice delivered to the Corporation. If there is no designated beneficiary surviving when a payment is due, payment of any benefits shall be made to the estate of the Employee.

5. Employee, or his beneficiary, shall receive distributions, as hereinafter provided, as soon as practicable following Employee's termination of employment with the Corporation.

6. Employee, with the consent of the Corporation, may designate a mutual fund the shares of which may, but are not required to, be purchased by the Corporation with amounts set aside in paragraph 3. Any mutual fund shares that may be purchased by the Corporation shall belong solely to the Corporation. The value of the mutual fund shares designated by the Employee, whether or not purchased by the Corporation, shall determine the amount of benefits payable under paragraph 7. Employee and the Corporation may at any time agree in writing to the

substitution of any other mutual fund or investment medium as the measured base for determination of the amounts of Employee's benefits under paragraph 7 below.

7. Starting with the first year of distribution, the Directors of the Corporation shall adopt one of the following modes of distribution:

a. A lump sum distribution equivalent to the value, determined on date of the Employee's termination or as near thereto as practicable, of the total number of the mutual fund shares designated by the Employee which could have been purchased by the Corporation with the amounts set aside pursuant to paragraph 3. For this purpose mutual fund shares designated by the Employee under paragraph 6 shall be determined as if such shares had been purchased immediately after the amounts specified had been set aside in accordance with paragraph 3.

b. Periodic installments over any period not exceeding the Employee's or beneficiary's life expectancy. The number of such installments shall be measured by no more than the number of years in the Employee's or beneficiary's life expectancy at the time of initial distribution. The amount of each installment shall be determined by dividing the value, on the date of the Employee's termination, or as near thereto as practicable, of the mutual fund shares which could have been acquired in accordance with (a) above by the number of installments remaining to be paid.

8. Neither Employee nor his beneficiary shall have any right to commute, sell, assign, transfer, or otherwise convey the right to receive any payments hereunder which payments and the right thereto are expressly declared to be nonassignable, nontransferable, and nonforfeitable, nor shall any interest of Employee herein be liable for any claim of any creditor or subject to any judicial process involving Employee.

 9. This Agreement shall be binding upon the parties hereto, their successors, assignees, executors, beneficiaries, or administrators.

 10. During the lifetime of Employee this Agreement may be amended or terminated, in whole or in part, by the mutual written agreement of Employee and the Board of Directors of the Corporation; provided, however, that no amendment or termination shall cause the payment of benefits provided herein to become forfeitable by the Employee.

 IN WITNESS WHEREOF, the Corporation has caused this Agreement to be executed by its duly authorized officer, and Employee has hereunto set his hand and seal on the day and year first above written.


Date  8/4/78                        CABRINI MEDICAL CENTER
                                    By _Sister Josephine Tsuei_

Date_____                        EMPLOYEE _____

# EXHIBIT E

SAMPLE

DEFERRED COMPENSATION AGREEMENT

THIS AGREEMENT, entered into this <u>15th</u> day of <u>December</u>, <u>1975</u>

by and between <u>Cabrini Health Care Center - Columbus Hospital</u> a

corporation organized and existing under the laws of <u>New York</u>

(hereinafter referred to as "Corporation") and <u>Angelo Taranta, M.D.</u>

(hereinafter referred to as "Employee").

W I T N E S S E T H :

WHEREAS, the Employee has acquired valuable knowledge and experience necessary
to the Corporation; and

WHEREAS, it is deemed to be in the best interest of the Corporation to pro-
vide for the uninterrupted services of Employee in such capacities as shall be assigned
by the Board of Directors of the Corporation until he reaches the age of sixty-five
(65) and thereafter to have the advantage of his services in a consulting and advisory
capacity; and

WHEREAS, the Corporation and Employee desire to enter into this Agreement
as an integral part of Employee's employment contract;

NOW THEREFORE, in consideration of the premises and in order to effectuate
their mutual desires, purposes and intentions, the parties do agree as follows:

1. The Corporation has employed Employee as Director of Medicine and
Employee agrees to faithfully perform such services and duties as shall be assigned
to him by the Board of Directors and the Corporation until he retires or dies, or until
his employment is otherwise terminated as provided herein. Employee shall be paid
by the Corporation a salary at such annual rate as shall be determined by the Board
of Directors of the Corporation from time to time.

2. Employee shall retire from the Corporation on the last day of the month
in which he attains his sixty-fifth (65th) birthday unless the Corporation requests,
and Employee agrees to continue his employment beyond that date. "Retirement" as
used in this Agreement shall refer to Employee's actual retirement from the Cor-
poration.

3. On or about the last day of each month beginning with the first month
of the calendar year following the day and year first above written, while Employee
remains in the employ of the Corporation, the Corporation will purchase in the name
of the Corporation, mutual fund shares of (Bullock Fund, Ltd., Dividend Shares, Inc.,

New York Venture Fund, Inc.) in amounts totaling  Thirteen Thousand Eight Hundred Eighty

$ 13,880      ) Dollars per annum in accordance with the terms of an Accumulation

Plan of such mutual fund which provides for the automatic reinvestment in additional

shares of said Fund of all dividends and distributions (both from income and capital

appreciation) which may accrue therefrom.  Employee shall have no right in such mutual

fund shares, which shall be the absolute property of the Corporation.

4.  Employee shall have the right to designate a beneficiary and, from time

to time, to change such designation by written notice delivered to the Corporation.

If there is no designated beneficiary surviving when a payment is due, payment of any

benefits which may be payable shall be made to the person in, or divided equally among

all the persons in the first of the following classes in which there shall be any

survivors of Employee:

> (a) his spouse;
> (b) his children;
> (c) his parents;
> (d) his brothers and sisters;
> (e) his executors or administrators.

5.  Employee, or his beneficiary, shall receive distributions, as hereinafter

provided, as soon as practicable following Employee's termination of employment with

the Corporation.

6.  Starting with the first year of distribution, the Directors of the Cor-

poration shall adopt one of the following modes of distribution;

> (a)  A lump sum distribution equivalent to the value of the total
>
> number of mutual fund shares accumulated by the Corporation
>
> pursuant to this Agreement.
>
> (b)  Periodic installments over any period not exceeding the Employee's
>
> or beneficiary's life expectancy.
>
> The number of such installments shall be measured by no more than
>
> the number of years in the Employee's or beneficiary's life
>
> expectancy at the time of initial distribution.  The fraction
>
> determining the total yearly payment, shall become progressingly
>
> greater.  For example, if life expectancy is fifteen years, for
>
> the first year there shall be paid 1/15th of the value of the total
>
> number of mutual fund shares accumulated by the Corporation pursuant
>
> to this Agreement, for the second year 1/14th of the remaining value
>
> at such time and preceeding until distribution has been fully com-
>
> pleted at the fifteenth year.

7. Employee shall elect whether to receive any of the above distributions in the form of cash or mutual fund shares.

8. Employee and the Corporation may at any time agree in writing to the substitution of any other mutual fund or investment medium as the measured base for determination of the amounts of Employee's benefits under Paragraph 6. above.

9. Neither Employee nor his beneficiary shall have any right to commute, sell, assign, transfer or otherwise convey the right to receive any payments hereunder, which payments and the right thereto are expressly declared to be non-assignable, non-transferable and non-forfeitable, nor shall any interest of Employee herein be liable to any claim of any creditor or subject to any judicial process involving Employee.

10. This Agreement shall be binding upon the parties hereto, their successors, assigns, executors, beneficiaries or administrators.

11. During the lifetime of Employee this Agreement may be amended or terminated, in whole or in part, by the mutual written agreement of Employee and the Board of Directors of the Corporation; provided, however, that no amendment or termination shall cause the payment of benefits provided herein to become forfeitable to the Employee.

12. During the period which Employee is receiving payments hereunder he will render to the Corporation such services of any advisory or consultative nature as the Corporation may reasonably require, so that the Corporation may continue to have the benefit of his experience and knowledge of the affairs of the Corporation and he will be available for advice and consultation to the officers and Directors of the Corporation at all reasonable times by telephone, letter or in person, provided, however, that his failure to render such services or to give such advice and consultation by reason of his illness or unavailability shall not affect his right to receive such payments during such period. Employee shall not be required to render any reports to the Corporation, nor shall he be required to observe any regular office hours in connection with the provisions of this Paragraph 12.

IN WITNESS WHEREOF, the Corporation has caused this Agreement to be executed by its duly authorized officer, and Employee has hereunto set his hand and seal on the day and year first above written.

CORPORATION: Cabrini Health Care Center
Columbus Hospital

EMPLOYEE: _Angelo Taranta_
Angelo Taranta, M.D.

(sign)
Vincent Dissanti

-3-

# EXHIBIT F

FAO DR. GUIDO PADULA
300 RECTOR PL # 5Q
NEW YORK NY 10280-1419

Account Number: 855-07N58
* * Duplicate Copy * *

24-Hour Assistance: (800) MERRILL
Access Code: 92-855-07658

**Net Portfolio Value:**

Your Financial Advisor:
JOSETTE L GREECHAN
360 HAMILTON AVE 8TH FL
WHITE PLAINS NY 10601
josette_greechan@ml.com
(914) 682.5548

TOTAL MERRILL
**$95,084.15**

# ■ EMA® ACCOUNT

## ASSETS

| | March 30 | February 28 |
|---|---|---|
| Cash/Money Accounts | 27.74 | 27.71 |
| Fixed Income | | |
| Equities | | |
| Mutual Funds | 95,056.41 | 94,029.83 |
| Options | | |
| Other | | |
| Subtotal (Long Portfolio) | 95,084.15 | 94,057.54 |
| TOTAL ASSETS | $95,084.15 | $94,057.54 |

## LIABILITIES

| | | |
|---|---|---|
| Debit Balance | | |
| Short Market Value | | |
| TOTAL LIABILITIES | | |
| NET PORTFOLIO VALUE | $95,084.15 | $94,057.54 |

## CASH FLOW

March 01, 2007 - March 30, 2007

| | This Statement | Year to Date |
|---|---|---|
| Opening Cash/Money Accounts | $27.71 | |
| CREDITS | | |
| Funds Received | | |
| Electronic Transfers | | |
| Other Credits | | |
| Subtotal | | |
| DEBITS | | |
| Electronic Transfers | | |
| Margin Interest Charged | | |
| Other Debits | | |
| Visa Purchases (debits) | | |
| ATM/Cash Advances | | |
| Checks Written/Bill Payment | | |
| Subtotal | | |
| Net Cash Flow | | |
| Dividends/Interest Income | 0.03 | 0.10 |
| Security Purchases/Debits | | |
| Security Sales/Credits | | |
| Closing Cash/Money Accounts | $27.74 | |
| Securities You Transferred In/Out | | |

7617   007576I 011162

004

CABRINI MEDICAL CENTER

# YOUR EMA BANK DEPOSIT INTEREST SUMMARY

March 01, 2007 - March 30, 2007

| Money Account Description | Opening Balance | Average Deposit Balance | Current Yield% | Interest on Deposits | Closing Balance |
|---|---|---|---|---|---|
| Merrill Lynch Bank USA | | 27 | 1.38 | 0.03 | 27 |
| **TOTAL** ML Bank Deposit Program | | | | 0.03 | 27 |

# YOUR EMA ASSETS

## CASH/MONEY ACCOUNTS

| Description | Quantity | Total Cost Basis | Estimated Market Price | Estimated Market Value | Estimated Annual Income | Est. Annual Yield% |
|---|---|---|---|---|---|---|
| CASH | 0.74 | | | .74 | | |
| ML Bank Deposit Program | 27.00 | 27 | 1.0000 | 27.00 | | 1.38 |
| **TOTAL** | | 27 | | 27.74 | | 1.37 |

## MUTUAL FUNDS/DEFINED ASSET FUNDS

| Description | Quantity | Total Client Investment | Cumulative Investment Return | Total Cost Basis | Estimated Market Price | Estimated Market Value | Unrealized Gain/(Loss) | Estimated Annual Income | Current Yield% |
|---|---|---|---|---|---|---|---|---|---|
| DAVIS NY VENTURE FD A | 2,444 | 95,047 | | 66,314 | 38.8900 | 95,047.16 | 28,732 | 659 | .69 |
| *(2380 FRACTIONAL SHARE)* | | | | | | | | | |
| *SYMBOL: NYVTX Initial Purchase:  REINV* | | | N/A | N/A | 38.8900 | 9.25 | N/A | | .69 |
| Subtotal (Equity Funds) | | | | | | | | | |
| **TOTAL** | | 95,047 | | 66,314 | | 95,056.41 | 28,732 | 659 | .69 |
| | | 95,047 | | 66,314 | | 95,056.41 | 28,732 | 659 | .69 |

Total Client Investment: Cost of shares directly purchased and still held. Does not include shares purchased through reinvestment.
Cumulative Investment Return: Estimated Market Value minus Total Client Investment.
Cumulative Investment Return is the capital appreciation (depreciation) of all shares purchased, including shares purchased through reinvestment.

**Market Timing** Merrill Lynch's policies prohibit mutual fund market timing, which involves the purchase and sale of mutual fund shares within short periods of time with the intention of capturing short-term profits resulting from market volatility. Market timing may result in lower returns for long-term fund shareholders because market timers capture short-term gains that would otherwise pass to all shareholders and due to increased transaction costs and fewer assets for investment due to the need to retain cash to satisfy redemptions.

Unrealized Gain or (Loss): Estimated Market Value minus Total Cost Basis.
Provided for Tax Planning purposes only and is not applicable to retirement accounts "denoted by N/A."
Initial Purchase: Date of your initial investment in this fund.






CABRINI MEDICAL CENTER

Account Number:855-07N58

## YOUR EMA ASSETS

**LONG PORTFOLIO**

| | Adjusted/Total Cost Basis | Estimated Market Value | Unrealized Gain/(Loss) | Estimated Accrued Interest | Estimated Annual Income | Current Yield% |
|---|---|---|---|---|---|---|
| **TOTAL** | 66,342 | 95,084.15 | 28,732 | | 660 | .69 |

Total values exclude N/A items

## YOUR EMA TRANSACTIONS

**DIVIDENDS/INTEREST INCOME TRANSACTIONS**

| Date | Transaction Type | Quantity | Description | Income | Income Year To Date |
|---|---|---|---|---|---|
| 03/30 | ¤ Bank Interest | | BANK DEPOSIT INTEREST | .03 | .10 |
| | Subtotal (Interest) | | | .03 | .10 |
| | **NET TOTAL** | | | .03 | .10 |

# Merrill Lynch

**Agreement Regarding Your Securities, Account and Other Important Information**
(You, the Client, and we, Merrill Lynch, Pierce, Fenner & Smith Inc. (Merrill Lynch) agree as follows:

(1) We will deliver your order for a security or option to the marketplace we consider to be the best primary market for that security unless you indicate otherwise.

(2) We will hold bonds and preferred stocks in bulk segregation (except for those held in custodian accounts). In the event of a call for less than an entire issue or series of those securities, the securities to be called will be randomly selected from those securities held in bulk segregation.

(3) We are not responsible for the loss or destruction of securities that are placed in the custody of a non-U.S. bank or broker or other custodian, and are lost or destroyed as a result of war, civil commotion, enemy action, government acts or any other causes beyond the control of the depository or us.

(4) This statement of account shall be deemed conclusive if not objected to within ten (10) days.

(5) This statement of account shall be deemed conclusive if not objected to within ten (10) days.

We receive a fee from our affiliated banks of up to 3% per annum of the average daily balances. We pay interest on the cash balances to the banks under the RASP and S&S programs.

(6) You will have the right to vote full shares, and we may solicit instructions concerning the voting of full shares held in your account. The voting shares in your account will be governed by the rules and policies of the New York Stock Exchange and the Securities and Exchange Commission then in effect, or other applicable laws.

(7) This statement serves as a confirmation of purchases that result from automatic reinvestment transactions, as well as your AIPS transaction, during the statement period.

Reinvestment or transactions are subject to the conditions, rules, regulations, customs, usages, rulings and interpretations in your account is subject to the constitution, rules, regulations, customs, usages, rulings and interpretations of the exchange or market, and its clearinghouse, if any, where the transactions are executed, and if not executed on any exchange, the National Association of Securities Dealers, Inc.

(10) We trade for our own accounts as an odd lot dealer, a block positioner and/or arbitrageur. At the time of any transaction in your account, we or an affiliate may have a long or short position in the same security, and our positions may be completely or partially hedged.

(11) We can use your free credit balance in our business and such funds are not segregated. You have the right to receive, upon demand, the free credit balance in any free credit balance and any fully paid securities to which you are entitled, subject to any commitments in any of your accounts.

(12) Merrill Lynch's financial statement is available for your inspection at our office, or a copy will be mailed to you upon your written request. [New York, N.Y. 10281]

(13) If this statement is for a margin account, it is a combined statement of your margin account and special memorandum account maintained for you pursuant to applicable regulations. The permanent record of the separate account, as required by Regulation T, is available for your inspection upon request. You should retain this statement for income tax purposes.

(14) The Securities Investor Protection Corporation (SIPC) and our excess-SIPC bond do not cover deposits are protected by the Federal Deposit Insurance Corporation.

(15) Merrill Lynch bears no responsibility or liability with respect to independent research selected by the Independent Consultant under the Global Research Settlement. Clients assume full responsibility for their trading decisions they make based upon such independent research ratings or reports.

**Prices and Valuations**
While we believe our pricing information to be reliable, we cannot guarantee its accuracy.

**Cost Data/Realized Capital Gains & Losses:** Cost data and Realized Capital Gains/Losses are provided for informational purposes only. Please review for accuracy. Merrill Lynch is not responsible for omitted or restated data. Please consult your tax advisor to determine the tax consequences of any securities transaction. Your statement is not an official accounting of gains/losses, and Merrill Lynch does not report gains/losses to the I.R.S. Please refer to your records,

trade confirmations, and the Consolidated Tax Reporting Statement (Form 1099).

**Fixed-Income Securities:** Values on your statement generally are based on estimates, which are obtained from various sources. The value will vary from prices achieved in actual transactions, especially for thinly traded securities, and are not firm bids or offers. The values assume no unusual market conditions and are generally for comparison purposes of $1 million or more, which often have more favorably priced than transactions in smaller amounts. Accordingly, you may pay more than the values if you purchase securities, or receive less if you sell securities.

**Insurance Policies:** Information is based on data from the insurer that issued the policy. Merrill Lynch is not responsible for the calculation of any cash value. Policies are generally not held in your Merrill Lynch account. If Merrill Lynch as custodian or trustee holds a policy, that is a security, SIPC protection and excess-SIPC protection applies.

**Est. Annual Yield%:** An annualized yield based on rates for the statement month. Current yields may be higher or lower.

**Symbols and Abbreviations**

| | |
|---|---|
| N/A | Value and/or cost data not available. |
| N/C | Not Calculated. |
| N/N | Non-negotiable securities. |
| N/O | Held registered in your name. |
| N/O CUST | Non-registered Custodian Registration. Merrill Lynch retained last day's |

| | |
|---|---|
| OCC | Option's Clearing Corporation. |
| | Transaction you requested required same-day payment. |
| | dividend or offset cost of advancing payment on your behalf. |
| RO | Bonds are changeable from coupon to registered and vice versa without charge. |
| RQ | Bonds registered for both principal and interest. |
| ‡‡ | Indicates that our global securities research division has upgraded(↑) or downgraded(↓) its fundamental opinion on a security. |

********AUTO** MIXED AADC 088
L83728 0011162 T80 P6 0.563
FAO DR. GUIDO PADULA
300 RECTOR PL # 5Q
NEW YORK NY 10280-1419

0011162

7617    0075744 011162

004

# EXHIBIT G

Online at:www.mled.ml.com

FAO DR. DANIELE SALVIONI
140 7TH AVE # 6N
NEW YORK NY 10011-1838

Account Number:855-07N57
\*\* Duplicate Copy \*\*

24-Hour Assistance: (800) MERRILL
Access Code: 92-855-07657

**Net Portfolio Value:**
$598,683.80

TOTAL MERRILL
$598,683.80

Your Financial Advisor:
JOSETTE L GREECHAN
360 HAMILTON AVE 8TH FL
WHITE PLAINS NY 10601
josette_greechan@ml.com
(914) 682-5548

# ■ EMA® ACCOUNT

## ASSETS

| | October 31 | September 29 |
|---|---|---|
| Cash/Money Accounts | 29.57 | 0.17 |
| Fixed Income | | |
| Equities | | |
| Mutual Funds | 598,654.23 | 579,866.69 |
| Options | | |
| Other | | |
| Subtotal (Long Portfolio) | 598,683.80 | 579,866.86 |
| **TOTAL ASSETS** | **$598,683.80** | **$579,866.86** |

## LIABILITIES

| | | |
|---|---|---|
| Debit Balance | | |
| Short Market Value | | |
| **TOTAL LIABILITIES** | | |
| **NET PORTFOLIO VALUE** | **$598,683.80** | **$579,866.86** |

# CASH FLOW

September 30, 2006 - October 31, 2006

| | This Statement | Year to Date |
|---|---|---|
| Opening Cash/Money Accounts | $0.17 | |
| CREDITS | | |
| Funds Received | | |
| Electronic Transfers | | |
| Other Credits | | |
| Dividends/Interest | | |
| Security Transactions | 37.40 | 268,284.81 |
| **TOTAL CREDITS** | **$37.40** | **$268,284.81** |
| DEBITS | | |
| Electronic Transfers | | |
| Margin Interest Charged | | |
| Other Debits | | |
| Visa Purchases (debits) | (8.00) | (268,255.76) |
| ATM/Cash Advances | | |
| Checks Written/Bill Payment | | |
| Security Transactions | | |
| **TOTAL DEBITS** | **($8.00)** | **($268,255.76)** |
| Net Cash Flow | $29.40 | $29.05 |
| Closing Cash/Money Accounts | $29.57 | |

1 of 4

7817  0046533 00993B

004

CABRINI MEDICAL CENTER

# YOUR EMA ASSETS

Account Number: 855-07N57

24-Hour Assistance: (800) MERRILL
Access Code: 92-855-07657

September 30, 2006 - October 31, 2006

## CASH/MONEY ACCOUNTS

| Description | Quantity | Total Cost Basis | Estimated Market Value | Estimated Annual Income | Est. Annual Yield/% |
|---|---|---|---|---|---|
| CASH | | 29.57 | 29.57 | | |

## MUTUAL FUNDS/DEFINED ASSET FUNDS

| Description | Quantity | Total Client Investment | Cumulative Investment Return | Total Cost Basis | Estimated Market Price | Estimated Market Value | Unrealized Gain/(Loss) | Estimated Annual Income | Current Yield/% |
|---|---|---|---|---|---|---|---|---|---|
| DAVIS NY VENTURE FDA | | | | | | | | | |
| (/5340) PORTFOLIO SHARE | 13,050 | | 29 | 485,962 | 353,168 | 37.2100 | 485,982.60 | 132,794 | 3,626 | .72 |
| SYMBOL: NYVTX Initial Purchase: 12/3/NV | 3,028 | | | | N/A | 37.2100 | 112,671.88 | N/A | 817 | .72 |
| Subtotal Equity Funds | | | | | N/A | 37.2100 | 19.75 | N/A | | .72 |
| TOTAL | | | | 485,962 | 353,168 | | 598,654.23 | 132,794 | 4,343 | .73 |

TOTAL    485,962    353,168    598,654.23    132,794    4,343    .73

Total Client Investment: Cost of shares directly purchased and still held. Does not include shares purchased through reinvestment.

Cumulative Investment: Total Client Investment.

Cumulative Investment Return: Estimated Market Value minus Total Client Investment, including shares purchased through reinvestment.

Unrealized Gain or (Loss): Estimated Market Value minus Total Cost Basis. Provided for Tax Planning purposes only and is not applicable to retirement accounts (denoted by N/A).

Initial Purchase: Date of your initial investment in this fund.

Market Timing: Merrill Lynch's policies prohibit mutual fund market timing, which involves the purchase and sale of mutual fund shares within short periods of time with the intention of capturing short-term profits resulting from market volatility. Market timing may result in lower returns for long-term shareholders because market timers capture short-term gains that would otherwise benefit all shareholders and due to increased transaction costs and fewer assets for investment due to the need to retain cash to satisfy redemptions.

Effective October 2006, Merrill Lynch Investment Managers, L.P. (MLIM) combined with BlackRock, Inc. As a result of the transaction, MLIM investments were rebranded BlackRock. For more information please contact your Financial Advisor or call (800) MERRILL.

## LONG PORTFOLIO

| | Adjusted/Total Cost Basis | Estimated Market Value | Unrealized Gain/(Loss) | Estimated Accrued Interest | Estimated Annual Income | Current Yield/% |
|---|---|---|---|---|---|---|
| TOTAL | 353,198 | 598,683.80 | 132,794 | | 4,343 | .73 |

Total Value Excludes NA Items

CABRINI MEDICAL CENTER

Account Number: 855-07N57

TOTAL MERRILL

September 30, 2006 - October 31, 2006

# YOUR EMA TRANSACTIONS

## SECURITY TRANSACTIONS

| Date | Description | Transaction Type | Quantity | Unit Price | Debit | Credit | Accrued Interest Earned/(Paid) |
|------|-------------|------------------|----------|------------|-------|--------|-------------------------------|
| 10/31 | DAVIS NY VENTURE FD A UNSOLICITED ORDER PRICE : 37.400000 | Sale | -1 | 37.4000 | | | 37.40 |
| | Subtotal (Sales) | | | | | | 37.40 |
| | **TOTAL** | | | | | | 37.40 |

## REALIZED GAINS/(LOSSES)

| Description | Quantity | Acquired Date | Liquidation Date | Sales Price | Cost Basis | Gains/(Losses) * This Statement | Year to Date |
|-------------|----------|---------------|------------------|-------------|------------|--------------------------------|--------------|
| DAVIS NY VENTURE FD A | 1.0000 | N/A | 10/26/06 | 37.40 | N/A | N/A | N/A |
| **TOTAL** | | | | | | | |

* - Excludes transactions for which we have insufficient data
N/A-Results which cannot be calculated because of insufficient data are reflected by an N/A entry in the capital gain or (loss) column and are not included in the realized capital gain and loss summary.

## CASH/OTHER TRANSACTIONS

| Date | Transaction Type | Quantity | Description | Debit | Credit |
|------|------------------|----------|-------------|-------|--------|
| 10/31 | Annual Charge | | EMA ANNUAL FEE | 8.00 | |
| | Subtotal (Other Debits/Credits) | | | 8.00 | |
| | **NET TOTAL** | | | 8.00 | |

7627    0006535 010958

# EXHIBIT H



# Merrill Lynch

## EML Fiscal Statement

FAO DR ANGELO TARANTA
100 BAY PL
OAKLAND CA 94610-4448

000002367

YOUR FINANCIAL ADVISOR:
JOSETTE L GREECHAN
FA # 7617
(800) 284-4433

For Client Service Questions call
1-800-MERRILL (800-637-7455)

Office Serving Your Account:
360 HAMILTON AVE 8TH FL
WHITE PLAINS NY 10601

Account Value as of December 31, 2006
$455,556.19

### Asset Allocation Summary

Cash 1 %

Equities 99 %

* May not reflect all holdings

### Total Value Comparison ( in $ Millions )

1.33  1.32  1.18  1.18  1.15  1.17  1.18  1.20  1.24  .45  .46

2/06  3/06  4/06  5/06  6/06  7/06  8/06  9/06  10/06  11/06  12/06

### Realized Capital Gain and Loss Summary*

|  | Current Fiscal Year (12/06) | Prior Fiscal Year (12/05) |
|---|---|---|
| Short Term | 0.00 | 0.00 |
| Long Term | 21,628.26 | 0.00 |

* Excludes transactions for which we have insufficient data.

### Unrealized Capital Gain and Loss Summary*

|  | Current Fiscal Year (12/06) | Prior Fiscal Year (12/05) |
|---|---|---|
| Short Term | 0.00 | 0.00 |
| Long Term | 24,699.00 | 90,957.00 |

* Excludes transactions for which we have insufficient data.

PLEASE SEE REVERSE SIDE
Page 1 of 8
Statement Period
Year Ending 12/31/06

Account No.
855-07N61

02732891

8500792100234720011    No 840008




# Merrill Lynch

**EML Fiscal Statement**

FAO DR ANGELO TARANTA
100 BAY PL
OAKLAND CA 94610-4448

**Total Account Value As Of 12/31/06**    $455,566.19

Your Financial Advisor:
JOSETTE L GREECHAN
FA # 7617
(800) 283-4483

Your Merrill Lynch Office:
360 HAMILTON AVE 8TH FL
WHITE PLAINS NY 10601

FOR CUSTOMER SERVICE QUESTIONS: (1-800-MERRILL (1-800-637-7455))

## ACTIVITY SUMMARY

| Credits | Fiscal Year Value 12/06 |
|---|---|
| Sales | 1,004,269.15 |
| Income | 3,173.89 |
| Funds Received | 0.00 |
| Electronic Tfrs | 0.00 |
| Other Credits | 0.00 |
| **Total Credits** | **1,007,443.04** |

| Debits | |
|---|---|
| Purchases | 1,004,269.16 |
| Withdrawals | 0.00 |
| Electronic Tfrs | 0.00 |
| Fees | 150.00 |
| Checks | 0.00 |
| Visa Transactions | 0.00 |
| Interest Charged | 0.00 |
| Other Debits | 3,170.45 |
| **Total Debits** | **1,007,589.61** |

| Net Activity | (146.57) |
|---|---|

## ANNUAL PORTFOLIO SUMMARY

| | Fiscal Year Value 12/31/06 | Current Portfolio Cost Basis | Unrealized Gains/(Losses) |
|---|---|---|---|
| Cash/Money Accounts | 5.60 | 5.60 | 0.00 |
| CD's/Equivalents | 0.00 | 0.00 | 0.00 |
| Government Securities | 0.00 | 0.00 | 0.00 |
| Corporate Bonds | 0.00 | 0.00 | 0.00 |
| Municipal Bonds | 0.00 | 0.00 | 0.00 |
| Equities | 0.00 | 0.00 | 0.00 |
| Mut Funds/Def Assets | 455,560.59 | 320,838.13 | 134,699.00 |
| Options | 0.00 | 0.00 | 0.00 |
| Other | 0.00 | 0.00 | 0.00 |
| **Long Market Value** | **455,566.19** | **320,843.73** | **134,699.00** |
| Short Market Value | 0.00 | 0.00 | 0.00 |
| Debit Balance | 0.00 | | |
| Estimated Accrued Int | 0.00 | | |
| **Net Portfolio Value** | **455,566.19** | **320,843.73** | **134,699.00** |

## INCOME SUMMARY

| | Current Year (12/06) |
|---|---|
| Interest | 3.44 |
| Dividends | 3,170.45 |
| **Total** | **3,173.89** |
| Accrued Interest Earned | 0.00 |
| Accrued Interest Paid | 0.00 |

**PLEASE NOTE:**

o This fiscal year end statement is for information purposes and should be used in conjunction with your monthly statements. This statement does not reflect any pending trades or dividend reclassifications. Please consult your tax advisor regarding any tax planning and reporting requirements.

PLEASE SEE REVERSE SIDE
Page 2 of 8

Statement Period
Year Ending 12/31/06

Account No.
855-07N81

X 00230882

6060D 11-01

# Merrill Lynch

**EMA Fiscal Statement**

FAO DR ANGELO TARANTA

## MONTHLY ACTIVITY SUMMARY

|  | 1/06 | 2/06 | 3/06 | 4/06 | 5/06 | 6/06 |
|---|---|---|---|---|---|---|
| **Credits** | | | | | | |
| Sales | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Income | 0.45 | 0.40 | 0.47 | 0.43 | 0.54 | 0.51 |
| Funds Received | 0.00 | 0.00 | 186,289.16 | 0.00 | 0.00 | 0.00 |
| Electronic Tfrs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Credits | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Credits | 0.45 | 0.40 | 186,289.16 | 0.43 | 0.54 | 0.51 |
| **Debits** | | | | | | |
| Purchases | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Withdrawals | 0.00 | 0.00 | 186,269.16 | 0.00 | 0.00 | 0.00 |
| Electronic Tfrs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Fees | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Checks | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Visa Transactions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Charged | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Debits | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Debits | 0.00 | 0.00 | 186,269.16 | 0.00 | 0.00 | 0.00 |
| **Net Activity** | 0.45 | 0.40 | 186,289.16 | 0.43 | 0.54 | 0.51 |

|  | 7/06 | 8/06 | 9/06 | 10/06 | 11/06 | 12/06 | TOTAL |
|---|---|---|---|---|---|---|---|
| **Credits** | | | | | | | |
| Sales | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Income | 0.53 | 0.07 | 0.01 | 0.01 | 0.01 | 0.01 | 3,17 |
| Funds Received | 0.00 | 0.00 | 0.00 | 0.00 | 818,000.01 | 3,170.46 | 1,004,26 |
| Electronic Tfrs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Other Credits | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Total Credits | 0.53 | 0.07 | 0.01 | 0.01 | 818,000.02 | 3,170.46 | 1,007,44 |
| **Debits** | | | | | | | |
| Purchases | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Withdrawals | 0.00 | 0.00 | 0.00 | 0.00 | 818,000.00 | 3,170.45 | 1,004,26 |
| Electronic Tfrs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Fees | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Checks | 0.00 | 150.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15 |
| Visa Transactions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Interest Charged | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Other Debits | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,17 |
| Total Debits | 0.00 | 150.00 | 0.00 | 0.00 | 818,000.00 | 3,170.45 | 1,007,58 |
| **Net Activity** | 0.53 | (149.93) | 0.01 | 0.01 | 0.02 | 0.01 | (14 |

Statement Period
Year Ending 12/31/06

Account No.
855-07N61

1 X 0272883

![Merrill Lynch]

# EML Fiscal Statement

FAO DR ANGELO TARANTA

## MONTHLY PORTFOLIO SUMMARY

| | 1/06 | 2/06 | 3/06 | 4/06 | 5/06 | 6/06 |
|---|---|---|---|---|---|---|
| Cash/Money Accounts | 152.22 | 148.00 | 153.47 | 153.90 | 154.44 | 154.95 |
| CD's/Equivalents | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Government Securities | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Corporate Bonds | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Municipal Bonds | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equities | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Mut Funds/Def Assets | 1,329,264.97 | 1,324,622.60 | 1,157,677.93 | 1,178,315.08 | 1,151,020.78 | 1,157,677.93 |
| Options | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Long Market Value | 1,329,417.09 | 1,324,775.62 | 1,157,831.40 | 1,178,468.98 | 1,151,175.22 | 1,157,832.88 |
| Short Market Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Debit Balance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Estimated Accrued Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Net Portfolio Value** | 1,329,417.09 | 1,324,775.62 | 1,157,831.40 | 1,178,468.98 | 1,151,175.22 | 1,157,832.88 |

| | 7/06 | 8/06 | 9/06 | 10/06 | 11/06 | 12/06 |
|---|---|---|---|---|---|---|
| Cash/Money Accounts | 155.43 | 5.55 | 5.56 | 5.57 | 5.59 | 5.60 |
| CD's/Equivalents | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Government Securities | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Corporate Bonds | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Municipal Bonds | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equities | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Mut Funds/Def Assets | 1,168,662.32 | 1,177,649.37 | 1,199,617.96 | 1,238,562.09 | 446,329.11 | 455,560.59 |
| Options | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Long Market Value | 1,168,817.70 | 1,177,654.92 | 1,199,623.52 | 1,238,567.84 | 446,334.70 | 455,566.19 |
| Short Market Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Debit Balance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Estimated Accrued Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Net Portfolio Value** | 1,168,817.70 | 1,177,654.92 | 1,198,623.52 | 1,238,567.84 | 446,334.70 | 455,566.19 |

PLEASE SEE REVERSE SIDE
Page 4 of 8
Statement Period
Year Ending 12/31/06

Account No.
855-07N61

606D 11-01



0272894 X

# Merrill Lynch

## EMA Fiscal Statement

FAO DR ANGELO TARANTA

## CURRENT PORTFOLIO SUMMARY

### Cash and Money Funds

| Quantity | Security Description | Date Acquired | Total/Adj Cost Basis | Fiscal Year Value 12/31/06 | Unrealized Gain or (Loss) | Est Accrued Interest | Est Annu Incon |
|---|---|---|---|---|---|---|---|
| | CASH | | | | | | |
| 5 | ML Bank Deposit Program | 6/14/02 | 0.60 | 0.60 | | | |
| | | | 5.00 | 5.00 | | | |
| | Total Cash and Money Funds | | 5.60 | 5.60 | | | |

## CURRENT PORTFOLIO SUMMARY

### Mutual Funds and Defined Assets

| Quantity | Security Description | Date Acquired | Total/Adj Cost Basis | Fiscal Year Value 12/31/06 | Unrealized Gain or (Loss) | Est Annu Incon |
|---|---|---|---|---|---|---|
| 11,826 | DAVIS NY VENTURE FD A (.5990 FRACTIONAL SHARE) | 12/04/00 | 320,838.13 | 455,537.52 | 134,699.00 | 3,19 |
| | | 12/04/00 | | 23.07 | | |
| | Total Mutual Funds and Defined Assets | | 320,838.13 | 455,560.59 | 134,699.00 | 3,19 |





PLEASE SEE REVERSE SIDE
Page 5 of 8
Statement Period
Year Ending 12/31/06

Account No.
855-07N61

02702895




# Merrill Lynch

## EML Fiscal Statement

FAO DR ANGELO TARANTA

## FISCAL YEAR ACTIVITY

### Security Transactions

| Date | Transaction | Quantity | Description | Price | Debit | Credit |
|---|---|---|---|---|---|---|
| 03/06/06 | Journal Entry | -1 | DAVIS NY VENTURE FD A FULL SHARE | | | |
| 03/06/06 | Sale | 5,400 | SHARE VALUE $3.12 DAVIS NY VENTURE FD FRAC SHR QUANTITY .571 | 34.49 | | 186,269.14CR |
| 11/22/06 | Sale | 21,543 | UNSOLICITED ORDER DAVIS NY VENTURE FD A FRAC SHR QUANTITY .324 | 37.97 | | 818,000.01CR |
| 12/05/06 | Dlvd Reinv | 84 | UNSOLICITED ORDER DAVIS NY VENTURE FD A REINV AMOUNT $3170.45 REINV PRICE $37.60000 | | | |
| | Net Total | | | | | 1,004,269.15 |

### Dividends and Interest

| Date | Transaction | Quantity | Description | Price | Debit | Credit |
|---|---|---|---|---|---|---|
| 09/29/06 | Bank Interest | | BANK DEPOSIT INTEREST | | | 0.01 |
| 10/31/06 | Bank Interest | | BANK DEPOSIT INTEREST | | | 0.01 |
| 11/30/06 | Bank Interest | | BANK DEPOSIT INTEREST | | | 0.01 |
| 12/29/06 | Bank Interest | | BANK DEPOSIT INTEREST | | | 0.01 |
| | | | Sub Total | | | .04 |
| 01/31/06 | Bank Interest | | BANK DEPOSIT INTEREST | | | 0.45 |
| 02/28/06 | Bank Interest | | BANK DEPOSIT INTEREST | | | 0.40 |
| 03/31/06 | Bank Interest | | BANK DEPOSIT INTEREST | | | 0.47 |
| 04/28/06 | Bank Interest | | BANK DEPOSIT INTEREST | | | 0.43 |
| 05/31/06 | Bank Interest | | BANK DEPOSIT INTEREST | | | 0.54 |
| 06/30/06 | Bank Interest | | BANK DEPOSIT INTEREST | | | 0.51 |
| 07/31/06 | Bank Interest | | BANK DEPOSIT INTEREST | | | 0.53 |
| 08/31/06 | Bank Interest | | BANK DEPOSIT INTEREST | | | 0.07 |
| | | | Sub Total | | | 3.40 |

PLEASE SEE REVERSE SIDE
Page 6 of 8
Statement Period
Year Ending 12/31/06
Account No.
855-07N61

X 02732896

60602 11-01

# Merrill Lynch

## EMA Fiscal Statement

FAO DR ANGELO TARANTA




## FISCAL YEAR ACTIVITY

| Date | Transaction | Quantity | Description | Price | Debit | Credit |
|---|---|---|---|---|---|---|
| 12/05/06 | Dividend | | DAVIS NY VENTURE FD A | | | 3,170.4 |
| | | | Net Total | | | 3,173.8 |

### Funds Received/Withdrawals

| Date | Transaction | Description | Price | Debit | Credit |
|---|---|---|---|---|---|
| 03/07/06 | Withdrawal | CK C 53210-562504 | | 186,289.18 | |
| 11/22/06 | Withdrawal | CK A 53214-88914 | | 818,000.00 | |
| | | Net Total | | 1,004,269.16 | |

### Other Activity

| Date | Transaction | Description | Debit |
|---|---|---|---|
| 12/05/06 | Reinvestment | DAVIS NY VENTURE FD A | 3,170.45 |
| | | Net Total | 3,170.45 |

### Fees

| Date | Description | Debit |
|---|---|---|
| 08/03/06 | EMA ANNUAL FEE | 150.00 |
| | Net Total | 150.00 |

## REALIZED CAPITAL GAIN AND LOSS SUMMARY

| Quantity | Security Description | Date of Acquisition | Date of Liquidation | Sale Price | Cost Basis | Gain or (Loss) |
|---|---|---|---|---|---|---|
| 5,400.6710 | DAVIS NY VENTURE FD A | 07/23/98 | 03/01/06 | 186,289.14 | N/A | N/C |
| 19,506.3240 | DAVIS NY VENTURE FD A | 07/28/98 | 11/17/06 | 740,655.10 | N/A | N/C |
| 133.0000 | DAVIS NY VENTURE FD A | 12/03/99 | 11/17/06 | 5,050.01 | 3,662.82 | 1,387.1 |
| 1,250.0000 | DAVIS NY VENTURE FD A | 12/03/99 | 11/17/06 | 47,462.50 | 34,425.00 | 13,037.5 |
| 6.0000 | DAVIS NY VENTURE FD A | 12/03/99 | 11/47/06 | 227.82 | 165.24 | 62.5 |
| 648.0000 | DAVIS NY VENTURE FD A | 12/04/06 | 11/17/06 | 24,604.58 | 17,463.59 | 7,140.9 |

02713887



# Merrill Lynch

# EM Fiscal Statement

FAO DR ANGELO TARANTA

Account No. 855-07N61
Statement Period
Year Ending 12/31/06

PLEASE SEE REVERSE SIDE
Page 8 of 8




**Agreement Regarding Your Securities Account and Other Important Information**

You, the Client, and we, Merrill Lynch, Pierce, Fenner & Smith Inc., agree as follows:

(1) We will direct your order for a multi-listed security or option to the market place we consider to be in your primary market for that security, unless you give us specific instructions to direct the order elsewhere.

(2) We will hold bonds and preferred stocks in bulk (except for those held in custodial accounts). In the event of a call for less than an entire issue, those securities to be so called will be automatically selected on a random basis from those held in bulk. Once the probability of holdings will be selected proportionately in the amount of your holdings relative to those of other customers.

(3) If you have any obligations to us we can, subject to applicable rules and regulations of regulatory bodies, without notifying you, take any of the following actions with respect to securities or other property including securities you may acquire or deposit to secure your account:

We can pledge, repledge, hypothecate or rehypothecate your securities, either separately or commingled with securities carried for the accounts of other customers. They may be pledged.

We can lend the securities.

We can deliver the securities on contracts or other commitments even if we do not have in our possession and control a like amount of similar securities or other such obligations to us. The amount involved can take any of these actions until you have discharged all your obligations to us. The amount involved in these actions may be more or less than the amount you owe us.

(4) If we are not responsible for the loss or destruction of securities that are beyond the control of any bank or broker or other custodian where your securities are lost or destroyed as a result of war, civil commotion, enemy action, government acts or any other causes beyond the control of the depository or us.

(5) This statement of account shall be deemed conclusive if not objected to within ten (10) days.

(6) You can transfer your account to anyone by assignment, transfer, consolidation or otherwise, unless you give us written notice to the contrary at the time. This agreement will inure to the benefit of anyone to whom your account will be assigned. Nothing contained in this paragraph shall affect your right to transfer your account under NYSE Rule 412.

**Insurance**
We are a member of the Securities Investor Protection Corporation (SIPC). The securities held in your account are covered by SIPC protection and excess SIPC protection obtained by Merrill Lynch. For detail refer to the Program Description for your account. SIPC protection is not available for balances in a daily deposit or a bank, and the securities offered by us, unless otherwise indicated, are not backed or guaranteed by any bank nor are they insured by the FDIC.

**Other Important Information**
(1) Depository institutions participating in the ISA program and Merrill Lynch Bank USA, in the Enhanced each program pay us a fee up to 2% per annum of the average daily depository account balances in respectively.

(2) You will have the right to vote full shares, and we will vote instructions concerning the voting of shares held in your account. If such instructions are not received by us on a timely basis, the exercise of such votes in your account is governed by the rules and policies of the New York Stock Exchange and the Securities and Exchange Commission then in effect.

**Other Important Information (Continued)**
(3) This statement serves as a confirmation of purchases that result from automatic re-investment transactions as well as your AIPS transactions, during the statement period.

(4) Insurance policy information is based on data from the insurer that issued the policy. Merrill Lynch is not responsible for the calculation of policy values. Policies are generally not held in your account. Merrill Lynch account and trustee holdings and the value of trustee holds a policy that is a security. SIPC protection and excess SIPC protection applies.

(5) As an additional service, we please advise your Financial Advisor promptly of any material change in your your confirmation, however, the options commission charges have been included in the investment objectives.

(6) Our official statement is available for personal inspection at our office, or a copy of it will be mailed to you upon your written request.

**Special Note:** If your records differ from this information, please notify your Financial Advisor in writing with a copy of the statement noting the discrepancy and, if appropriate, any necessary adjustments will be made.

**WCMA Loan Account Activity**
Refer to important information from Merrill Lynch Business Financial Services Inc. (MLBFS, Inc.) through which the WCMA Line of Credit is made available. Includes information on your Line of Credit, Loan Balance, Loan Subject to Interest, and Loan Interest Charged. Interest charges accrue daily during the statement period with each day period deemed to constitute 1/360 of year. Refer to the WCMA Agreement and documents required by MLBFS for details.

**Managed Trust Units**
Information for RCMA for Business Retirement Plan clients on units of the Merrill Lynch Managed Trust is reported in this section. From information supplied by the Merrill Lynch Trust Company or its agent, neither the Trust nor its units are held in your Merrill Lynch, Pierce, Fenner & Smith Inc. account and therefore, are not subject to SIPC protection. An annual report is furnished separately.



Merrill Lynch Pierce Fenner & Smith Inc.
World Financial Center
North Tower
New York, N.Y. 10281-1332
Member, Securities Investor Protection Corporation (SIPC)

[X] 3272898

6060D 11-01

# EXHIBIT I



# Merrill Lynch

# EMA™ ACCOUNT

000031R2

```
||....||....||.....|.....||.||||....|....||||||....|||||..||||
.......*AUTO**MIXED AADC 088
248558 0003192 T25 P60 0.534
FAO DR: MANNUCCIO MANNUCCI
21 E 90TH ST
NEW YORK NY 10128-0654
```

## Portfolio Summary

| Asset | 02/27/04 Value | % | 03/31/04 Value | % |
|---|---|---|---|---|
| Cash/Money Accounts | | | 54 | * |
| CD's/Equivalents | 54 | * | | |
| Government & Agency | | | | |
| Corporate Bonds | | | | |
| Municipal Bonds | | | | |
| Equities | | | | |
| Mutual Funds | 724,383 | 100 | 712,438 | 100 |
| Options | | | | |
| Other | | | | |
| *Less than 1 % | | | | |
| **Long Market Value** | **724,437** | | **712,492** | |
| Short Market Value | | | | |
| Estimated Accrued Interest | | | | |
| Debit Balance | | | | |
| **Net Portfolio Value** | **724,438** | | **712,493** | |

## NEWS

---

## Total Account Value As Of 03/31/2004          $712,493.65

.. Duplicate Copy ..

YOUR FINANCIAL ADVISOR:          Your Merrill Lynch Office:
JOSETTE L GREECHAN                360 HAMILTON AVE 8TH FL
Josette_Greechan@ml.com          WHITE PLAINS NY 10601
(914) 682-5548

FOR CUSTOMER SERVICE QUESTIONS:
1-800-MERRILL (1-800-637-7455)

Review Your Statement Online at:
www.mlol.ml.com

### Income Summary

| | This Statement | Year-to-Date |
|---|---|---|
| Tax-Exempt Funds | | |
| Tax-Exempt Interest | | 12.02 |
| Reportable Interest | .02 | |
| Reportable Dividends | | |
| Income Not Reported | | |
| **Total** | **.02** | **12.02** |

### Items for Attention

| Security | Message | Date |
|---|---|---|
| | No Items For Attention | |

Purchasing Power  54

### Financial Market Indicators

| | This Statement | Last Statement | Previous Year-End |
|---|---|---|---|
| S&P 500 | 1126.21 | 1144.94 | 1111.92 |
| Three-Month Treasury Bills | .94% | .94% | .92% |
| Long-Term Treasury Bonds | 4.77% | 4.84% | 5.08% |
| One-Month LIBOR | 1.09% | 1.09% | 1.12% |
| NASDAQ | 1994.22 | 2029.82 | 2003.37 |


00204  7517


81882000003192000|
No Sewers

21 E 90TH ST

Statement Period
02/28/04 TO 03/31/04

Page
1 of 4

Account No.
855-07N59

0029563

# Merrill Lynch

**CMA** ACCOUNT

## Cash Flow Summary

| Activity Summary | This Statement | Year-to-Date |
|---|---|---|
| Opening Balance Cash & Money Accounts | 54.78 | |
| Net Credits & Debits | .02 | |
| Closing Balance Cash & Money Accounts | 54.80 | |

| | This Statement | Year-to-Date |
|---|---|---|
| **Credits** | | |
| Sales | | 75,849.92 |
| Income | | 12.02 |
| Funds Received | .02 | 42.00 |
| Electronic Tfrs | | |
| Other | 54.01 | |
| **Total Credits** | | 75,903.94 |

| | This Statement | Year-to-Date |
|---|---|---|
| **Debits** | | |
| Purchases | | 75,849.9 |
| Withdrawals | | |
| Electronic Tfrs | | |
| Other | | |
| **Total Debits** | | 75,849.9 |

## Bank Deposit Interest Summary

| Money Account Description | Opening Balance | Average Deposit Balance | Current Yield % | Interest on Deposits | Closing Balance | Year-to-Date |
|---|---|---|---|---|---|---|
| Merrill Lynch Bank USA | 54 | 54 | .36 | 0.02 | 54 | .36 |
| Total ML Bank Deposit Program | 54 | | | 0.02 | 54 | |

## Current Portfolio

| Quantity | Security Description | Date Acquired | Adjust/Unit Cost Basis | Total Cost Basis | Estimated Market Price | Estimated Market Value | Estimated Accrued Interest | Estimated Annual Income | Current Yield % |
|---|---|---|---|---|---|---|---|---|---|
| **Cash and Money Accounts** | | | | | | | | | |
| 54 | ML Bank Deposit Program | | 1.00 | 54 | 1.00 | 54 | | | |

## Current Portfolio

| Quantity | Security Description | Total Client Investment | Cumulative Investment Return | Total Cost Basis | Estimated Market Price | Estimated Market Value | Unrealized Gain or (Loss) | Estimated Annual Income | Current Yield % |
|---|---|---|---|---|---|---|---|---|---|
| **Mutual Funds and Defined Asset Funds** | | | | | | | | | |
| **Equity Funds** | | | | | | | | | |
| 4,204 | DAVIS NY VENTURE FD A | $120,360 | | 112,591 | 28.63 | 120,360 | 7,764 | 777 | .64 |
| 20,680 | DAVIS NY VENTURE FD A | | | N/A | 28.63 | 592,068 | N/A | 3,825 | .64 |
| | (.3470 FRACTIONAL SHARE) | | | N/A | 28.63 | 9 | N/A | | .64 |
| | INITIAL PURCHASE; RE INV | | | | | | | | |
| **Total Equity Funds** | | $120,360 | | 112,591 | | 712,438 | 7,764 | 4,603 | .65 |

Page    ST

Statement Period

Account No.





# Merrill Lynch

## EMA™ ACCOUNT

### Current Portfolio

| Quantity | Security Description | Total Client Investment | Cumulative Investment Return | Total Cost Basis | Estimated Market Price | Estimated Market Value | Unrealized Gain or (Loss) | Estimated Annual Income | Current Yield % |
|---|---|---|---|---|---|---|---|---|---|
| **Total Funds** | | | $120,360 | 112,591 | | 712,438 | 7,764 | 4,603 | .65 |

TOTAL CLIENT INVESTMENT: Cost of shares directly purchased and still held. Does not include shares purchased through reinvestment. CUMULATIVE INVESTMENT RETURN: Estimated Market Value minus Total Client Investment. Cumulative Investment Return is the capital appreciation (depreciation) of all shares purchased, including shares purchased through reinvestment.

UNREALIZED GAIN or (LOSS): Estimated Market Value minus Total Cost Basis. Provided for Tax Planning purposes only and is not applicable to retirement accounts "denoted by N/A INITIAL PURCHASE: Date of your initial investment in this fund.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Total of Long Portfolio** | | | | 112,645* | | 712,492 | 7,764 * | 4,603 | .65 |

* Excludes N/A Items

### Statement Activity

| Date | Transaction | Quantity | Description | Price | Debit | Credit |
|---|---|---|---|---|---|---|
| **Dividends and Interest** | | | | | | |
| 03/31 | Bank Interest | | BANK DEPOSIT INTEREST | | | .02 |
| **Net Total** | | | | | | .02 |

### Customer Service

For information about your account, please call 1-800-Merrill (1-800-637-7455). To report Lost or Stolen Visa Cards or checks, please call 1-800-262-5678. When requested, enter your Access Code 92-855-07659.

† 21 E 90TH ST

0629505

Page 3 of 4

Statement Period 02/28/04 TO 03/31/04

Account No. 855-07N59

000202 7617



# Agreement Regarding Your Securities Account and Other Important Information

You, the Client, and we, Merrill Lynch, Pierce, Fenner & Smith Incorporated (Merrill Lynch), agree as follows:

(1) We will direct your order for a security or option to the marketplace we consider to be the primary market for that security or option.

(2) We will hold bonds and preferred stocks in bulk segregation (except for those held in custodian accounts). In the event all preferred stocks and bonds of an issue or series of those securities to be called will be randomly selected from those held in bulk.

(3) We are not responsible for the loss or destruction of securities that are placed in the custody of a non-enemy action, government acts or any other causes beyond our control.

(4) This statement of account shall be deemed conclusive if not objected to within ten (10) days.

(5) A "P" after a fee from ISA® banks of up to 2% per annum of the average daily balances. In the event of a fee that you are charged is up to 30% and is paid by our affiliated banks.

(6) You will have the right to vote full shares. The voting options concerning the voting of full shares held in your account. The voting shares in your account will be governed by the rules and procedures of the applicable exchanges or regulatory provision, and the Securities and Exchange Commission then in effect, or other applicable exchanges or regulatory provision.

(7) This statement serves as a confirmation of purchases that result from automatic reinvestment transaction, as well as your AIPS transactions, during the statement period.

As our client, please advise us promptly of any material change in your investment objectives or financial condition. The information will be made available to you upon request.

(9) All transactions in your account are subject to the constitution, rules, regulations, customs, usages, summary of this information will be made available to you upon request.

(10) We trade for our own accounts as an odd lot dealer, a block positioner and/or otherwise as principal to execute odd-lot orders. We or an affiliate may have a long or short position in the same security, and our positions may change while you are reviewing this statement.

(11) We can use your free credit balance in the normal course of business and such are not segregated. You have the right to receive, in the normal course of business, any free credit balance and any fully paid securities on demand subject to any open commitments in any of your accounts.

(12) Merrill Lynch's financial statement is available for your inspection at our office, or a copy will be mailed upon request to: Merrill Lynch, WFC, NY, New York, NY 10281.

(13) If this statement is for a margin account, it is a combined statement of your margin account and record of the separate account, maintained for you pursuant to applicable regulations. The permanent memorandum account. You should retain this statement for use with your next statement to calculate interest charges if any, that interest due for the final day of the statement period will parallel the statement Period, except that interest due for the final day of the statement period will be carried over and appear on your next statement.

The Securities Investor Protection Corporation (SIPC) and/or our excess-SIPC bond do not cover, assets that are not securities or assets not held by Merrill Lynch such as assets on deposit at Merrill Lynch Bank USA, Merrill Lynch Bank & Trust Co. or other depository institutions. Deposits at Merrill Lynch Bank USA and Merrill Lynch Bank & Trust Co. are insured by the Federal Deposit Insurance Corporation. Deposits are not protected by the Securities Investor Protection Insurance and are guaranteed by neither Merrill Lynch. ARE NOT FDIC-INSURED, ARE NOT BANK GUARANTEED, AND MAY LOSE VALUE.

While we believe our pricing information to be reliable, we cannot guarantee its accuracy. Managed Trust Units: Information is based on data from the Merrill Lynch Trust Company or its agent. Insurance Policies: Information is based on data from the issuer of the policy. Merrill Lynch is not responsible for the calculation of policy values. Policies are generally not held in your Merrill Lynch account, are not subject to SIPC protection, and are not carried by Merrill Lynch or its custodian or trustee unless a policy that is a security, SIPC protection applies.

Cost Data/Realized Capital Gains & Losses: Cost data and Realized Capital Gains/Losses are provided for informational purposes only. Please consult your tax advisor to determine the tax consequences for omitted or restated data. Please consult your tax advisor to determine the tax consequences of gains/losses, and Merrill Lynch does not report. If you have access to the detailed accounting of gains/losses, and Merrill Lynch does not report to your records, trade confirmations, and the Consolidated Tax Reporting Statement (Form 1099).

## Prices and Valuations (Cont.)

Fixed-Income Securities: Market values are estimated values obtained from various sources and may be based on bids where available, or the bid/offer spread, closing prices, a matrix methodology utilizing general market levels, the value of comparable securities and/or analytic models, pricing estimates do not constitute bids or offers to purchase or sell any security. Actual prices realized if sale, or paid at the time of purchase, may be more or less than the value reflected on the statement.

**Symbols and Abbreviations**

Interest reported to IRS.
Gross Proceeds reported to the IRS.       N/C    Value and/or cost data not available.
Dividends reported to the IRS.            N/O    Non-negotiable securities.
Transactions reported to IRS.             N/O    Held registered in your name.
NOCC                                      N/O    Non-negotiable securities.
                                          N/O    Held registered in your name.
# Merrill Lynch maintains a fundamental opinion on this security.
@ Transaction you requested required same-day payment — Merrill Lynch retained last day's dividend of distribution.
RD Bonds are changeable from coupon to registered and vice versa without charge.
RI Bonds registered for both principal and interest.
+ Indicates that one of our global securities research division has upgraded (↑) or downgraded (↓) its fundamental opinion on a security.
NPC    Non-negotiable securities held registered in your name.
NO CUST Non-negotiable securities held registered in your name.
Interest in assets not registered in the name of nor held by Merrill Lynch or its nominees; held by you or registered in your name with the issuer or his agent. Merrill Lynch does not control or act as custodian. SIPC and excess-SIPC protection do not apply. These assets are not included on this statement unless a service to you.
Visa foreign currency transactions are converted to U.S. dollars using either a government-mandated rate or a wholesale currency rate. The Currency Conversion amount on your statement shows the amount of the 1% and Merrill Lynch increases by 1% the transaction.
Standard & Poor's is a service of The McGraw-Hill Companies, Inc. and is licensed for use by Merrill Lynch.

****AUTO**MIXED AADC 088
248558 0003192 T25 P60 0.534
FAO DR. MANNUCCIO MANNUCCI
21 E 90TH ST
NEW YORK NY 10128-0654

*** END OF STATEMENT ***

# EXHIBIT J

# Vital Statistics of the United States, 1980

Life Tables

Volume II, Section 6



DHHS Publication No. (PHS) 84-1104

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
Public Health Service
National Center for Health Statistics

Hyattsville, Maryland
May 1984

Table 6-3.  Expectation of Life at Single Years of Age, by Race and Sex:  United States, 1980

| Age | All races | | | White | | | All other | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total | | | Black | | |
| | Both sexes | Male | Female | Both sexes | Male | Female | Both sexes | Male | Female | Both sexes | Male | Female |
| 0 | 73.7 | 70.0 | 77.5 | 74.4 | 70.7 | 78.1 | 69.5 | 65.3 | 73.6 | 68.0 | 63.7 | 72.3 |
| 1 | 73.7 | 70.0 | 77.4 | 74.2 | 70.6 | 77.9 | 69.8 | 65.7 | 73.9 | 68.5 | 64.2 | 72.7 |
| 2 | 72.7 | 69.0 | 76.4 | 73.3 | 69.6 | 76.9 | 68.9 | 64.7 | 73.0 | 67.6 | 63.3 | 71.8 |
| 3 | 71.8 | 68.1 | 75.5 | 72.3 | 68.7 | 76.0 | 68.0 | 63.8 | 72.1 | 66.6 | 62.3 | 70.9 |
| 4 | 70.8 | 67.1 | 74.5 | 71.4 | 67.7 | 75.0 | 67.0 | 62.9 | 71.1 | 65.7 | 61.4 | 69.9 |
| 5 | 69.8 | 66.1 | 73.5 | 70.4 | 66.8 | 74.0 | 66.1 | 61.9 | 70.2 | 64.7 | 60.5 | 69.0 |
| 6 | 68.9 | 65.2 | 72.6 | 69.4 | 65.8 | 73.1 | 65.1 | 60.9 | 69.2 | 63.8 | 59.5 | 68.0 |
| 7 | 67.9 | 64.2 | 71.6 | 68.4 | 64.8 | 72.1 | 64.1 | 60.0 | 68.2 | 62.8 | 58.5 | 67.0 |
| 8 | 66.9 | 63.2 | 70.6 | 67.5 | 63.8 | 71.1 | 63.1 | 59.0 | 67.2 | 61.8 | 57.5 | 66.0 |
| 9 | 65.9 | 62.2 | 69.6 | 66.5 | 62.8 | 70.1 | 62.2 | 58.0 | 66.3 | 60.8 | 56.6 | 65.1 |
| 10 | 64.9 | 61.3 | 68.6 | 65.5 | 61.9 | 69.1 | 61.2 | 57.1 | 65.3 | 59.9 | 55.6 | 64.1 |
| 11 | 64.0 | 60.3 | 67.6 | 64.5 | 60.9 | 68.1 | 60.2 | 56.1 | 64.3 | 58.9 | 54.6 | 63.1 |
| 12 | 63.0 | 59.3 | 66.6 | 63.5 | 59.9 | 67.1 | 59.2 | 55.1 | 63.3 | 57.9 | 53.6 | 62.1 |
| 13 | 62.0 | 58.3 | 65.7 | 62.5 | 58.9 | 66.2 | 58.2 | 54.1 | 62.3 | 56.9 | 52.7 | 61.1 |
| 14 | 61.0 | 57.3 | 64.7 | 61.6 | 57.9 | 65.2 | 57.3 | 53.1 | 61.3 | 55.9 | 51.7 | 60.1 |
| 15 | 60.0 | 56.4 | 63.7 | 60.6 | 57.0 | 64.2 | 56.3 | 52.2 | 60.4 | 55.0 | 50.7 | 59.2 |
| 16 | 59.1 | 55.4 | 62.8 | 59.6 | 56.0 | 63.2 | 55.4 | 51.2 | 59.4 | 54.0 | 49.8 | 58.2 |
| 17 | 58.1 | 54.5 | 61.8 | 58.7 | 55.1 | 62.3 | 54.4 | 50.3 | 58.4 | 53.0 | 48.8 | 57.2 |
| 18 | 57.2 | 53.6 | 60.8 | 57.7 | 54.2 | 61.3 | 53.4 | 49.3 | 57.4 | 52.1 | 47.9 | 56.2 |
| 19 | 56.3 | 52.7 | 59.8 | 56.8 | 53.3 | 60.3 | 52.5 | 48.4 | 56.5 | 51.1 | 46.9 | 55.3 |
| 20 | 55.3 | 51.8 | 58.9 | 55.9 | 52.4 | 59.4 | 51.5 | 47.5 | 55.5 | 50.2 | 46.0 | 54.3 |
| 21 | 54.4 | 50.9 | 57.9 | 54.9 | 51.6 | 58.4 | 50.6 | 46.6 | 54.5 | 49.3 | 45.2 | 53.3 |
| 22 | 53.5 | 50.0 | 56.9 | 54.0 | 50.5 | 57.4 | 49.7 | 45.7 | 53.6 | 48.4 | 44.3 | 52.4 |
| 23 | 52.5 | 49.1 | 56.0 | 53.1 | 49.6 | 56.5 | 48.7 | 44.7 | 52.6 | 47.5 | 43.4 | 51.4 |
| 24 | 51.6 | 48.2 | 55.0 | 52.1 | 48.7 | 55.5 | 47.9 | 44.0 | 51.7 | 46.6 | 42.5 | 50.5 |
| 25 | 50.7 | 47.3 | 54.0 | 51.2 | 47.8 | 54.5 | 47.0 | 43.1 | 50.7 | 45.7 | 41.7 | 49.5 |
| 26 | 49.7 | 46.4 | 53.1 | 50.3 | 46.9 | 53.6 | 46.1 | 42.3 | 49.8 | 44.8 | 40.8 | 48.6 |
| 27 | 48.8 | 45.4 | 52.1 | 49.3 | 46.0 | 52.6 | 45.2 | 41.4 | 48.8 | 43.9 | 40.0 | 47.7 |
| 28 | 47.9 | 44.5 | 51.1 | 48.4 | 45.1 | 51.6 | 44.3 | 40.5 | 47.9 | 43.0 | 39.1 | 46.7 |
| 29 | 46.9 | 43.6 | 50.2 | 47.4 | 44.2 | 50.6 | 43.4 | 39.7 | 47.0 | 42.1 | 38.3 | 45.8 |
| 30 | 46.0 | 42.7 | 49.2 | 46.5 | 43.2 | 49.7 | 42.5 | 38.8 | 46.0 | 41.2 | 37.4 | 44.8 |
| 31 | 45.1 | 41.8 | 48.2 | 45.5 | 42.3 | 48.7 | 41.6 | 38.0 | 45.1 | 40.3 | 36.6 | 43.9 |
| 32 | 44.1 | 40.9 | 47.3 | 44.6 | 41.4 | 47.7 | 40.7 | 37.1 | 44.2 | 39.4 | 35.7 | 43.0 |
| 33 | 43.2 | 39.9 | 46.3 | 43.7 | 40.4 | 46.8 | 39.8 | 36.2 | 43.2 | 38.5 | 34.9 | 42.1 |
| 34 | 42.2 | 39.0 | 45.4 | 42.7 | 39.5 | 45.8 | 38.9 | 35.4 | 42.3 | 37.7 | 34.1 | 41.2 |
| 35 | 41.3 | 38.1 | 44.4 | 41.8 | 38.6 | 44.9 | 38.0 | 34.5 | 41.4 | 36.8 | 33.2 | 40.2 |
| 36 | 40.4 | 37.2 | 43.5 | 40.8 | 37.6 | 43.9 | 37.1 | 33.7 | 40.4 | 35.9 | 32.4 | 39.3 |
| 37 | 39.4 | 36.3 | 42.5 | 39.9 | 36.7 | 42.9 | 36.2 | 32.8 | 39.5 | 35.0 | 31.6 | 38.4 |
| 38 | 38.5 | 35.3 | 41.6 | 38.9 | 35.8 | 42.0 | 35.3 | 32.0 | 38.6 | 34.2 | 30.8 | 37.5 |
| 39 | 37.6 | 34.4 | 40.6 | 38.0 | 34.9 | 41.0 | 34.5 | 31.2 | 37.7 | 33.3 | 29.9 | 36.6 |
| 40 | 36.7 | 33.5 | 39.7 | 37.1 | 34.0 | 40.1 | 33.6 | 30.3 | 36.8 | 32.5 | 29.1 | 35.7 |
| 41 | 35.7 | 32.6 | 38.7 | 36.1 | 33.0 | 39.1 | 32.8 | 29.5 | 35.9 | 31.6 | 28.3 | 34.8 |
| 42 | 34.8 | 31.7 | 37.8 | 35.2 | 32.1 | 38.2 | 31.9 | 28.7 | 35.0 | 30.8 | 27.5 | 33.9 |
| 43 | 33.9 | 30.9 | 36.9 | 34.3 | 31.2 | 37.3 | 31.1 | 27.9 | 34.2 | 30.0 | 26.8 | 33.1 |
| 44 | 33.0 | 30.0 | 36.0 | 33.4 | 30.3 | 36.4 | 30.2 | 27.1 | 33.3 | 29.2 | 26.0 | 32.2 |
| 45 | 32.1 | 29.1 | 35.0 | 32.5 | 29.4 | 35.4 | 29.4 | 26.3 | 32.4 | 28.4 | 25.2 | 31.4 |
| 46 | 31.3 | 28.2 | 34.1 | 31.6 | 28.6 | 34.5 | 28.6 | 25.6 | 31.6 | 27.6 | 24.5 | 30.5 |
| 47 | 30.4 | 27.4 | 33.2 | 30.7 | 27.7 | 33.6 | 27.8 | 24.8 | 30.7 | 26.8 | 23.7 | 29.7 |
| 48 | 29.5 | 26.5 | 32.3 | 29.8 | 26.8 | 32.7 | 27.1 | 24.1 | 29.9 | 26.0 | 23.0 | 28.9 |
| 49 | 28.7 | 25.7 | 31.4 | 29.0 | 26.0 | 31.8 | 26.3 | 23.3 | 29.1 | 25.3 | 22.2 | 28.1 |
| 50 | 27.8 | 24.9 | 30.6 | 28.1 | 25.2 | 30.9 | 25.5 | 22.6 | 28.3 | 24.5 | 21.6 | 27.3 |
| 51 | 27.0 | 24.1 | 29.7 | 27.2 | 24.3 | 30.0 | 24.8 | 21.9 | 27.5 | 23.8 | 21.0 | 26.5 |
| 52 | 26.1 | 23.3 | 28.8 | 26.4 | 23.5 | 29.1 | 24.0 | 21.2 | 26.7 | 23.1 | 20.3 | 25.7 |
| 53 | 25.3 | 22.5 | 28.0 | 25.6 | 22.7 | 28.2 | 23.3 | 20.6 | 25.9 | 22.4 | 19.7 | 24.9 |
| 54 | 24.5 | 21.7 | 27.1 | 24.8 | 21.9 | 27.4 | 22.5 | 19.9 | 25.1 | 21.7 | 19.0 | 24.2 |
| 55 | 23.7 | 21.0 | 26.3 | 23.9 | 21.2 | 26.5 | 21.9 | 19.3 | 24.4 | 21.0 | 18.4 | 23.4 |
| 56 | 22.9 | 20.2 | 25.4 | 23.1 | 20.4 | 25.7 | 21.2 | 18.6 | 23.6 | 20.3 | 17.8 | 22.7 |
| 57 | 22.2 | 19.5 | 24.6 | 22.4 | 19.6 | 24.8 | 20.5 | 18.0 | 22.9 | 19.7 | 17.2 | 22.0 |
| 58 | 21.4 | 18.8 | 23.8 | 21.6 | 18.9 | 24.0 | 19.9 | 17.4 | 22.1 | 19.0 | 16.6 | 21.3 |
| 59 | 20.6 | 18.0 | 23.0 | 20.8 | 18.2 | 23.2 | 19.2 | 16.8 | 21.4 | 18.4 | 16.0 | 20.5 |
| 60 | 19.9 | 17.4 | 22.2 | 20.1 | 17.5 | 22.4 | 18.6 | 16.2 | 20.7 | 17.8 | 15.5 | 19.8 |
| 61 | 19.2 | 16.7 | 21.4 | 19.3 | 16.8 | 21.6 | 17.9 | 15.7 | 20.0 | 17.2 | 14.9 | 19.1 |
| 62 | 18.5 | 16.0 | 20.6 | 18.6 | 16.1 | 20.8 | 17.3 | 15.1 | 19.3 | 16.6 | 14.4 | 18.5 |
| 63 | 17.8 | 15.4 | 19.8 | 17.9 | 15.4 | 20.0 | 16.7 | 14.6 | 18.6 | 16.0 | 13.9 | 17.8 |
| 64 | 17.1 | 14.7 | 19.1 | 17.2 | 14.8 | 19.2 | 16.1 | 14.0 | 18.0 | 15.4 | 13.4 | 17.2 |
| 65 | 16.4 | 14.1 | 18.3 | 16.5 | 14.2 | 18.5 | 15.5 | 13.5 | 17.3 | 14.9 | 12.9 | 16.5 |
| 66 | 15.7 | 13.5 | 17.6 | 15.8 | 13.6 | 17.7 | 15.0 | 13.0 | 16.7 | 14.3 | 12.4 | 15.9 |
| 67 | 15.1 | 12.9 | 16.9 | 15.2 | 13.0 | 17.0 | 14.4 | 12.5 | 16.0 | 13.7 | 11.9 | 15.3 |
| 68 | 14.4 | 12.3 | 16.1 | 14.5 | 12.4 | 16.2 | 13.8 | 12.0 | 15.4 | 13.2 | 11.4 | 14.6 |
| 69 | 13.8 | 11.8 | 15.4 | 13.9 | 11.8 | 15.5 | 13.3 | 11.5 | 14.8 | 12.6 | 10.9 | 14.0 |
| 70 | 13.2 | 11.3 | 14.8 | 13.3 | 11.3 | 14.8 | 12.8 | 11.1 | 14.2 | 12.1 | 10.5 | 13.4 |
| 71 | 12.6 | 10.7 | 14.1 | 12.7 | 10.7 | 14.1 | 12.2 | 10.6 | 13.6 | 11.6 | 9.9 | 12.9 |
| 72 | 12.0 | 10.2 | 13.4 | 12.1 | 10.2 | 13.4 | 11.7 | 10.2 | 13.0 | 11.1 | 9.6 | 12.3 |
| 73 | 11.5 | 9.7 | 12.8 | 11.5 | 9.7 | 12.8 | 11.3 | 9.7 | 12.5 | 10.6 | 9.2 | 11.8 |
| 74 | 10.9 | 9.3 | 12.1 | 10.9 | 9.3 | 12.2 | 10.8 | 9.3 | 11.9 | 10.1 | 8.8 | 11.2 |
| 75 | 10.4 | 8.8 | 11.5 | 10.4 | 8.8 | 11.5 | 10.3 | 8.9 | 11.4 | 9.7 | 8.3 | 10.7 |
| 76 | 9.9 | 8.4 | 10.9 | 9.9 | 8.3 | 10.9 | 9.9 | 8.3 | 10.9 | 9.2 | 7.9 | 10.2 |
| 77 | 9.3 | 7.9 | 10.3 | 9.3 | 7.9 | 10.3 | 9.4 | 8.1 | 10.4 | 8.8 | 7.5 | 9.7 |
| 78 | 8.9 | 7.5 | 9.7 | 8.8 | 7.5 | 9.7 | 9.0 | 7.7 | 9.9 | 8.3 | 7.1 | 9.2 |
| 79 | 8.4 | 7.1 | 9.2 | 8.4 | 7.1 | 9.2 | 8.5 | 7.3 | 9.4 | 7.9 | 6.7 | 8.7 |
| 80 | 7.9 | 6.7 | 8.6 | 7.9 | 6.7 | 8.6 | 8.1 | 6.9 | 9.0 | 7.4 | 6.3 | 8.2 |
| 81 | 7.5 | 6.3 | 8.1 | 7.4 | 6.3 | 8.1 | 7.7 | 6.5 | 8.5 | 7.0 | 6.0 | 7.7 |
| 82 | 7.0 | 6.0 | 7.6 | 7.0 | 6.0 | 7.6 | 7.3 | 6.2 | 8.1 | 6.6 | 5.6 | 7.3 |
| 83 | 6.6 | 5.7 | 7.2 | 6.6 | 5.6 | 7.1 | 6.9 | 5.8 | 7.7 | 6.2 | 5.2 | 6.9 |
| 84 | 6.2 | 5.3 | 6.8 | 6.2 | 5.3 | 6.7 | 6.6 | 5.5 | 7.3 | 5.8 | 4.9 | 6.5 |
| 85 | 5.9 | 5.0 | 6.4 | 5.9 | 5.0 | 6.3 | 6.3 | 5.3 | 7.0 | 5.5 | 4.5 | 6.1 |

# EXHIBIT K

**Maximum Permissible Length of Deferred Compensation Payments to Dr. Padula[1] and Dr. Salvioni[2] Pursuant to their respective Deferred Compensation Plans (based on life expectantcy of 21 years in 1980)**

| year | fractional annual payment | annual payment --% of remaining principal | annual payment --% of original principal | remaining % of original principal to be paid | cumulative % of original to have been paid |
|---|---|---|---|---|---|
| 1980[3] | 1/21 | 4.7619% | 4.7619% | 95.2381% | 4.7619% |
| 1981 | 1/20 | 5.000% | 4.7619% | 90.4762% | 9.5238% |
| 1982 | 1/19 | 5.263% | 4.7619% | 85.7143% | 14.2857% |
| 1983 | 1/18 | 5.555% | 4.7619% | 80.9524% | 19.0476% |
| 1984 | 1/17 | 5.882% | 4.7619% | 76.1905% | 23.8095% |
| 1985 | 1/16 | 6.250% | 4.7619% | 71.4286% | 28.5714% |
| 1986 | 1/15 | 6.667% | 4.7619% | 66.6667% | 33.3333% |
| 1987 | 1/14 | 7.143% | 4.7619% | 61.9048% | 38.0952% |
| 1988 | 1/13 | 7.692% | 4.7619% | 57.1429% | 42.8571% |
| 1989 | 1/12 | 8.333% | 4.7619% | 52.3810% | 47.6190% |
| 1990 | 1/11 | 9.090% | 4.7619% | 47.6190% | 52.3810% |
| 1991 | 1/10 | 10.000% | 4.7619% | 42.8571% | 57.1429% |
| 1992 | 1/9 | 11.111% | 4.7619% | 38.0952% | 61.9048% |
| 1993 | 1/8 | 12.500% | 4.7619% | 33.3333% | 66.6667% |
| 1994 | 1/7 | 14.286% | 4.7619% | 28.5714% | 71.4286% |
| 1995 | 1/6 | 16.667% | 4.7619% | 23.8095% | 76.1905% |
| 1996 | 1/5 | 20.000% | 4.7619% | 19.0476% | 80.9524% |
| 1997 | 1/4 | 25.000% | 4.7619% | 14.2857% | 85.7143% |
| 1998 | 1/3 | 33.333% | 4.7619% | 9.5238% | 90.4762% |
| 1999 | 1/2 | 50.000% | 4.7619% | 4.7619% | 95.2381% |
| 2000 | 1/1 | 100% | 4.7619% | 0% | 100% |
| totals | | | 100.00% | | |

---

[1]     Dr. Padula was born on November 25, 1925 and retired in October 1980.
[2]     Dr. Salvioni was born on January 1, 1925 and retired in October 1980.
[3]     Because Drs. Padula and Salvioni retired in October 1980, deferred compensation payments were required to commence "as soon as practicable" following termination of employment (i.e., before year-end 1980).

**Maximum Permissible Length of Deferred Compensation Payments to Dr. Taranta[4] Pursuant to the Taranta Deferred Compensation Plan (based on life expectantcy of 13 years in 1995)**

| year | fractional annual payment | annual payment --% of remaining principal | annual payment --% of original principal | remaining % of original principal to be paid | cumulative % of original to have been paid |
|------|------|------|------|------|------|
| 1995[5] | 1/13 | 7.6923% | 7.6923% | 92.3077% | 7.6923% |
| 1996 | 1/12 | 8.333% | 7.6923% | 84.6154% | 15.3846% |
| 1997 | 1/11 | 9.090% | 7.6923% | 76.9231% | 23.0769% |
| 1998 | 1/10 | 10.000% | 7.6923% | 69.2308% | 30.7692% |
| 1999 | 1/9 | 11.111% | 7.6923% | 61.5385% | 38.4615% |
| 2000 | 1/8 | 12.500% | 7.6923% | 53.8462% | 46.1538% |
| 2001 | 1/7 | 14.286% | 7.6923% | 46.1538% | 53.8462% |
| 2002 | 1/6 | 16.667% | 7.6923% | 38.4615% | 61.5385% |
| 2003 | 1/5 | 20.000% | 7.6923% | 30.7692% | 69.2308% |
| 2004 | 1/4 | 25.000% | 7.6923% | 23.0769% | 76.9231% |
| 2005 | 1/3 | 33.333% | 7.6923% | 15.3846% | 84.6154% |
| 2006 | 1/2 | 50.000% | 7.6923% | 7.6923% | 92.3077% |
| 2007 | 1/1 | 100% | 7.6923% | 0% | 100% |
| totals | | | 100% | | |

---

[4] Dr. Taranta was born on April 18, 1927 and retired on May 7, 1995.

[5] Because Dr. Taranta retired on May 7, 1995, deferred compensation payments were required to commence "as soon as practicable" following termination of employment (*i.e.*, June 1995).

**Maximum Permissible Length of Deferred Compensation Payments to Dr. Mannucci[6] Pursuant to the Mannucci Deferred Compensation Plan (based on life expectantcy of 10 years in 2000)**

| year | fractional annual payment | annual payment --% of remaining principal | annual payment --% of original principal | remaining % of original principal to be paid | cumulative % of original to have been paid |
|------|------|------|------|------|------|
| 2001[7] | 1/10 | 10.00% | 10.00% | 90.00% | 10.00% |
| 2002 | 1/9 | 11.111% | 10.00% | 80.00% | 20.00% |
| 2003 | 1/8 | 12.500% | 10.00% | 70.00% | 30.00% |
| 2004 | 1/7 | 14.286% | 10.00% | 60.00% | 40.00% |
| 2005 | 1/6 | 16.667% | 10.00% | 50.00% | 50.00% |
| 2006 | 1/5 | 20.000% | 10.00% | 40.00% | 60.00% |
| 2007 | 1/4 | 25.000% | 10.00% | 30.00% | 70.00% |
| 2008 | 1/3 | 33.333% | 10.00% | 20.00% | 80.00% |
| 2009 | 1/2 | 50.000% | 10.00% | 10.00% | 90.00% |
| 2010 | 1/1 | 100% | 10.00% | 0% | 100% |
| totals | | | 100% | | |

---

[6]    Dr. Mannucci was born on June 13, 1926 and retired on December 31, 2000.

[7]    Because Dr. Mannucci retired on December 31, 2000, deferred compensation payments were required to commence "as soon as practicable" following termination of employment (i.e., early 2001).

# EXHIBIT L

# Vital Statistics

# of the

# United States, 1995

Preprint of Volume II, Mortality, Part A, Section 6

From the CENTERS FOR DISEASE CONTROL AND PREVENTION/National Center for Health Statistics

# LIFE ■ TABLES



U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
Centers for Disease Control and Prevention
National Center for Health Statistics

Hyattsville, Maryland
May 1998

DHHS Publication No. (PHS) 98-1104

Table 6-3. Expectation of Life at Single Years of Age, by Race and Sex:  United States, 1995

| Age | All races | | | White | | | All other | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total | | | Black | | |
| | Both sexes | Male | Female | Both sexes | Male | Female | Both sexes | Male | Female | Both sexes | Male | Female |
| 0 | 75.8 | 72.5 | 78.9 | 76.5 | 73.4 | 79.6 | 71.9 | 67.9 | 75.7 | 69.6 | 65.2 | 73.9 |
| 1 | 75.4 | 72.1 | 78.5 | 76.0 | 72.9 | 79.0 | 71.8 | 67.8 | 75.6 | 69.7 | 65.3 | 73.9 |
| 2 | 74.4 | 71.2 | 77.5 | 75.1 | 72.0 | 78.1 | 70.9 | 68.9 | 74.6 | 68.7 | 64.3 | 73.0 |
| 3 | 73.4 | 70.2 | 76.6 | 74.1 | 71.0 | 77.1 | 69.9 | 65.9 | 73.7 | 67.8 | 63.4 | 72.0 |
| 4 | 72.5 | 69.3 | 75.6 | 73.1 | 70.0 | 76.1 | 68.9 | 64.9 | 72.7 | 66.8 | 62.4 | 71.0 |
| 5 | 71.5 | 68.3 | 74.6 | 72.1 | 69.1 | 75.1 | 68.0 | 64.0 | 71.7 | 65.9 | 61.5 | 70.1 |
| 6 | 70.5 | 67.3 | 73.6 | 71.1 | 68.1 | 74.1 | 67.0 | 63.0 | 70.8 | 64.9 | 60.5 | 69.1 |
| 7 | 69.5 | 66.3 | 72.6 | 70.2 | 67.1 | 73.1 | 66.0 | 62.0 | 69.8 | 63.9 | 59.5 | 68.1 |
| 8 | 68.5 | 65.3 | 71.6 | 69.2 | 66.1 | 72.2 | 65.0 | 61.0 | 68.8 | 62.9 | 58.5 | 67.1 |
| 9 | 67.5 | 64.3 | 70.6 | 68.2 | 65.1 | 71.2 | 64.0 | 60.1 | 67.8 | 61.9 | 57.5 | 66.1 |
| 10 | 66.6 | 63.3 | 69.7 | 67.2 | 64.1 | 70.2 | 63.1 | 59.1 | 66.8 | 61.0 | 56.6 | 65.2 |
| 11 | 65.6 | 62.4 | 68.7 | 66.2 | 63.1 | 69.2 | 62.1 | 58.1 | 65.8 | 60.0 | 55.6 | 64.2 |
| 12 | 64.6 | 61.4 | 67.7 | 65.2 | 62.1 | 68.2 | 61.1 | 57.1 | 64.8 | 59.0 | 54.6 | 63.2 |
| 13 | 63.6 | 60.4 | 66.7 | 64.2 | 61.2 | 67.2 | 60.1 | 56.1 | 63.9 | 58.0 | 53.6 | 62.2 |
| 14 | 62.6 | 59.4 | 65.7 | 63.2 | 60.2 | 66.2 | 59.1 | 55.1 | 62.9 | 57.0 | 52.6 | 61.2 |
| 15 | 61.6 | 58.4 | 64.7 | 62.3 | 59.2 | 65.2 | 58.2 | 54.2 | 61.9 | 56.1 | 51.7 | 60.2 |
| 16 | 60.7 | 57.5 | 63.7 | 61.3 | 58.3 | 64.3 | 57.2 | 53.2 | 60.9 | 55.1 | 50.8 | 59.3 |
| 17 | 59.7 | 56.5 | 62.8 | 60.3 | 57.3 | 63.3 | 56.3 | 52.3 | 59.9 | 54.2 | 49.8 | 58.3 |
| 18 | 58.8 | 55.6 | 61.8 | 59.4 | 56.4 | 62.3 | 55.3 | 51.4 | 59.0 | 53.2 | 48.9 | 57.3 |
| 19 | 57.8 | 54.7 | 60.8 | 58.4 | 55.4 | 61.3 | 54.4 | 50.5 | 58.0 | 52.3 | 48.1 | 56.4 |
| 20 | 56.9 | 53.8 | 59.9 | 57.5 | 54.5 | 60.4 | 53.5 | 49.6 | 57.0 | 51.4 | 47.2 | 55.4 |
| 21 | 55.9 | 52.9 | 58.9 | 56.5 | 53.6 | 59.4 | 52.6 | 48.7 | 56.1 | 50.5 | 46.3 | 54.4 |
| 22 | 55.0 | 51.9 | 57.9 | 55.6 | 52.7 | 58.4 | 51.6 | 47.9 | 55.1 | 49.6 | 45.4 | 53.5 |
| 23 | 54.1 | 51.0 | 57.0 | 54.6 | 51.7 | 57.4 | 50.7 | 47.0 | 54.2 | 48.7 | 44.6 | 52.5 |
| 24 | 53.1 | 50.1 | 56.0 | 53.7 | 50.8 | 56.5 | 49.8 | 46.1 | 53.2 | 47.8 | 43.7 | 51.6 |
| 25 | 52.2 | 49.2 | 55.0 | 52.7 | 49.9 | 55.5 | 48.9 | 45.2 | 52.3 | 46.9 | 42.9 | 50.6 |
| 26 | 51.2 | 48.3 | 54.0 | 51.8 | 48.9 | 54.5 | 48.0 | 44.4 | 51.3 | 46.0 | 42.0 | 49.7 |
| 27 | 50.3 | 47.3 | 53.1 | 50.8 | 48.0 | 53.6 | 47.1 | 43.5 | 50.4 | 45.1 | 41.1 | 48.7 |
| 28 | 49.3 | 46.4 | 52.1 | 49.9 | 47.1 | 52.6 | 46.2 | 42.6 | 49.4 | 44.2 | 40.3 | 47.8 |
| 29 | 48.4 | 45.5 | 51.1 | 49.0 | 46.2 | 51.6 | 45.2 | 41.7 | 48.5 | 43.3 | 39.4 | 46.9 |
| 30 | 47.5 | 44.6 | 50.2 | 48.0 | 45.2 | 50.6 | 44.3 | 40.8 | 47.5 | 42.4 | 38.6 | 46.0 |
| 31 | 46.5 | 43.7 | 49.2 | 47.1 | 44.3 | 49.7 | 43.4 | 40.0 | 46.5 | 41.5 | 37.7 | 45.0 |
| 32 | 45.6 | 42.8 | 48.3 | 46.1 | 43.4 | 48.7 | 42.6 | 39.1 | 45.7 | 40.7 | 36.9 | 44.1 |
| 33 | 44.7 | 41.9 | 47.3 | 45.2 | 42.5 | 47.7 | 41.7 | 38.3 | 44.7 | 39.8 | 36.1 | 43.2 |
| 34 | 43.8 | 41.0 | 46.3 | 44.3 | 41.6 | 46.8 | 40.8 | 37.4 | 43.8 | 38.9 | 35.3 | 42.3 |
| 35 | 42.8 | 40.1 | 45.4 | 43.3 | 40.7 | 45.8 | 39.9 | 36.6 | 42.9 | 38.1 | 34.5 | 41.4 |
| 36 | 41.9 | 39.2 | 44.4 | 42.4 | 39.8 | 44.9 | 39.0 | 35.7 | 42.0 | 37.2 | 33.6 | 40.5 |
| 37 | 41.0 | 38.3 | 43.5 | 41.5 | 38.9 | 43.9 | 38.1 | 34.9 | 41.1 | 36.4 | 32.8 | 39.6 |
| 38 | 40.1 | 37.4 | 42.6 | 40.5 | 37.9 | 42.9 | 37.3 | 34.1 | 40.1 | 35.5 | 32.0 | 38.7 |
| 39 | 39.2 | 36.5 | 41.6 | 39.6 | 37.0 | 42.0 | 36.4 | 33.3 | 39.2 | 34.7 | 31.2 | 37.8 |
| 40 | 38.3 | 35.6 | 40.7 | 38.7 | 36.1 | 41.0 | 35.6 | 32.4 | 38.3 | 33.9 | 30.5 | 36.9 |
| 41 | 37.3 | 34.8 | 39.7 | 37.8 | 35.3 | 40.1 | 34.7 | 31.6 | 37.4 | 33.0 | 29.7 | 36.1 |
| 42 | 36.4 | 33.9 | 38.8 | 36.9 | 34.4 | 39.2 | 33.9 | 30.8 | 36.6 | 32.2 | 28.9 | 35.2 |
| 43 | 35.5 | 33.0 | 37.9 | 35.9 | 33.5 | 38.2 | 33.0 | 30.0 | 35.7 | 31.4 | 28.2 | 34.3 |
| 44 | 34.6 | 32.1 | 36.9 | 35.0 | 32.6 | 37.3 | 32.2 | 29.2 | 34.8 | 30.6 | 27.4 | 33.5 |
| 45 | 33.8 | 31.3 | 36.0 | 34.1 | 31.7 | 36.3 | 31.4 | 28.5 | 33.9 | 29.8 | 26.7 | 32.6 |
| 46 | 32.9 | 30.4 | 35.1 | 33.2 | 30.8 | 35.4 | 30.5 | 27.7 | 33.0 | 29.0 | 25.9 | 31.7 |
| 47 | 32.0 | 29.5 | 34.2 | 32.3 | 29.9 | 34.5 | 29.7 | 26.9 | 32.2 | 28.2 | 25.2 | 30.9 |
| 48 | 31.1 | 28.7 | 33.2 | 31.4 | 29.1 | 33.5 | 28.9 | 26.1 | 31.3 | 27.5 | 24.5 | 30.1 |
| 49 | 30.2 | 27.8 | 32.3 | 30.5 | 28.2 | 32.6 | 28.1 | 25.4 | 30.4 | 26.7 | 23.7 | 29.2 |
| 50 | 29.3 | 27.0 | 31.4 | 29.6 | 27.3 | 31.7 | 27.3 | 24.6 | 29.6 | 25.9 | 23.0 | 28.4 |
| 51 | 28.5 | 26.2 | 30.5 | 28.8 | 26.5 | 30.8 | 26.5 | 23.8 | 28.7 | 25.2 | 22.2 | 27.6 |
| 52 | 27.6 | 25.3 | 29.7 | 27.9 | 25.6 | 29.9 | 25.7 | 23.1 | 27.9 | 24.4 | 21.8 | 26.8 |
| 53 | 26.8 | 24.5 | 28.8 | 27.0 | 24.8 | 29.0 | 24.9 | 22.4 | 27.1 | 23.7 | 21.0 | 26.0 |
| 54 | 25.9 | 23.7 | 27.9 | 26.2 | 24.0 | 28.1 | 24.2 | 21.7 | 26.2 | 22.9 | 20.3 | 25.2 |
| 55 | 25.1 | 22.9 | 27.0 | 25.3 | 23.2 | 27.3 | 23.4 | 21.0 | 25.4 | 22.2 | 19.6 | 24.4 |
| 56 | 24.3 | 22.1 | 26.2 | 24.5 | 22.4 | 26.4 | 22.7 | 20.3 | 24.6 | 21.5 | 19.0 | 23.6 |
| 57 | 23.5 | 21.3 | 25.3 | 23.7 | 21.6 | 25.5 | 21.9 | 19.6 | 23.8 | 20.8 | 18.3 | 22.8 |
| 58 | 22.7 | 20.6 | 24.5 | 22.9 | 20.8 | 24.7 | 21.2 | 18.9 | 23.1 | 20.1 | 17.7 | 22.1 |
| 59 | 21.9 | 19.8 | 23.7 | 22.1 | 20.0 | 23.9 | 20.5 | 18.2 | 22.3 | 19.4 | 17.0 | 21.3 |
| 60 | 21.1 | 19.1 | 22.9 | 21.3 | 19.3 | 23.0 | 19.8 | 17.6 | 21.5 | 18.7 | 16.4 | 20.6 |
| 61 | 20.4 | 18.3 | 22.0 | 20.5 | 18.5 | 22.2 | 19.1 | 16.9 | 20.8 | 18.1 | 15.9 | 19.9 |
| 62 | 19.6 | 17.6 | 21.3 | 19.8 | 17.8 | 21.4 | 18.4 | 16.3 | 20.0 | 17.5 | 15.3 | 19.2 |
| 63 | 18.9 | 16.9 | 20.5 | 19.0 | 17.1 | 20.6 | 17.7 | 15.7 | 19.3 | 16.8 | 14.7 | 18.5 |
| 64 | 18.2 | 16.2 | 19.7 | 18.3 | 16.4 | 19.8 | 17.1 | 15.1 | 18.6 | 16.2 | 14.2 | 17.8 |
| 65 | 17.4 | 15.6 | 18.9 | 17.6 | 15.7 | 19.1 | 16.4 | 14.5 | 17.9 | 15.6 | 13.6 | 17.1 |
| 66 | 16.7 | 14.9 | 18.2 | 16.9 | 15.0 | 18.3 | 15.8 | 13.9 | 17.2 | 15.0 | 13.1 | 16.5 |
| 67 | 16.1 | 14.3 | 17.4 | 16.2 | 14.4 | 17.5 | 15.1 | 13.3 | 16.5 | 14.4 | 12.5 | 15.8 |
| 68 | 15.4 | 13.6 | 16.7 | 15.5 | 13.7 | 16.8 | 14.5 | 12.8 | 15.8 | 13.8 | 12.0 | 15.2 |
| 69 | 14.7 | 13.0 | 16.0 | 14.8 | 13.1 | 16.1 | 13.9 | 12.2 | 15.1 | 13.2 | 11.5 | 14.5 |
| 70 | 14.1 | 12.4 | 15.3 | 14.1 | 12.5 | 15.4 | 13.3 | 11.7 | 14.5 | 12.7 | 11.0 | 13.9 |
| 71 | 13.4 | 11.8 | 14.6 | 13.5 | 11.9 | 14.7 | 12.7 | 11.1 | 13.9 | 12.2 | 10.5 | 13.3 |
| 72 | 12.8 | 11.3 | 13.9 | 12.9 | 11.3 | 14.0 | 12.1 | 10.6 | 13.3 | 11.7 | 10.1 | 12.7 |
| 73 | 12.2 | 10.7 | 13.2 | 12.2 | 10.8 | 13.3 | 11.7 | 10.2 | 12.7 | 11.2 | 9.6 | 12.2 |
| 74 | 11.6 | 10.2 | 12.6 | 11.6 | 10.2 | 12.6 | 11.1 | 9.7 | 12.1 | 10.7 | 9.2 | 11.7 |
| 75 | 11.0 | 9.7 | 11.9 | 11.1 | 9.7 | 12.0 | 10.6 | 9.3 | 11.5 | 10.2 | 8.8 | 11.1 |
| 76 | 10.5 | 9.1 | 11.3 | 10.5 | 9.2 | 11.3 | 10.1 | 8.8 | 10.9 | 9.7 | 8.4 | 10.6 |
| 77 | 9.9 | 8.6 | 10.7 | 10.0 | 8.7 | 10.7 | 9.6 | 8.3 | 10.4 | 9.3 | 8.0 | 10.0 |
| 78 | 9.3 | 8.2 | 10.1 | 9.4 | 8.2 | 10.1 | 9.1 | 7.9 | 9.8 | 8.8 | 7.6 | 9.5 |
| 79 | 8.8 | 7.7 | 9.5 | 8.8 | 7.7 | 9.5 | 8.6 | 7.5 | 9.2 | 8.3 | 7.2 | 8.9 |
| 80 | 8.3 | 7.2 | 8.9 | 8.3 | 7.2 | 8.9 | 8.1 | 7.0 | 8.7 | 7.8 | 6.8 | 8.4 |
| 81 | 7.8 | 6.8 | 8.4 | 7.8 | 6.8 | 8.4 | 7.6 | 6.6 | 8.1 | 7.4 | 6.4 | 7.9 |
| 82 | 7.3 | 6.4 | 7.8 | 7.3 | 6.4 | 7.8 | 7.2 | 6.2 | 7.6 | 7.0 | 6.0 | 7.5 |
| 83 | 6.9 | 6.0 | 7.3 | 6.9 | 6.0 | 7.3 | 6.7 | 5.9 | 7.2 | 6.6 | 5.7 | 7.0 |
| 84 | 6.4 | 5.6 | 6.8 | 6.4 | 5.6 | 6.8 | 6.3 | 5.5 | 6.7 | 6.2 | 5.4 | 6.6 |
| 85 | 6.0 | 5.2 | 6.3 | 6.0 | 5.2 | 6.3 | 6.0 | 5.2 | 6.3 | 5.9 | 5.1 | 6.2 |

# EXHIBIT M

# National Vital Statistics Reports



**Volume 51, Number 3**

**December 19, 2002**

# United States Life Tables, 2000

by Elizabeth Arias, Ph.D., Division of Vital Statistics

## Abstract

This report presents period life tables for the United States based on age-specific death rates in 2000. Data used to prepare these life tables are 2000 final mortality statistics; July 1, 2000, population estimates based on the 1990 decennial census; and data from the Medicare program. Presented are complete life tables by age, race, and sex. In 2000 the overall expectation of life at birth was 76.9 years, representing an increase of 0.2 years from life expectancy in 1999. Between 1999 and 2000, life expectancy increased for both males and females and for both the white and black populations. Life expectancy increased by 0.4 years for black males (from 67.8 to 68.2) and by 0.2 years for white males (from 74.6 to 74.8). It increased by 0.2 years for white females (from 74.7 to 74.9) and by 0.1 year for white females (from 79.9 to 80.0).

## Introduction

There are two types of life tables—the cohort (or generation) life table and the period (or current) life table. The cohort life table presents the mortality experience of a particular birth cohort, all persons born in the year 1900, for example, from the moment of birth through consecutive ages in successive calendar years. Based on age-specific death rates observed through consecutive calendar years, the cohort life table reflects the mortality experience of an actual cohort from birth until no lives remain in the group. To prepare just a single complete cohort life table requires data over many years. It is usually not feasible to construct cohort life tables entirely on the basis of observed data for real cohorts due to data unavailability or incompleteness (1). For example, a life table representation of the mortality experience of a cohort of persons born in 1970 would require the use of data projection techniques to estimate deaths into the future (2,3).

Unlike the cohort life table, the period life table does not represent the mortality experience of an actual birth cohort. Rather, the period life table presents what would happen to a hypothetical (or synthetic) cohort if it experienced throughout its entire life the mortality conditions

**Keywords**: life expectancy • life tables • survival • death rates • race

of a particular period in time. Thus, for example, a period life table for 2000 assumes a hypothetical cohort subject throughout its lifetime to the age-specific death rates prevailing for the actual population in 2000. The period life table may thus be characterized as rendering a "snapshot" of current mortality experience, and shows the long-range implications of a set of age-specific death rates that prevailed in a given year. In this report the term "life table" refers only to the period life table and not to the cohort life table.

## Data and Methods

The data used to prepare the U.S. life tables for 2000 are final numbers of deaths for the year 2000; postcensal population estimates for the year 2000; and data from the Medicare program prepared by the Health Care Financing Administration. Population estimates are prepared by the U.S. Census Bureau. They are based on the 1990 decennial census because detailed populations from the 2000 census were not available when this report was prepared. A comparison of 1990 census based estimates and summary 2000 census results show differences for some ethnic and race groups. These differences could result in the underestimation or overestimation of life expectancy (see Technical Notes). Once population estimates based on the 2000 census are available, we will publish another report presenting revised life expectancy estimates. Data from the Medicare program are used to calculate probabilities of dying for ages over 85 years (see Technical Notes).

Life tables can be classified in two ways according to the length of the age interval in which data are presented. A complete life table

### Acknowledgments

This report was prepared in the Division of Vital Statistics under the general direction of Robert N. Anderson, Lead Statistician, and James A. Weed, Acting Chief, Mortality Statistics Branch. Registration Methods Staff and the Data Acquisition and Evaluation Branch provided consultation to State vital statistics offices regarding the collection of the death certificate data on which this report is based. This report was edited by Demarius V. Miller, typeset by Jacqueline M. Davis, and graphics produced by Jarmila Ogburn of the Publications Branch, Division of Data Services.



## Table 5. Life table for white males: United States, 2000

| Age | Probability of dying between ages x to x+1<br>$q_x$ | Number surviving to age x<br>$l_x$ | Number dying between ages x to x+1<br>$d_x$ | Person-years lived between ages x to x+1<br>$L_x$ | Total number of person-years lived above age x<br>$T_x$ | Expectation of life at age x<br>$e_x$ |
|---|---|---|---|---|---|---|
| 0–1 | 0.006236 | 100,000 | 624 | 99,452 | 7,478,650 | 74.8 |
| 1–2 | 0.000499 | 99,376 | 50 | 99,352 | 7,379,198 | 74.3 |
| 2–3 | 0.000344 | 99,327 | 34 | 99,310 | 7,279,846 | 73.3 |
| 3–4 | 0.000262 | 99,293 | 26 | 99,280 | 7,180,537 | 72.3 |
| 4–5 | 0.000196 | 99,267 | 19 | 99,257 | 7,081,257 | 71.3 |
| 5–6 | 0.000189 | 99,247 | 19 | 99,238 | 6,982,000 | 70.3 |
| 6–7 | 0.000182 | 99,228 | 18 | 99,219 | 6,882,762 | 69.4 |
| 7–8 | 0.000175 | 99,210 | 17 | 99,202 | 6,783,543 | 68.4 |
| 8–9 | 0.000160 | 99,193 | 16 | 99,185 | 6,684,341 | 67.4 |
| 9–10 | 0.000138 | 99,177 | 14 | 99,170 | 6,585,156 | 66.4 |
| 10–11 | 0.000121 | 99,163 | 12 | 99,157 | 6,485,986 | 65.4 |
| 11–12 | 0.000127 | 99,151 | 13 | 99,145 | 6,386,829 | 64.4 |
| 12–13 | 0.000183 | 99,139 | 18 | 99,130 | 6,287,684 | 63.4 |
| 13–14 | 0.000299 | 99,121 | 30 | 99,106 | 6,188,554 | 62.4 |
| 14–15 | 0.000457 | 99,091 | 45 | 99,068 | 6,089,448 | 61.5 |
| 15–16 | 0.000629 | 99,046 | 62 | 99,015 | 5,990,380 | 60.5 |
| 16–17 | 0.000787 | 98,983 | 78 | 98,944 | 5,891,365 | 59.5 |
| 17–18 | 0.000922 | 98,906 | 91 | 98,860 | 5,792,421 | 58.6 |
| 18–19 | 0.001025 | 98,814 | 101 | 98,764 | 5,693,561 | 57.6 |
| 19–20 | 0.001102 | 98,713 | 109 | 98,659 | 5,594,797 | 56.7 |
| 20–21 | 0.001181 | 98,604 | 116 | 98,546 | 5,496,139 | 55.7 |
| 21–22 | 0.001260 | 98,488 | 124 | 98,426 | 5,397,593 | 54.8 |
| 22–23 | 0.001310 | 98,364 | 129 | 98,299 | 5,299,167 | 53.9 |
| 23–24 | 0.001322 | 98,235 | 130 | 98,170 | 5,200,868 | 52.9 |
| 24–25 | 0.001304 | 98,105 | 128 | 98,041 | 5,102,698 | 52.0 |
| 25–26 | 0.001275 | 97,977 | 125 | 97,915 | 5,004,657 | 51.1 |
| 26–27 | 0.001252 | 97,852 | 123 | 97,791 | 4,906,742 | 50.1 |
| 27–28 | 0.001240 | 97,730 | 121 | 97,669 | 4,808,951 | 49.2 |
| 28–29 | 0.001247 | 97,609 | 122 | 97,548 | 4,711,282 | 48.3 |
| 29–30 | 0.001272 | 97,487 | 124 | 97,425 | 4,613,734 | 47.3 |
| 30–31 | 0.001303 | 97,363 | 127 | 97,299 | 4,516,310 | 46.4 |
| 31–32 | 0.001341 | 97,236 | 130 | 97,171 | 4,419,010 | 45.4 |
| 32–33 | 0.001397 | 97,106 | 136 | 97,038 | 4,321,840 | 44.5 |
| 33–34 | 0.001474 | 96,970 | 143 | 96,898 | 4,224,802 | 43.6 |
| 34–35 | 0.001568 | 96,827 | 152 | 96,751 | 4,127,903 | 42.6 |
| 35–36 | 0.001667 | 96,675 | 161 | 96,594 | 4,031,152 | 41.7 |
| 36–37 | 0.001773 | 96,514 | 171 | 96,428 | 3,934,558 | 40.8 |
| 37–38 | 0.001893 | 96,343 | 182 | 96,252 | 3,838,130 | 39.8 |
| 38–39 | 0.002031 | 96,160 | 195 | 96,063 | 3,741,878 | 38.9 |
| 39–40 | 0.002186 | 95,965 | 210 | 95,860 | 3,645,815 | 38.0 |
| 40–41 | 0.002352 | 95,755 | 225 | 95,643 | 3,549,955 | 37.1 |
| 41–42 | 0.002528 | 95,530 | 242 | 95,409 | 3,454,312 | 36.2 |
| 42–43 | 0.002729 | 95,289 | 260 | 95,159 | 3,358,903 | 35.2 |
| 43–44 | 0.002964 | 95,029 | 282 | 94,888 | 3,263,744 | 34.3 |
| 44–45 | 0.003233 | 94,747 | 306 | 94,594 | 3,168,857 | 33.4 |
| 45–46 | 0.003542 | 94,441 | 334 | 94,273 | 3,074,263 | 32.6 |
| 46–47 | 0.003876 | 94,106 | 365 | 93,924 | 2,979,990 | 31.7 |
| 47–48 | 0.004213 | 93,741 | 395 | 93,544 | 2,886,066 | 30.8 |
| 48–49 | 0.004530 | 93,346 | 423 | 93,135 | 2,792,522 | 29.9 |
| 49–50 | 0.004835 | 92,924 | 449 | 92,699 | 2,699,387 | 29.0 |
| 50–51 | 0.005152 | 92,474 | 476 | 92,236 | 2,606,688 | 28.2 |
| 51–52 | 0.005510 | 91,998 | 507 | 91,744 | 2,514,452 | 27.3 |
| 52–53 | 0.005923 | 91,491 | 542 | 91,220 | 2,422,707 | 26.5 |
| 53–54 | 0.006420 | 90,949 | 584 | 90,657 | 2,331,487 | 25.6 |
| 54–55 | 0.007017 | 90,365 | 634 | 90,048 | 2,240,830 | 24.8 |
| 55–56 | 0.007721 | 89,731 | 693 | 89,385 | 2,150,782 | 24.0 |
| 56–57 | 0.008513 | 89,038 | 758 | 88,659 | 2,061,398 | 23.2 |
| 57–58 | 0.009372 | 88,280 | 827 | 87,867 | 1,972,738 | 22.3 |
| 58–59 | 0.010264 | 87,453 | 898 | 87,004 | 1,884,872 | 21.6 |
| 59–60 | 0.011196 | 86,555 | 969 | 86,071 | 1,797,868 | 20.8 |
| 60–61 | 0.012241 | 85,586 | 1,048 | 85,062 | 1,711,797 | 20.0 |
| 61–62 | 0.013441 | 84,539 | 1,136 | 83,970 | 1,626,735 | 19.2 |
| 62–63 | 0.014749 | 83,402 | 1,230 | 82,787 | 1,542,765 | 18.5 |
| 63–64 | 0.016146 | 82,172 | 1,327 | 81,509 | 1,459,977 | 17.8 |
| 64–65 | 0.017637 | 80,845 | 1,426 | 80,132 | 1,378,469 | 17.1 |
| 65–66 | 0.019184 | 79,419 | 1,524 | 78,658 | 1,298,336 | 16.3 |
| 66–67 | 0.020868 | 77,896 | 1,626 | 77,083 | 1,219,679 | 15.7 |

## Table 5. Life table for white males: United States, 2000—Con.

| Age | Probability of dying between ages x to x+1<br>$q_x$ | Number surviving to age x<br>$l_x$ | Number dying between ages x to x+1<br>$d_x$ | Person-years lived between ages x to x+1<br>$L_x$ | Total number of person-years lived above age x<br>$T_x$ | Expectation of life at age x<br>$e_x$ |
|---|---|---|---|---|---|---|
| 67–68 . . . . . . . . . . . . . . . . . . . | 0.022813 | 76,270 | 1,740 | 75,400 | 1,142,595 | 15.0 |
| 68–69 . . . . . . . . . . . . . . . . . . . | 0.025074 | 74,530 | 1,869 | 73,596 | 1,067,195 | 14.3 |
| 69–70 . . . . . . . . . . . . . . . . . . . | 0.027581 | 72,662 | 2,004 | 71,660 | 993,599 | 13.7 |
| 70–71 . . . . . . . . . . . . . . . . . . . | 0.030135 | 70,657 | 2,129 | 69,593 | 921,940 | 13.0 |
| 71–72 . . . . . . . . . . . . . . . . . . . | 0.032717 | 68,528 | 2,242 | 67,407 | 852,347 | 12.4 |
| 72–73 . . . . . . . . . . . . . . . . . . . | 0.035519 | 66,286 | 2,354 | 65,109 | 784,940 | 11.8 |
| 73–74 . . . . . . . . . . . . . . . . . . . | 0.036644 | 63,932 | 2,471 | 62,696 | 719,831 | 11.3 |
| 74–75 . . . . . . . . . . . . . . . . . . . | 0.042097 | 61,461 | 2,587 | 60,167 | 657,134 | 10.7 |
| 75–76 . . . . . . . . . . . . . . . . . . . | 0.045725 | 58,874 | 2,692 | 57,528 | 596,967 | 10.1 |
| 76–77 . . . . . . . . . . . . . . . . . . . | 0.049489 | 56,182 | 2,780 | 54,792 | 539,439 | 9.6 |
| 77–78 . . . . . . . . . . . . . . . . . . . | 0.053668 | 53,401 | 2,866 | 51,968 | 484,647 | 9.1 |
| 78–79 . . . . . . . . . . . . . . . . . . . | 0.058525 | 50,535 | 2,958 | 49,057 | 432,679 | 8.6 |
| 79–80 . . . . . . . . . . . . . . . . . . . | 0.064254 | 47,578 | 3,057 | 46,049 | 383,622 | 8.1 |
| 80–81 . . . . . . . . . . . . . . . . . . . | 0.071083 | 44,521 | 3,165 | 42,938 | 337,573 | 7.6 |
| 81–82 . . . . . . . . . . . . . . . . . . . | 0.078908 | 41,356 | 3,263 | 39,724 | 294,634 | 7.1 |
| 82–83 . . . . . . . . . . . . . . . . . . . | 0.087489 | 38,093 | 3,333 | 36,426 | 254,910 | 6.7 |
| 83–84 . . . . . . . . . . . . . . . . . . . | 0.096336 | 34,760 | 3,349 | 33,086 | 218,483 | 6.3 |
| 84–85 . . . . . . . . . . . . . . . . . . . | 0.105413 | 31,411 | 3,311 | 29,756 | 185,398 | 5.9 |
| 85–86 . . . . . . . . . . . . . . . . . . . | 0.115497 | 28,100 | 3,245 | 26,478 | 155,642 | 5.5 |
| 86–87 . . . . . . . . . . . . . . . . . . . | 0.126243 | 24,855 | 3,138 | 23,286 | 129,164 | 5.2 |
| 87–88 . . . . . . . . . . . . . . . . . . . | 0.137661 | 21,717 | 2,990 | 20,222 | 105,878 | 4.9 |
| 88–89 . . . . . . . . . . . . . . . . . . . | 0.149752 | 18,727 | 2,804 | 17,325 | 85,656 | 4.6 |
| 89–90 . . . . . . . . . . . . . . . . . . . | 0.162517 | 15,923 | 2,588 | 14,629 | 68,331 | 4.3 |
| 90–91 . . . . . . . . . . . . . . . . . . . | 0.175949 | 13,335 | 2,346 | 12,162 | 53,702 | 4.0 |
| 91–92 . . . . . . . . . . . . . . . . . . . | 0.190036 | 10,989 | 2,088 | 9,945 | 41,540 | 3.8 |
| 92–93 . . . . . . . . . . . . . . . . . . . | 0.204761 | 8,901 | 1,822 | 7,989 | 31,595 | 3.5 |
| 93–94 . . . . . . . . . . . . . . . . . . . | 0.220100 | 7,078 | 1,558 | 6,299 | 23,606 | 3.3 |
| 94–95 . . . . . . . . . . . . . . . . . . . | 0.236024 | 5,520 | 1,303 | 4,869 | 17,306 | 3.1 |
| 95–96 . . . . . . . . . . . . . . . . . . . | 0.252495 | 4,217 | 1,065 | 3,685 | 12,438 | 2.9 |
| 96–97 . . . . . . . . . . . . . . . . . . . | 0.269471 | 3,152 | 850 | 2,728 | 8,753 | 2.8 |
| 97–98 . . . . . . . . . . . . . . . . . . . | 0.286902 | 2,303 | 661 | 1,973 | 6,025 | 2.6 |
| 98–99 . . . . . . . . . . . . . . . . . . . | 0.304732 | 1,642 | 500 | 1,392 | 4,052 | 2.5 |
| 99–100 . . . . . . . . . . . . . . . . . . | 0.322897 | 1,142 | 369 | 957 | 2,660 | 2.3 |
| 100 years and over . . . . . . . . . . . | 1.00000 | 773 | 773 | 1,703 | 1,703 | 2.2 |

# EXHIBIT N



# Cabrini
## MEDICAL CENTER

227 East 19th Street • New York, NY 10003 • (212) 995-6000

April 8, 1997

Guido Padula, M.D.
300 Rector Place, Apt. 5Q
New York, N.Y. 10280

Dear Dr. Padula:

We have been advised by our attorneys of a tax problem under the deferred compensation arrangement covering you and about a half-dozen other former employees. The agreements all require payment to commence to you as soon as practicable following your termination of employment. These payments are to be made in either a lump sum or installment payments as the Administration of the Medical Center may determine. For reasons which are not clear, the required payments were not begun immediately following your termination of employment.

Our attorneys advise us that under the tax rules governing deferred compensation arrangements, the IRS can argue that you were taxable on the full amount of your deferred compensation account in the year you terminated employment. This obviously poses a tax risk to you. It also poses a tax risk to the Medical Center for having failed to report these amounts as income to the IRS.

We believe that we need to address this matter directly and get back on track. The options we have been given include (1) reporting the income back in the year of termination, (2) paying out your deferred compensation account in a lump sum this year and reporting it as income this year, and (3) paying out installment payments commencing this year but with a current lump sum payment equal to the total installments that would have been paid from the time of termination through the present. Of the three options the first one clearly meets the IRS requirements.

Although the final decision on what action will be taken is up to Cabrini, we would like to have your input as part of the decision making process. What we would hope to get from you is an indication of which of the above options is the most appealing to you and, if none, another suggestion for the administration to consider. To resolve the matter as soon as possible, we request a response from you no later than May 1, 1997.



A Facility of the Missionary Sisters of the Sacred Heart
A Member of The Mount Sinai Health System • An Affiliate of Mount Sinai School of Medicine

Please keep in mind that we cannot accede to individual requests. If we could, the tax rules would require you to be taxed on your full account balance even if you were to receive installment payments. (Tax rules require you to be taxed when you first could have received the funds.) We are looking for your views to help the Administration make a decision that takes into account a sense of what the majority wishes along with concerns the Medical Center itself may have, given its tax risks and obligations.

If you have any questions, please call me at 995-7426. Also remember that we need your response by May 1, 1997.

Sincerely,

*V. Kelleher*

Veronica Kelleher
Senior Vice President
Human Resources

VK/sr

cc:   Jeffrey Frerichs
       David DeCerbo
       Robert W. Wild
bcc:  Gerry Dantis



# Cabrini
## MEDICAL CENTER

227 East 19th Street · New York, NY 10003 · (212) 995-6000

April 8, 1997

Daniele Salvioni, M.D.
350 East 57th Street
New York, N.Y. 10022

Dear Dr. Salvioni:

We have been advised by our attorneys of a tax problem under the deferred compensation arrangement covering you and about a half-dozen other former employees. The agreements all require payment to commence to you as soon as practicable following your termination of employment. These payments are to be made in either a lump sum or installment payments as the Administration of the Medical Center may determine. For reasons which are not clear, the required payments were not begun immediately following your termination of employment.

Our attorneys advise us that under the tax rules governing deferred compensation arrangements, the IRS can argue that you were taxable on the full amount of your deferred compensation account in the year you terminated employment. This obviously poses a tax risk to you. It also poses a tax risk to the Medical Center for having failed to report these amounts as income to the IRS.

We believe that we need to address this matter directly and get back on track. The options we have been given include (1) reporting the income back in the year of termination, (2) paying out your deferred compensation account in a lump sum this year and reporting it as income this year, and (3) paying out installment payments commencing this year but with a current lump sum payment equal to the total installments that would have been paid from the time of termination through the present. Of the three options the first one clearly meets the IRS requirements.

Although the final decision on what action will be taken is up to Cabrini, we would like to have your input as part of the decision making process. What we would hope to get from you is an indication of which of the above options is the most appealing to you and, if none, another suggestion for the administration to consider. To resolve the matter as soon as possible, we request a response from you no later than May 1, 1997.



A Facility of the Missionary Sisters of the Sacred Heart
A Member of The Mount Sinai Health System · An Affiliate of N

Please keep in mind that we cannot accede to individual requests. If we could, the tax rules would require you to be taxed on your full account balance even if you were to receive installment payments. (Tax rules require you to be taxed when you first could have received the funds.) We are looking for your views to help the Administration make a decision that takes into account a sense of what the majority wishes along with concerns the Medical Center itself may have, given its tax risks and obligations.

If you have any questions, please call me at 995-7426. Also remember that we need your response by May 1, 1997.

Sincerely,

*V Kelleher*

Veronica Kelleher
Senior Vice President
Human Resources

VK/sr

cc:     Jeffrey Frerichs
        David DeCerbo
        Robert W. Wild



# Cabrini
## MEDICAL CENTER

227 East 19th Street · New York, NY 10003 · (212) 995-6000

April 8, 1997

Angelo Taranta, M.D.
1788 Oakcreek Drive, #301
Palo Alto, CA 93404-2128

Dear Dr. Taranta:

We have been advised by our attorneys of a tax problem under the deferred compensation arrangement covering you and about a half-dozen other former employees. The agreements all require payment to commence to you as soon as practicable following your termination of employment. These payments are to be made in either a lump sum or installment payments as the Administration of the Medical Center may determine. For reasons which are not clear, the required payments were not begun immediately following your termination of employment.

Our attorneys advise us that under the tax rules governing deferred compensation arrangements, the IRS can argue that you were taxable on the full amount of your deferred compensation account in the year you terminated employment. This obviously poses a tax risk to you. It also poses a tax risk to the Medical Center for having failed to report these amounts as income to the IRS.

We believe that we need to address this matter directly and get back on track. The options we have been given include (1) reporting the income back in the year of termination, (2) paying out your deferred compensation account in a lump sum this year and reporting it as income this year, and (3) paying out installment payments commencing this year but with a current lump sum payment equal to the total installments that would have been paid from the time of termination through the present. Of the three options the first one clearly meets the IRS requirements.

Although the final decision on what action will be taken is up to Cabrini, we would like to have your input as part of the decision making process. What we would hope to get from you is an indication of which of the above options is the most appealing to you and, if none, another suggestion for the administration to consider. To resolve the matter as soon as possible, we request a response from you no later than May 1, 1997.



A Facility of the Missionary Sisters of the Sacred Heart
A Member of The Mount Sinai Health System · An Affiliate of Mount Sinai School of Medicine

Please keep in mind that we cannot accede to individual requests. If we could, the tax rules would require you to be taxed on your full account balance even if you were to receive installment payments. (Tax rules require you to be taxed when you first could have received the funds.) We are looking for your views to help the Administration make a decision that takes into account a sense of what the majority wishes along with concerns the Medical Center itself may have, given its tax risks and obligations.

If you have any questions, please call me at 995-7426. Also remember that we need your response by May 1, 1997.

Sincerely,

Veronica Kelleher
Senior Vice President
Human Resources

VK/sr

cc:    Jeffrey Frerichs
       David DeCerbo
       Robert W. Wild



# Cabrini
## MEDICAL CENTER

227 East 19th Street · New York, NY 10003 · (212) 995-6000

April 8, 1997

Mannuccio Mannucci, M.D.
21 East 90th Street, Apt. 5A
New York, N.Y. 10128

Dear Dr. Mannucci:

We have been advised by our attorneys of a tax problem under the deferred compensation arrangement covering you and about a half-dozen other former employees. The agreements all require payment to commence to you as soon as practicable following your termination of employment. These payments are to be made in either a lump sum or installment payments as the Administration of the Medical Center may determine. For reasons which are not clear, the required payments were not begun immediately following your termination of employment.

Our attorneys advise us that under the tax rules governing deferred compensation arrangements, the IRS can argue that you were taxable on the full amount of your deferred compensation account in the year you terminated employment. This obviously poses a tax risk to you. It also poses a tax risk to the Medical Center for having failed to report these amounts as income to the IRS.

We believe that we need to address this matter directly and get back on track. The options we have been given include (1) reporting the income back in the year of termination, (2) paying out your deferred compensation account in a lump sum this year and reporting it as income this year, and (3) paying out installment payments commencing this year but with a current lump sum payment equal to the total installments that would have been paid from the time of termination through the present. Of the three options the first one clearly meets the IRS requirements.

Although the final decision on what action will be taken is up to Cabrini, we would like to have your input as part of the decision making process. What we would hope to get from you is an indication of which of the above options is the most appealing to you and, if none, another suggestion for the administration to consider. To resolve the matter as soon as possible, we request a response from you no later than May 1, 1997.



Please keep in mind that we cannot accede to individual requests. If we could, the tax rules would require you to be taxed on your full account balance even if you were to receive installment payments. (Tax rules require you to be taxed when you first could have received the funds.) We are looking for your views to help the Administration make a decision that takes into account a sense of what the majority wishes along with concerns the Medical Center itself may have, given its tax risks and obligations.

If you have any questions, please call me at 995-7426. Also remember that we need your response by May 1, 1997.

Sincerely,

Veronica Kelleher
Senior Vice President
Human Resources

VK/sr

cc:  Jeffrey Frerichs
     David DeCerbo
     Robert W. Wild

# EXHIBIT O

## YEARLY DISTRIBUTIONS FOR PADULA, SALVIONI, TARANTA AND MANNUCCI

| 1980-1996 | | PADULA<br>*retired in 1980 at age 55* [1] | SALVIONI<br>*retired in 1980 at age 55* [2] | TARANTA<br>*retired in 1995 at age 68* [3] | MANNUCCI<br>*retired in 2000 at age 74* [4] |
|---|---|---|---|---|---|
| | | No Distributions Made | | | |
| 1997 | Distribution Made | $75,241.97 | $89,800.32 | $81,108.97 | |
| | Account Balance | | | | |
| | Fraction | | | | |
| 1998 | Distribution Made | $69,341.28 | $147,738.42 | $104,898.48 | |
| | Account Balance | | | | |
| | Fraction | | | | |
| 1999 | Distribution Made | $77,165.20 | $169,915.40 | $118,589.00 | |
| | Account Balance | $771,652.00 | $1,699,154.00 | $1,660,372.00 | |
| | Fraction | 1/10 | 1/10 | 3/14 | |
| 2000 | Distribution Made | $92,274.00 | $199,609.00 | $138,941.00 | |
| | Account Balance | $830,472.00 | $1,796,482.00 | $1,790,012.00 | |
| | Fraction | 1/9 | 1/9 | 1/13 | |
| 2001 | Distribution Made | $97,818.49 | $219,707.65 | $153,356.84 | $77,027.43 |
| | Account Balance | $782,547.00 | $1,757,660.00 | $1,840,282.04 | $1,001,356.00 |
| | Fraction | 1/8 | 1/8 | 1/12 | 1/13 |
| 2002 | Distribution Made | $85,888.10 | $195,023.44 | $136,068.65 | $68,802.13 |
| | Account Balance | $601,216.00 | $1,365,164.00 | $1,496,755.00 | $825,625.00 |
| | Fraction | 1/7 | 1/7 | 1/11 | 1/12 |
| 2003 | Distribution Made | $69,069.42 | $161,556.82 | $112,750.07 | $57,433.30 |
| | Account Balance | $414,416.00 | $969,341.00 | $1,127,501.00 | $631,766.00 |
| | Fraction | 1/6 | 1/6 | 1/10 | 1/11 |
| 2004 | Distribution Made | $91,347.14 | $212,664.93 | $148,797.51 | $75,849.93 |
| | Account Balance | $456,735.00 | $1,063,324.00 | $1,339,177.60 | $758,498.00 |
| | Fraction | 1/5 | 1/5 | 1/9 | 1/10 |
| 2005 | Distribution Made | $103,346.56 | $240,660.89 | $167,821.08 | $85,504.90 |
| | Account Balance | $413,386.00 | $962,643.00 | $1,342,568.60 | $769,344.00 |
| | Fraction | 1/4 | 1/4 | 1/8 | 1/9 |
| 2006 | Distribution Made | $115,099.64 | $268,105.77 | $186,269.16 | $94,862.35 |
| | Account Balance | $345,298.92 | $804,317.27 | $1,303,884.11 | $758,898.82 |
| | Fraction | 1/3 | 1/3 | 1/7 | 1/8 |
| 2007 | | | No Distribution Made | | |
| 2008 | | | No Distribution Made | | |

## UNAUTHORIZED WITHDRAWALS BY CABRINI

| | PADULA | SALVIONI | TARANTA | MANNUCCI |
|---|---|---|---|---|
| NOVEMBER 2006 | $170,000.00 | $896,000.00 | $818,000.00 | $488,000.00 |
| APRIL 2007 | $83,113.57 | $185,669.40 | $135,558.26 | $67,974.81 |
| JULY 2007 | $12,719.44 | $29,785.91 | $347,020.94 | $217,785.86 |

1 Date of Birth: 11/25/1925; Date of Retirement: 10/1980
2 Date of Birth: 1/1/1925; Date of Retirement: 10/1980
3 Date of Birth: 4/18/1927; Date of Retirement: 5/7/1995
4 Date of Birth: 6/13/1926; Date of Retirement: 12/31/2000

# EXHIBIT P

**C A B R I N I** Medical Center

Healing New York one neighbor at a time[SM]

227 East 19th Street • New York, NY 10003 • (212) 995-6000

www.cabrininy.org

November 16, 2006

Danielle Salvione, M.D.
140 7th Avenue, Apt. 6N
New York, New York 10011

Dear Dr. Salvione:

As you may be aware, Cabrini Medical Center is in the midst of a major restructuring project intended to reverse the effects of several years of operating losses and ensure the future of the Medical Center. This turnaround effort is at a critical juncture and the Medical Center is in desperate need of working capital in order to maintain operations until the effects of this effort can be realized. As a result, we must temporarily move $396,000 from the deferred compensation investment account designated for your benefit into the Medical Center's general operating account. It is expected that these funds, along with any interest that would have accrued, will be returned to the deferred compensation investment account during 2007. We regret the fact that we must take this action at this time. Please be assured that Cabrini Medical Center is committed to fulfilling its obligation under the Deferred Compensation Agreement with you, including making the 2007 distribution, and will keep you informed of the progress of our efforts to replenish the deferred compensation investment account.

Sincerely,

Robert Chaloner
President/ CEO

Cc:  Peter Buscemi
     Kevin Dolan



A Facility of the Missionary Sisters of the Sacred Heart
A Member of the Mount Sinai Health System • An Affiliate of Mount Sinai School of Medicine
An Associate Member of the Catholic Health Care Network

November 16, 2006

Angelo Taranta, M.D.
100 Bay Place, Apt. 2111
Oakland, California 94610

Dear Dr. Taranta:

As you may be aware, Cabrini Medical Center is in the midst of a major restructuring project intended to reverse the effects of several years of operating losses and ensure the future of the Medical Center. This turnaround effort is at a critical juncture and the Medical Center is in desperate need of working capital in order to maintain operations until the effects of this effort can be realized. As a result, we must temporarily move $818,000 from the deferred compensation investment account designated for your benefit into the Medical Center's general operating account. It is expected that these funds, along with any interest that would have accrued, will be returned to the deferred compensation investment account during 2007. We regret the fact that we must take this action at this time. Please be assured that Cabrini Medical Center is committed to fulfilling its obligation under the Deferred Compensation Agreement with you, including making the 2007 distribution, and will keep you informed of the progress of our efforts to replenish the deferred compensation investment account.

Sincerely,

Robert Chaloner
President/ CEO

Cc:     Peter Buscemi
        Kevin Dolan



A Facility of the Missionary Sisters of the Sacred Heart
A Member of the Mount Sinai Health System • An Affiliate of Mount Sinai School of Medicine
An Associate Member of the Catholic Health Care Network

November 16, 2006

Mannuccio Mannucci, M.D.
21 East 90th Street, Apt. 5A
New York, New York 10128

Dear Dr. Mannucci:

As you may be aware, Cabrini Medical Center is in the midst of a major restructuring project intended to reverse the effects of several years of operating losses and ensure the future of the Medical Center. This turnaround effort is at a critical juncture and the Medical Center is in desperate need of working capital in order to maintain operations until the effects of this effort can be realized. As a result, we must temporarily move $486,000 from the deferred compensation investment account designated for your benefit into the Medical Center's general operating account. It is expected that these funds, along with any interest that would have accrued, will be returned to the deferred compensation investment account during 2007. We regret the fact that we must take this action at this time. Please be assured that Cabrini Medical Center is committed to fulfilling its obligation under the Deferred Compensation Agreement with you, including making the 2007 distribution, and will keep you informed of the progress of our efforts to replenish the deferred compensation investment account.

Sincerely,



Robert Chaloner
President/ CEO

Cc:    Peter Buscemi
       Kevin Dolan

A Facility of the Missionary Sisters of the Sacred Heart
A Member of the Mount Sinai Health System • An Affiliate of Mount Sinai School of Medicine
An Associate Member of the Catholic Health Care Network

# EXHIBIT Q



Jay P. Warren
Direct: 212-541-2110
Fax: 212-541-1466
jpwarren@bryancave.com

October 23, 2007

Bryan Cave LLP
1290 Avenue of the Americas
New York, NY 10104-3300
Tel (212) 541-2000
Fax (212) 541-4630
www.bryancave.com

Chicago
Hong Kong
Irvine
Jefferson City
Kansas City
Kuwait
Los Angeles
New York
Phoenix
Riyadh
Shanghai
St. Louis
United Arab Emirates (Dubai)
Washington, DC

And Bryan Cave,
A Multinational Partnership

London

**BY HAND**

Katherine B. Harrison, Esq.
Paduano & Weintraub LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020

Re: Cabrini Hospital Deferred Compensation Agreements

Dear Ms. Harrison:

We represent Cabrini Medical Center ("Cabrini"), and are writing in response to your letters dated August 9, 2007, September 10, 2007, and September 19, 2007, requesting certain documents relating to deferred compensation agreements between Cabrini (or its predecessors) and your clients, Dr. Mannucci, Dr. Padula, Dr. Salvioni and Dr. Taranta. Cabrini is the administrator with respect to those agreements.

Cabrini believes that the deferred compensation agreements between your clients and Cabrini constitute an ERISA Top Hat Plan, and, therefore, many of the documents which you requested are not required to be created or filed by a Top Hat Plan: e.g., summary plan descriptions and amendments, and reports filed with state or federal authorities. Based on Cabrini's searches of its files to date, such documents do not exist.

Without acknowledging that Cabrini has an obligation to do so, we are authorized to provide the following documents: (1) the Deferred Compensation Agreements executed by each of your clients (except for Dr. Mannucci, because, to date, Cabrini has been unable to locate an agreement signed by him); and (2) all correspondence between Cabrini and each of your clients (or other documents signed by your clients) with respect to the Deferred Compensation Agreements. These documents are being delivered to you along with this letter.

While Cabrini chose to maintain separate mutual fund accounts with respect to each Deferred Compensation Agreement, under the terms of each agreement the shares held in those accounts were the exclusive property of Cabrini. Those agreements provide: "Employee shall have no right in such mutual fund shares, which shall be the absolute property of the Corporation." At the end of 2006 (and continuing

Bryan Cave LLP

through 2007), Cabrini elected to close those separate accounts and transfer the account balances to its general accounts. The amounts transferred with respect to each of your client's agreements is:

| Dr. Mannucci | $771,843.47 |
|---|---|
| Dr. Padula | $265,962.29 |
| Dr. Salvioni | $619,645.51 |
| Dr. Taranta. | $1,298,724.74 |

Cabrini is currently determining what amounts may be owed to your clients in 2007 pursuant to the Deferred Compensation Agreements.

Thank you for your courtesy for agreeing to an extension of time to allow Cabrini to attempt to find the documents you requested.

Very truly yours,

Jay P. Warren

JPW/dlw

C054154/0213614/1451651.2