| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | NOT FOR PUBLICATION |

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| CABRINI MEDICAL CENTER, | : | Case No. 09-14398 (AJG) |
|  | : | Confirmed Case |
| Debtor. | : |  |
|  | : |  |
| CABRINI MEDICAL CENTER, | : |  |
|  | : |  |
| Plaintiff, | : |  |
| v. | : | Adv. No. 11-02261 (AJG) |
|  | : |  |
| GUIDO PADULA, DILVA SALVIONI,<br>ANGELO TARANTA, AND<br>MANNUCCIO MANNUCCI, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |
| MANNUCCIO MANNUCCI,<br>GUIDO PADULA, DILVA SALVIONI, AND<br>ANGELO TARANTA, | : |  |
|  | : |  |
| Plaintiffs, | : |  |
| v. | : | Adv. No. 11-02407 (AJG) |
|  | : |  |
| CABRINI MEDICAL CENTER, | : |  |
|  | : |  |
| Defendant. | : |  |

OPINION CONCERNING MOTIONS FOR SUMMARY JUDGMENT

Before the Court are two consolidated adversary proceedings concerning a dispute between Cabrini Medical Center ("Cabrini" or the "debtor") and three retired doctors formerly employed by Cabrini, as well as the widow of a fourth doctor (collectively, referred to as the "doctors") (certain references, however, include the period of time prior to the fourth doctor's

death and, therefore, in those instances, the reference includes the fourth doctor and not his widow). The adversary proceedings concern certain deferred compensation agreements that were entered into separately by Cabrini with each of the formerly employed doctors, prior to their retirement. Cabrini and the doctors have each filed motions seeking summary judgment in their favor, and have opposed the motion filed by the other.

Federal Rule of Civil Procedure ("Rule") 56(a) incorporated into bankruptcy practice by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7056 provides that summary judgment shall be rendered "if the movant shows that there no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The summary judgment standard is interpreted in a way to support its primary goal of "dispos[ing] of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). Where no triable issue of material fact exists, applying the summary judgment procedure is not a disfavored procedural shortcut, but an integral part of the Federal Rules. *Id.* at 327, 106 S. Ct. at 2555.

The Court has reviewed the pleadings and exhibits filed, and has considered the parties arguments at the hearing. For the purposes of their motions, the Court incorporates the Joint Stipulated Statement of Undisputed Material Facts submitted by the parties in support of their respective motions for summary judgment.

The underlying dispute at issue concerns whether the funds subject to each deferred compensation agreement is property of the debtor's estate or whether it is excluded or exempted from the debtor's estate under sections 541(b)(7) and 547(d) of the Bankruptcy Code.

*Parties' Contentions*

Cabrini argues that the plain language of the agreements establish that the funds accumulated pursuant to the deferred compensation agreements remained Cabrini's property; that the absence of trust language in the agreements establishes that the funds were not held in trust for the doctors; that because the funds were not contributed or withheld from the doctors, the funds are not excluded from the debtor's estate pursuant to section 541(b)(7) of the Bankruptcy Code; and, finally, that even if the funds were determined to be trust funds by statute or under common law theories, the absence of a res precluded a trust from attaching.

The doctors argue that, pursuant to section 541(b)(7) Bankruptcy Code, the deferred compensation funds are excluded from the debtor's estate because they were part of a pension benefit plan. Alternatively, the doctors argue that, pursuant to section 547(d) of the Bankruptcy Code, the funds are exempted from the debtor's estate because the funds were held by Cabrini in trust for the doctors.

## *DISCUSSION*

A plan in which an employer agrees to pay an employee deferred compensation at a specified time is considered unfunded where the employer does not set aside the funds in an escrow, trust fund, or otherwise. *Schroeder v. New Century Holdings, Inc. (In re New Century Holdings, Inc.)*, 387 B.R. 95, 109 (Bankr. D.Del. 2008). Therefore, a plan is unfunded when it will be paid from the general assets of the employer. *In re Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283, 287 (2d Cir. 2000). "Amounts deferred into an unfunded plan remain part of the general assets of the [employer] subject to the claims of general unsecured creditors." *In re The Colonial Bancgroup, Inc.* 436 B.R. 695, 712 (Bankr. M.D. Ala. 2010). As noted by the *Colonial Bancgroup* court, "if such were not the case, the amounts

3

deferred would be taxed as income to the participants." *Id*. at 712 n.26.

Therefore, the terms of a plan must be examined to determine whether it establishes that the employee has greater rights than the general unsecured creditors of an employer to a specific set of funds from which the deferred compensation will be paid. *Id*.

Although the agreements are substantially similar, there are certain distinctions in the three formats that were utilized for the various plans. One agreement provides that the additional compensation would be set aside in an account opened in Cabrini's name to be invested in securities and the securities would remain Cabrini's property. Certain of the other agreements provide that the deferred compensation money would be used to purchase mutual funds in Cabrini's name, and that the mutual funds would remain Cabrini's property. In those agreements, the parties could agree to substitute the mutual fund or investment medium that served as the measured base. The third format provided that the amount of deferred compensation would be "set aside" on Cabrini's "books and records." If consented to by Cabrini, this third type of agreement allowed for a designation of a mutual fund that would function as a measured base to determine the benefits payable under the agreement. In addition, the parties could agree to substitute the mutual fund with another or a different investment measure. Cabrini had the option to purchase shares of any such mutual fund, however, if such shares were purchased, those shares were to remain Cabrini's property. Further, there was no obligation for Cabrini to purchase any such shares. In addition, all of the agreements purport to place the employee's interests in the deferred income outside of the reach of the creditors of the employees.

The doctors argue that, although the agreements provide that the securities remain

4

Cabrini's property, the value of the securities should be separated from the ownership of the securities and treated as property of the doctors. In support of this position, the doctors point to the reference in certain of the agreements to the mutual fund or other investment medium serving as the measured base for determining the amount payable to the doctors. The doctors further note that Cabrini was not even obligated to purchase the designated mutual fund.

With respect to the plan where Cabrini had the option to purchase the shares of an agreed-upon mutual fund, it is clear that the agreement did not require funds to be segregated. The fact that any mutual fund or investment vehicle utilized was intended to serve as a notional base and the absence of any requirement to purchase shares of even a designated mutual fund make clear that the plan was unfunded. This particular plan clearly provides that Cabrini would "set aside on its books and records" the requisite amount "for the purpose of providing the benefits set forth [under the agreement]." The agreement afforded the employee an option to designate a mutual fund to serve as a measuring base. However, any such designation required Cabrini's consent, and even if such consent were forthcoming, Cabrini still had the choice of whether it purchased such securities or not. The agreement further clarified that even if Cabrini purchased any securities, those shares would be belong to Cabrini. It appears that the set aside for the doctor in that particular agreement was just a bookkeeping entry because Cabrini did not even have to agree to designate a mutual fund or purchase any shares. If no shares were purchased, whether a fund was designated or not, then any disbursements due the doctors would have to come from general corporate assets. If shares were purchased, those shares would belong to Cabrini. However, the fact that the designation of a mutual fund was merely to provide a notional measure suggests that the doctors' claim against Cabrini was a general claim

against its assets. Nevertheless, there is an allegation that Cabrini did set up a segregated accounts for this particular account.

With respect to the agreements that provided that the employer would purchase particular mutual fund shares at the outset, the agreements provided that the employer would purchase those shares in its name and they would be the property of the employer. In one instance, the agreement also specified that the account would be in the employer's name.

Although the debtors have made a strong case that the property remained the debtors, including that there is no language giving the employees any rights to a particular fund or, alternatively, that the plans were likely "top hat" plans[1] not covered by ERISA, it is premature at this stage to determine the owners of the funds.

There are factual issues concerning whether the plans were funded or unfunded, whether the plans were "top hat" plans, or whether the plans qualified as ERISA plans. Although, there are factual issues concerning those aspects, nevertheless, as will be described in the section on constructive trusts, once the funds were commingled with Cabrini's general operating funds, it was necessary for the doctors to trace such funds to establish a constructive trust. The doctors have not attempted to trace the funds but seek a relaxing of the tracing requirement.[2]

---

[1]Although a "top hat" plan may provide for a trust into which the employer deposits funds to pay any deferred compensation obligations to employees, nevertheless, as long as the employees have no interest in the trust and the trust assets remain part of the employer's general assets, the fact that a trust was established does not affect the plan's "unfunded" status. *In re Washington Mutual, Inc.*, 450 B.R. 490, 494 (Bankr. D. Del. 2011). Thus, as previously discussed, whether employees are taxed on the amounts set aside would be an indication of whether they owned and controlled the funds or whether the funds remained the property of the employer and part of its general assets. *New Century Holdings*, 387 B.R. at 109-110.

[2]The debtor also argues that the funds at issue are not eligible for exemption from property of the estate under section 547(b)(7) of the bankruptcy code because the funds were neither "withholdings" nor "contributions" from the employee. *In re Downey Regional Medical Center-Hospital, Inc.*, 441 B.R. 120, 130 (B.A.P. 9th Cir. 2010); *but see Colonial Bancgroup*, 436 B.R. at 712 (arguing that there are weaknesses in this theory). In light of

6

*Express Trust*

Turning to the trust argument, none of the agreements contain the language required to establish a trust. An express trust requires four elements: (i) a designated beneficiary; (ii) a designated trustee who is not the beneficiary; (iii) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (iv) the actual delivery of the fund or other property, or the legal assignment thereof to the trustee, with the intention of passing legal title thereto to him or her as trustee. *LFD Operating, Inc. v. Ames Dep't. Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 274 B.R. 600, 623 (Bankr. S.D.N.Y. 2002). Further, pursuant to New York law, "if there is no distinct trust fund but merely a general obligation to ultimately pay a sum of money, then there is no trust, but only a debt. *Id*. at 624 (citing, *Petition of Travers*, 32 N.Y.S.2d 742, 743, 177 Misc. 1044, 1046 (Sup. Ct. Kings Co. 1941); and *Warner-Quinlan*, 86 F.2d 103, 104 (2d Cir. 1936).

There is no trustee designated in any of the agreements. Nor is there any language setting up an express trust. Section 541(a) provides that, with certain exceptions, a debtor's estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." Although section 541(d) exempts from property of the estate any equitable interest in property that the debtor does not hold, such as the equitable interest in property held in trust for another, no express trust was established by the terms of the agreements.

The doctors contend that the fact that their interests in the deferred compensation are not

---

the Court's ultimate determination concerning the implications of commingling the funds, the Court does not address this argument.

subject to forfeiture supports their position that they should not have the benefits taken from them. The non-forfeiture provisions, however, relate to each doctor's respective *claim* against the estate. The doctors retain their claims against the estate, which have not been forfeited. *See Colonial Bancgroup*, 436 at 706 (noting that a claim accrued when funds were deferred into the plan and the claim remains despite the pending bankruptcy). With respect to their claims, the doctors are general unsecured creditors on equal footing with all of the other general unsecured creditors who will share in the assets of the estate.

The doctors also contend that because their interest in the deferred compensation has vested, the debtor is precluded from depriving them of their property interest. Although an employee with a vested interest against his employer does not lose that interest upon termination of his employment, nevertheless, in the context of an insolvent employer, what the employee retains for his vested interest is his *claim* against the estate. The doctors still have that claim. However, that "vested" claim was subject to the risk of the employer's insolvency. *See Colonial Bancgroup*, 436 at 707 (noting that "vested" and "funded" are distinct concepts and the payment of a vested claim is subject to risks, including the insolvency of an employer at which point the employee holds a general unsecured claim).

Pursuant to the plain language of the agreements, there were no express trusts created and no assets held in trust for the doctors that would be exempted from the estate pursuant to section 541(d) of the Bankruptcy Code.

Alternatively, the doctors argue that even if the funds were initially Cabrini's property pursuant to the terms of the agreements, those funds became the doctors property upon their retirement - two doctors in 1980, one in 1995, and the third in 2000. The doctors contend that

8

because the distributions were not made when required under the terms of the plan, the employer became a trustee of the funds and a constructive trust should be imposed upon the funds. The doctors further contend that Cabrini funded the doctors interests when it set up the respective Merrill Lynch accounts in 1998 for the doctors. The doctors also reference the duplicate statements that they received on those accounts.

The fact that Cabrini opened the separate Merrill Lynch accounts reflecting the doctor's names and that the doctors periodically received duplicate statement accounts reflecting the balances would not change the legal ownership of the funds. *See Colonial Bancgroup*, 436 B.R. at 708. If the doctors had no control over either the accounts or the funds in the accounts, then the separate accounts would serve as a record-keeping mechanism to facilitate the debtor's ability to comply with its obligations under the terms of the plan.

Finally, even if the funds were part of a funded plan subject to ERISA or later became the doctor's property when placed in the Merrill Lynch accounts, prior to their being swept into and commingled with the debtor's general operating funds, the doctors acknowledge that such commingling occurred in 2006 and 2007. Thereafter, Cabrini used the operating funds and, at the time of the filing, only approximately $221,000 remained in the debtor's account.

*Constructive Trust*

Pursuant to New York law, to impose a constructive trust, four elements must be established: (i) a confidential relationship or fiduciary relationship; (ii) a promise, express or implied; (iii) a transfer made in reliance on that promise; and (iv) unjust enrichment. *Ames*, 274 B.R. at 625. In addition, the claimant must "establish proof of a *res* to which the constructive trust could attach and . . . [must] trace the property. *Id*. at 625 n. 16. *See also In re Washington*

*Mutual, Inc.*, 450 B.R. 490, 503-04 (D. Del 2011).

The debtor argues that the doctors fail to establish a constructive trust under New York law because they fail to establish a *res*. The debtor notes that, at most, there was only approximately $221,000 at the time of filing and the doctors fail to trace their funds to that amount. The debtor asserts that the monies used to fund the debtor's operation post-petition came from the post-petition DIP financing and the monies used to fund the debtor's plan came from the sale of the real estate.

The doctors argue that they can trace the funds to the debtor's real property because the funds attributable to their deferred compensation funds were transferred to the debtor's general operating account, from which account mortgage payments were made on the properties that were subject to the sale. Therefore, the doctors seek to impress a constructive trust upon the proceeds of the sale of the debtor's real property.

Here, to the extent the doctors' argument for a constructive trust is premised on the written agreement, such agreement precludes a claim for a constructive trust. *First Central Superintendent of Ins. v. Ochs (In re First Central Fin. Corp.)*, 377 F.3d 209, 213-15 (2d Cir. 2004).

To the extent their argument is premised upon rights concerning the funds under ERISA, those funds were transferred from the Merrill Lynch accounts to the debtor's general operating account in 2006 and 2007. Thereafter, Cabrini operated the hospital for more than two years after the funds were transferred, using the funds in the general account for all expenses and continuing operations. In addition, during that period, the general account was replenished with new flows of income from various sources. The doctors have not attempted to trace the funds,

and acknowledge that they could not trace their funds to either mortgage payments or to the $221,000 remaining on hand at the petition date.[3]

Although the doctors concede that they could not trace the funds, they have asked that the Court "relax" the tracing requirement. In support, the debtors cite certain cases in which courts have indicated that, under certain circumstances, it would be appropriate to relax the requirement for tracing assets.

The party seeking to impose a constructive trust is required to trace its interest to "identifiable property" held by the alleged constructive trustee. *Wilde v. Wilde*, 576 F.Supp. 2d 598, 605 (S.D.N.Y. 2008). Where the purported misappropriated funds are commingled with other funds, "the constructive trust extends only to the portion traceable to the misappropriated funds." *Id*. The *Wilde* court noted, however, that "in limited situations the tracing requirement may be relaxed." *Id.*

In *Wilde* the court required the plaintiffs, who had been defrauded by a relative to whom they had given a power of attorney, to meet the tracing requirement in most instances, notwithstanding the fact that the defrauded plaintiffs could only trace a fraction of their losses. The court only permitted a relaxing with respect to a small portion of the amount attributable to certain automobiles and jewels that had been purchased with the aggrieved party's funds, once the plaintiffs had traced the greater portion of the purchase price to their funds. *Id*. at 607.

---

[3] The doctors argue that as a wrongdoer, Cabrini should be presumed to have spent its own money first, thereby allowing the doctors to assert their claims against any funds remaining in the general operating account. However, even if Cabrini were to have breached its fiduciary duty rendering it a "wrongdoer," the theory advanced is inapplicable if at any time after the commingling, the account is depleted. Here, the doctors have not established that the amount of cash in the general operating account was not entirely depleted at any time after their funds were commingled but prior to the filing date. Inasmuch as, prior to the filing, funds were flowing in and out of the account for years, the balance in that account could have been depleted and replenished several time during that period, with subsequent cash flows resulting in the approximate $221,000 balance at the time of filing.

The concept of softening the harsh consequences of the tracing requirement stems from *Simonds v. Simonds*, 45 N.Y.2d 233, 239-40, 408 N.Y.S.2d 359 (N.Y. 1978), and *Rogers v. Rogers*, 63 N.Y.2d 582, 586, 483 N.Y.S.2d 976 (N.Y. 1984). In each of these cases, after a divorce, a husband had been obligated to maintain an insurance policy to benefit the first wife. After the husband's death, it was discovered that the policy had been allowed to lapse and the first wife sought to impose a constructive trust on a policy that the husband had purchased, subsequent to his purchase of the first policy, for the benefit of the second wife.

The courts in *Simonds* and *Rogers* reasoned that the subsequently-purchased policies, although not technical replacements for the earlier policies, served the purpose of a replacement or substitute for the lapsed policy, and the courts relaxed the tracing requirement to impose the constructive trust. Simonds, 45 N.Y.2d at 239, Rogers 63 N.Y.2d at 587. A major distinction between those cases and this case is that in the lapsed-policy cases, the earlier purchased policies were not liquidated. There were no funds that emanated from the prior-lapsed policy to trace. Instead, those policies merely ceased to exist after the husband stopped making payments. Thus, those courts reasoned that the later-purchased policies should be considered substitutes for the earlier policies.

Moreover, none of the cases where the tracing requirements were relaxed involved a large operational business where funds were integrated into the business and flowed in and out of the general operating account that funded the continuation of the business for a substantial period of time.

The doctors also argue that the tracing requirement should be relaxed in the event that it were determined that Cabrini breached a fiduciary duty to them. However, the alleged breach in

commingling the funds occurred in 2006 and 2007. The doctors should have acted sooner to protect their interests by seeking injunctive relief soon after the funds were allegedly commingled.

The doctors contend that they took action in that they first telephoned Cabrini to try to get information and later - starting in September 2007 - sent letters asking for information and inquiring as to the status of their funds. However, the doctors did not seek any injunctive relief in state court to segregate the funds or to prevent the funds from being dissipated. Therefore, they did not preserve the integrity of the alleged trust.

Moreover, although the doctors' claims are not sufficient to warrant the imposition of a constructive trust under traditional state law requirements, they are seeking a relaxing of the requirements based upon equitable considerations. However, in the cases where the tracing requirement was relaxed, there was a nexus between the previous equitable interest and either the property that replaced it or the subsequent equivalent wealth. Here, with the breadth and scope of the debtor's business, combined with the long period during which the funds were integrated into this large complex business enterprise, there is not a sufficient nexus between the funds in the Merrill Lynch accounts and either the real property or the $221,000 held by the debtor at the time it filed the bankruptcy petition. The Court concludes that a relaxing of the tracing requirements is not warranted in this case.

Moreover, in the bankruptcy context, it is important "to act very cautiously to minimize conflict with the goals of the Bankruptcy Code," even while recognizing the requirement of applying constructive trust law, *see First Central*, 377 B.R. at 217 (citations and internal quotations omitted). Here, where the doctors have not met the traditional standard for a

13

constructive trust, it would be inequitable to deprive the general creditors of this value. Rather, it is more equitable to treat all creditors of the debtor ratably.

*CONCLUSION*

The Court concludes that, with respect to the agreements, there are factual disputes concerning whether they meet the ERISA standards for a funded plan or whether the plans are unfunded. Moreover, even if a trust were created, there are factual issues concerning whether the plans, nevertheless, are unfunded "top hat" plans.

The Court further concludes that, pursuant to the plain language of the agreements, there were no express trusts created and no assets held in trust for the doctors that would be exempted from the estate pursuant to section 541(d) of the Bankruptcy Code.

Notwithstanding these conclusions, even if the doctors were able to establish that the plans met the requirement for funded plans pursuant to ERISA and that Cabrini had fiduciary obligations to the doctors, once the funds were commingled with the funds in the debtor's general operating account, the doctors would be required to trace their funds to an identifiable res. The doctors acknowledge that they cannot trace such funds.

The Court further concludes that, to the extent that the doctors seek to impose a constructive trust based upon the written agreements, such agreements precludes a claim for constructive trust. To the extent that the claim to impose the constructive trust is premised upon rights concerning the funds under ERISA, once those funds were commingled with the debtor's general operating account, the doctors did not adequately trace the funds as required to impose a constructive trust.

The Court further concludes that relaxing the tracing requirements is not warranted in

this case.  First, the facts of this case are not similar to those in which the tracing requirement was relaxed because there is no nexus between the doctor's previous interest and either the real property or the $221,000 held by the debtor at the time it filed the bankruptcy petition.  The commingled funds were integrated into a large complex business enterprise, which continued to operate for several years.  Further, although the doctors took some actions once they became aware of the commingling, they did not seek immediate relief to segregate the funds to prevent them from being dissipated.

      Therefore, because the funds were commingled and the tracing requirement is not met, summary judgment is granted to Cabrini and each of the doctors' claims is allowed as an unsecured claim.  The parties indicated that there was a discrepancy concerning the actual amount of the claims.  The parties should confer concerning that issue, however, if they are not able to resolve it, they should contact Chambers to schedule a hearing on the issue.

      The doctors' motion for summary judgment is denied.

      Counsel for the debtors is to settle an order consistent with this Opinion.


Dated: New York, New York
      February 16, 2012


                                **s/Arthur J. Gonzalez**
                                Chief United States Bankruptcy Judge